# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JORDAN HOSPITAL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 07-01160 (JDB) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(1), Defendant, Michael O. Leavitt,

Secretary of Health and Human Services, by and through his undersigned counsel, respectfully

moves this Court to dismiss Plaintiff's complaint for the reasons set forth in the attached

Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss.

A proposed order is attached.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610

_____/s/_____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
N.Y. Reg. No. 4202982
Civil Division
555 4th St., N.W.
Washington, D.C. 20530
(202) 307-0372


_____/s/_____
BRIDGETTE KAISER
Attorney
D.C. Bar No. 492406
U.S. Department of Health and Human Services
Office of the General Counsel-CMS Division
Room 5309 Cohen Building
330 Independence Ave., S.W.
Washington, D.C. 20201
(202) 205-5872

OF COUNSEL:

JAMES C. STANSEL
Acting General Counsel

CAROL J. BENNET
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

United States Department of
Health and Human Services

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JORDAN HOSPITAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 07-01160 (JDB) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

### INTRODUCTION

Plaintiff, Jordan Hospital, is a hospital located in Plymouth, Massachusetts which participates in the Medicare program. Plaintiff has brought this action against Defendant Michael O. Leavitt, Secretary of Health and Human Services ("the Secretary"), seeking judicial review of an interim agency decision. Specifically, Plaintiff's amended complaint challenges the interim decision of the CMS Administrator to remand this case to lower agency officials for further proceedings. Plaintiff's amended complaint nowhere challenges a final decision by the Secretary. Under the Medicare statute, 42 U.S.C. § 1395oo(f)(1), district courts have jurisdiction to review only final decisions of the Secretary. Therefore, this Court does not have jurisdiction to entertain Plaintiff's complaint.

### STATUTORY AND REGULATORY FRAMEWORK

### I. The Medicare Program

Title XVIII of the Social Security Act ("Medicare statute") establishes the Medicare program, a federally funded health insurance program that provides payment for covered

services furnished to aged and certain disabled persons.  See generally 42 U.S.C. §§ 1395-

1395hhh.  Under Part A of the statute, the program provides payment for certain inpatient

hospital and post-hospital extended care services, including skilled nursing services.  42 U.S.C.

§§ 1395c, 1395d, 1395i, 1395x(b), (i).[1/]  The Medicare program is administered by the Centers

for Medicare & Medicaid Services ("CMS"), which is a component agency of the Department of

Health and Human Services.

An institution or distinct part of an institution that primarily furnishes either skilled

nursing care and related services or rehabilitation services is known as a "skilled nursing

facility" ("SNF").  42 U.S.C. §§ 1395i-3(a), 1395x(j), (u).

**A.  Reasonable Cost Reimbursement**

Prior to 1998, the Medicare program paid SNFs for providing covered services in an

amount equal to the lesser of the "reasonable cost" of or the customary charge for such services.

See 42 U.S.C. § 1395f(b)(1); 42 C.F.R. § 413.1(a)(2)(ii), (b), (g).[2/]  "Reasonable cost" is

statutorily defined to be the cost actually incurred in providing services, excluding all costs

"found to be unnecessary in the efficient delivery of needed health services."  42 U.S.C.

§ 1395x(v)(1)(A); cf. id. at § 1395x(v)(7)(D).  Congress has vested the Secretary with broad

authority to refine this definition through regulation and has specifically authorized the Secretary

to issue regulations establishing upper "limits on the [costs] to be recognized as reasonable based

---

[1/] Providers of services must enter into agreements with the Secretary in order to participate in and obtain payment from the Medicare program.  See 42 U.S.C. §§ 1395g, 1395cc.

[2/] For cost reporting periods beginning on or after July 1, 1998, SNFs are no longer reimbursed on a reasonable cost basis and, instead, are reimbursed under a "prospective payment system" ("PPS").  See 42 U.S.C. § 1395yy(e)(1), (e)(2)(D)-(E); 42 C.F.R. § 413.1(g)(2)(i).

2

on estimates of the costs necessary in the efficient delivery of needed health services." See id. § 1395x(v)(1)(A).

The congressional mandate that Medicare reimburse only reasonable costs applies to routine service costs. See H.R. Conf. Rep. No. 105-217, at 753-54 (1997), reprinted in 1997 U.S.C.C.A.N. 176, 374-75; cf. 42 U.S.C. § 1395yy(e)(2)(B) (defining skilled nursing facility "costs" for purposes of prospective payment). Routine service costs are those costs incurred in providing services for which patients normally pay a single, daily inpatient service charge. The costs of these services reflect the SNF's cost of providing a bed and basic services for each patient. See 42 C.F.R. § 413.53(b); CMS Pub. 15-1, Provider Reimbursement Manual Pt. 1 §§ 2202.6, 2203.1 (hereinafter "PRM-1").[3] It is this reasonable cost limit – known as the routine service cost limit – from which Jordan Hospital sought an exemption available to "new" providers.

**B. Routine Service Cost Limits ("RCLs")**

Congress has determined that whenever a SNF's (non-capital) routine service costs exceed certain per diem cost limitations, the costs exceeding the cap are unreasonable and unnecessary "in the efficient delivery of health services." See 42 U.S.C. §§ 1395x(v)(7)(D), 1395yy(a).[4] Accordingly, the Secretary's per diem "routine service cost limits" place a ceiling on the amount of non-capital routine service costs that Medicare will reimburse per day of patient

---

[3] The Provider Reimbursement Manual, which contains CMS's interpretive rules regarding Medicare reimbursement, see Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 99 (1995), is available on-line at http://cms.hhs.gov/Manuals/PBM/list.asp.

[4] The cap does not limit reimbursement for capital costs. See H.R. Conf. Rep. No. 105-217 at 753, supra.

3

care.  Cf. 42 C.F.R. § 413.30(a)-(b) (1996) (setting forth limitations on payable costs).

The per diem routine service cost limit ("RCL") that is applicable to a specific SNF is determined by taking the average amount of per diem routine service costs incurred by SNFs of its type nationwide, adjusting this average to reflect the prevailing wage rates near the SNF, and setting the limit for free-standing SNFs at 112% of the adjusted average.  See id. at § 1395yy(a); see also St. Francis Health Care Ctr. v. Shalala, 205 F.3d 937, 940 & n.3 (6th Cir. 2000) (explaining RCLs); 57 Fed. Reg. 46,177, 46,177, 46,179-80 (1992) (explaining methodology of calculating RCLs).  Roughly speaking, this limit allows a SNF to be reimbursed for per diem routine service costs up to 12% higher than average, thereby "encourag[ing] providers with high[er] costs to bring their expenditures into line with their more efficient peers."  See 44 Fed. Reg. at 51,544.[5/]

A SNF's total routine service cost limit over the course of a multi-day period is calculated by multiplying the per diem limit by the number of days of inpatient care that the SNF has provided to Medicare patients.  Because a single inpatient day for a single Medicare patient counts as one day of care, a 15-bed SNF that has 10 inpatients each day during a 10-day period will provide 100 days of patient care during that period.  Such a SNF could then be reimbursed for (non-capital) routine service costs equal to 100 times the applicable per diem RCL.[6/]

---

[5/] Hospital-based SNFs (like Plaintiff's here) benefit from a higher cost limit than that applicable to free-standing SNFs.  The RCL for a hospital-based SNF equals the free-standing limit plus one-half of the difference between the free-standing limit and 112% of the average per diem routine service costs of hospital-based SNFs.  See 42 U.S.C. § 1395yy(a)(3)-(4); St. Francis, 205 F.3d at 940 & n.3 (explaining higher limit).

[6/] A SNF's non-capital routine service costs are calculated by subtracting the SNF's capital-related routine service costs from the total amount of routine service costs.

### C.  The New Provider Exemption

Recognizing that routine service cost limits may sometimes warrant adjustment when applied to a particular SNF, the Secretary has exercised his broad statutory authority to adjust the cost limitations "to the extent [he] deems appropriate" through a regulation that authorizes the agency to award "exemptions" from and "exceptions" to the limits.  See 42 U.S.C. § 1395yy(c); 42 C.F.R. § 413.30(e)-(f) (1996).  While the "exceptions" created by this regulation can increase a SNF's routine service cost limit to account for the specific circumstances warranting the exception, the "exemption" found in section 413.30(e) completely exempts a SNF from the application of the routine service cost limits.  See 44 Fed. Reg. 31,802, 31,802 (1979).[7]

The new provider exemption was created in 1979 to address the "problem[] of initial underutilization" that new inpatient facilities may face.  See 44 Fed. Reg. at 31,802; see also PRM-1 § 2533.1.A (1997).  Such underutilization reflects a reduction in the number of days of patient care that a new facility provides (relative to other SNFs) and has the effect of reducing the amount of reimbursement calculated from the applicable per diem RCL.  Recognizing the "great difficulty [of] meeting applicable cost limits" in such circumstances, the Secretary established the exemption to authorize (but not require) the Department to exercise its discretion to provide new providers with "relief from the[] cost limits" during their initial years of operation.  See 42 C.F.R. § 413.30(e) (1996) (Department "may" grant exemption to new provider); 44 Fed. Reg. at 31,802.

---

[7] If the Secretary grants an exemption for a specific cost reporting period, he will not apply the requisite RCLs to cap the provider's routine service costs, but will apply other criteria regarding the reimbursement of "reasonable" costs.  See e.g., 42 C.F.R. § 413.9(c)(2) (costs "substantially out of line" with other providers are not reasonable).

During the period relevant to this litigation, the exemption defined "new provider" to mean a provider of inpatient services that

> has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years.

42 C.F.R. § 413.30(e) (1996); see also PRM-1 § 2604.1.[8]  While the exemption does not define the term "previous ownership," CMS's Provider Reimbursement Manual lists several transactions that constitute a "change of ownership" ("CHOW").  See PRM-1 § 1500 (1985).

## II.  Administrative and Judicial Review

A provider must file an annual cost report with its fiscal intermediary in order to receive Medicare reimbursement.  42 C.F.R. § 413.20.  After receiving the cost report, the fiscal intermediary audits it where necessary and makes a final determination of the total amount of Medicare reimbursement owed to the provider, which is set forth in an initial notice of program reimbursement ("NPR").  42 C.F.R. §§ 405.1803, 413.20, 413.60.  If the provider is dissatisfied with any aspect of the reimbursement set forth in the initial NPR, it may request a hearing before the Provider Reimbursement Review Board ("PRRB" or "Board").  The PRRB is an administrative tribunal appointed by the Secretary.  The Medicare statute provides that two of the Board members must be provider representatives.  42 U.S.C. § 1395oo(h).  The Medicare statute also provides that, in order to qualify for PRRB review, the amount in controversy must

---

[8] The new provider exemption was first promulgated in 1979 as 42 C.F.R. § 405.460(e)(2), but was subsequently redesignated in 1986 as 42 C.F.R. § 413.30(e)(2), and in 1995 as 42 C.F.R. § 413.30(e).  See 60 Fed. Reg. 45,778, 45,840, 45,849 (1995); 51 Fed. Reg. 34,790, 34,790 (1986); 44 Fed. Reg. 31,802, 31,804 (1979).  After the time relevant to this litigation, minor editorial changes were made to the exemption, which was moved to its current location at 42 C.F.R. § 413.30(d).  See 64 Fed. Reg. 42,610, 42,611-13 (1999).

be at least $10,000 (at least $50,000 for a group appeal), and the hearing request must be submitted within 180 days of the initial NPR.  42 U.S.C. § 1395oo(a), (b).

A request for a new provider exemption must be submitted to the fiscal intermediary within 180 days of the initial NPR.  42 C.F.R. § 413.30(c).  The fiscal intermediary makes a recommendation to CMS, which, in turn, makes a decision on the provider's exemption request. 42 C.F.R. § 413.30(d).  CMS's decision is subject to PRRB review, and the 180-day period in which a hearing request must be submitted following the initial NPR is tolled pending CMS's decision.

If the jurisdictional prerequisites are satisfied and the PRRB has authority to decide the matter at issue, see 42 C.F.R. § 405.1867, the PRRB may hold a hearing and issue a decision, which is subject to further (discretionary) review by the CMS Administrator, on behalf of the Secretary.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875.  If the Administrator decides to review a Board decision, "the Administrator will affirm, reverse, modify or remand the case." 42 C.F.R. § 405.1875(g)(1).  After remand, a new decision of the Board "will be final unless the Administrator reverses, affirms, modifies, or again remands the decision . . . ."  42 C.F.R. § 405.1875(h)(4).

The Medicare statute authorizes the provider to request judicial review, within 60 days of the final agency decision, in a federal district court with venue.  42 U.S.C. § 1395oo(f)(1).  The Medicare statute further provides that 42 U.S.C. § 1395oo(f)(1) is the exclusive jurisdictional basis for judicial review of all aspects of Medicare provider reimbursement disputes.  42 U.S.C. §§ 405(h), 1395ii; Heckler v. Ringer, 466 U.S. 602, 614-15 (1984).

## STATEMENT OF FACTS

### I.  Factual Background

Plaintiff Jordan Hospital is a non-profit, general acute care hospital.  Exhibit ("Ex.") 1 at 3 (Feb. 28, 2007 PRRB Decision ).  Plaintiff opened the Peter Chapman Transitional Care Unit ("PCTCU"), a twenty-five bed hospital-based skilled nursing facility ("SNF") in December of 1995.  Ex. 2 at 1. (Apr. 30, 2007 Decision by CMS Administrator).  At that time, Massachusetts law required Plaintiff to obtain a Determination of Need ("DON") before opening its new SNF. Id. at 2.  In 1992, Massachusetts imposed a moratorium on DON applications.  Id. However, the state did have an exception process whereby it would issue a DON to open a new SNF if the entity wishing to open the SNF first arranged by contract for the closure of another nursing facility interested in closing its beds.  Id.  The SNF would then apply to the state to acquire the closing facility's right to operate its facility.  Ex. 1 at 3.

Plaintiff entered into a contract with Shirley Dionne, operator of Greenlawn Nursing Home, which provided that Ms. Dionne would surrender her license to operate Greenlawn and would assist Plaintiff in obtaining from the state the right to operate a SNF.  Id.  In March 1995, the state granted approval to Greenlawn to suspend its license as of January 11, 1995, the date by which Greenlawn had transferred its last patient out of its facility.  Id.  In May 1995, Plaintiff was notified that the PCTCU could be licenced.  Id.  However, the suspension of Greenlawn's license was extended until Plaintiff's facility was constructed.  Id.  A license was issued to PCTCU in December 1995.  Id. at 3-4.[9]

---

[9] In 1996 Massachusetts established an alternative basis for the issuance of DONs.  Ex. 1 at 4. As a result of this change, in September 1996, the state issued a new DON to Plaintiff, retroactive to December 8, 1995.  Id.

On June 17, 1997, Plaintiff applied to its fiscal intermediary ("FI") for a "new provider exemption" from the routine cost limits for the fiscal year ending September 30, 1998. Amended Complaint ("Am. Compl.") ¶ 30. Because the Plaintiff had been reassigned to a new FI, the application was returned to it in July 1997. Ex. 1 at 4. On December 31, 1997, Plaintiff resubmitted its exemption application to its new FI. Id. CMS subsequently denied Plaintiff's exception request on the basis that 1) Plaintiff's purchase of Greenlawn Nursing Home, including its bed rights and DON rights, necessitated a review of the services furnished by *Greenlawn* during the three year look-back period; 2) Greenlawn provided services equivalent to a SNF during the look-back period; and 3) PCTCU and Greenlawn served the same inpatient population. Id.; Am. Compl. ¶ 31. The NPR reflecting CMS's denial of Plaintiff's exemption request issued on September 25, 2000. Id. ¶ 32; Ex. 1 at 4.

## II.  Procedural Background

Plaintiff timely appealed the NPR, including the agency's denial of the exemption request, to the PRRB. Ex. 1 at 4. The PRRB held a hearing on the record on December 15, 2005. Id. at 1. On February 28, 2007, the PRRB issued a decision reversing CMS's denial of Plaintiff's exception request. Id. at 9. Although Plaintiff's appeal concerned only fiscal year end 1998, and although Plaintiff did not have appeals pending for the 1996 or 1997 cost reporting periods, the Board majority granted the exemption for 1996, 1997 and 1998. Id.

The CMS Administrator reviewed the PRRB decision and the entire record. Ex. 2 at 13. On April 30, 2007, the Administrator vacated the PRRB's decision and remanded the matter to CMS for a determination on Plaintiff's application for an exemption taking into consideration a recent decision of the U.S. Court of Appeals for the District of Columbia Circuit. Ex. 2 at 15;

9

<u>see</u> <u>St. Elizabeth's Med. Ctr. of Boston v. Thompson</u>, 396 F.3d 1228 (D.C. Cir. 2005).[10/] Because the Administrator's decision remanded this matter to CMS, it was an interim decision – it was not a final determination of the Secretary subject to review under the Medicare statute.  42 U.S.C. § 1395oo(f)(1).  Nevertheless, Plaintiff filed its district court complaint on June 28, 2007.

Upon remand, CMS requested further documentation from Plaintiff relating to the types of services provided by Greenlawn during the look-back period.  Am. Compl. ¶¶ 41, 43.  By letter dated August 24, 2007, Plaintiff stated that it had already submitted all the documentation that it has available regarding the services furnished by Greenlawn Nursing Home.  <u>Id.</u> at ¶ 45.

By letter to the FI, dated November 9, 2007, CMS denied Plaintiff's request for an exemption to the SNF RCL.  <u>Id.</u> ¶¶ 46-47; Ex. 3 (Nov. 9, 2007 Letter from Sheila Lambowitz, CMS, to Vinnie Guarino).  Although the letter represented its final determination, <u>id.</u> at 1, CMS stated that it would reopen the decision if PCTCU submitted specified documents to the agency. <u>id.</u> at ¶ 4-5.

## III.  <u>Plaintiff's Claims in This Court</u>

The Amended Complaint alleges jurisdiction under the Medicare and federal question statutes, as well as the Declaratory Judgment Act and the federal mandamus statute. Am. Compl. ¶ 3; <u>see</u> 42 U.S.C. § 1395oo(f); 28 U.S.C. § 1331; 28 U.S.C. § 2201; 28 U.S.C. § 1361.  Plaintiff alleges that the Administrator was without authority to remand this matter to CMS and that the PRRB's decision therefore remains "the final decision of CMS, by operation of law" which the Secretary has a duty to implement.  Am. Compl. ¶¶ 50-52.  Plaintiff alleges that the

---

[10/] The Administrator expressed agreement with the Board's dissenters that this case is limited to Plaintiff's fiscal year end 1998 cost report appeal and that the Board did not have jurisdiction over the cost reports for fiscal years ending 1996 or 1997. Ex. 2 at 15 n.23.

Administrator's remand violated the Medicare statute and regulations; was arbitrary and capricious, an abuse of discretion, and contrary to law in violation of the Administrative Procedure Act; and deprived it of due process.  Id. at ¶¶ 56-57, 63, 71.[11]  Plaintiff seeks declaratory relief, an order requiring the Secretary to adjust its Medicare reimbursement for its fiscal years 1996, 1997 and 1998 to reflect application of the new provider exemption, interest, fees and costs.  Id. at ¶¶ 18-19.

## ARGUMENT

**This Action Should Be Dismissed Because This Court Lacks Jurisdiction to Review the Administrator's April 30, 2007 Decision**

## I. Legal Standard

### A.    Standard for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1)

Under Fed. R. Civ. P. 12(b)(1), a court must dismiss any claim over which it lacks subject matter jurisdiction.  Because federal courts are courts of limited jurisdiction, the law presumes that any claim lies outside this limited jurisdiction, and "the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction."  Role Models Am., Inc. v. Harvey, 459 F. Supp. 2d 28, 33-34 (D.D.C. 2006).   A court may dismiss a complaint for lack of subject matter jurisdiction if, because of a jurisdictional defect, "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief."  Id. at 34.  In deciding a Rule 12(b)(1) motion, "the court is not limited to the allegations contained in the complaint" and "may consider materials outside the pleadings."  Id. (internal citations

---

[11] Plaintiff also challenges the Administrator's conclusion that the PRRB lacked jurisdiction to order the application of the new provider exemption to Plaintiff's fiscal years ending 1996 and 1997, as well as CMS's determination that Plaintiff had provided insufficient documentation in support of its exemption request.  Am. Compl. ¶¶ 66, 68.

11

omitted).

    B.    **Deference Owed to the Secretary's Interpretation of the Medicare Statute and Regulations**

Under the standard of deference articulated in <u>Chevron USA, Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-45 (1984), the Secretary's interpretation of the Medicare statute must be upheld so long as it represents a "permissible" construction, <u>Shalala v. Illinois Council on Long Term Care</u>, 529 U.S. 1, 21 (2000), "within the bounds of reasonable interpretation," <u>Your Home Visiting Nurse Servs., Inc. v. Shalala</u>, 525 U.S. 449, 450 (1999). It is "settled law that the rule of deference applies even to an agency's interpretation of its own statutory authority or jurisdiction." <u>Mississippi Power & Light Co. v. Mississippi</u>, 487 U.S. 354, 381 (1988) (Scalia, J., concurring) (citing <u>Commodity Futures Trading Comm'n v. Schor</u>, 478 U.S. 833, 844-845 (1986); <u>NLRB v. City Disposal Systems, Inc.</u>, 465 U.S. 822, 830 (1984)). Moreover, the Secretary's interpretation of his own regulations is entitled to "substantial deference," and "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994) (internal quotation omitted).

**II.**    **42 U.S.C. § 1395oo(f) Is the Exclusive Source of Federal Court Jurisdiction Over Medicare Provider Reimbursement Disputes**

It is well settled that "[t]he United States, as sovereign, 'is immune from suit save as it consents to be sued, . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" <u>Lehman v. Nakishian</u>, 453 U.S. 156, 160 (1981) (quoting <u>United States v. Testan</u>, 424 U.S. 392, 399 (1976) and <u>United States v. Sherwood</u>, 312 U.S. 584, 586 (1941)). In addition, Congress may prescribe the procedures and conditions under which judicial review of administrative orders may be obtained. <u>Tacoma v. Taxpayers of Tacoma</u>, 357

12

U.S. 320, 336 (1958); <u>Am. Power & Light Co. v. S.E.C.</u>, 325 U.S. 385, 389-90 (1945).

It has long been established "that where Congress has provided statutory review procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." <u>Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.</u>, 379 U.S. 411, 420 (1965). By operation of 42 U.S.C. §§ 405(h), 1395ii, and 1395oo(f), Congress has provided the exclusive means of administrative and judicial review of Medicare provider reimbursement decisions such as those presented by Plaintiff in this case. <u>See Heckler v. Ringer</u>, 466 U.S. 602, 614-15 (1984); <u>Weinberger v. Salfi</u>, 422 U.S. 749, 757 (1975).

Section 1395ii of the Medicare statute limits judicial review of Medicare matters by incorporating § 405(h) of the Social Security Act. This latter provision specifically states that

> No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency <u>except as herein provided</u>. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under sections 1331 [general federal question] or 1346 [United States as a defendant] of title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h) (emphasis added). Thus, if a provider desires judicial review of a reimbursement decision of the Secretary, it must follow the administrative procedures provided by the Medicare statute, that is, the procedures "herein provided." <u>Id.</u> If the provider does not follow the established procedures, the statute is quite clear that, no "finding of fact or decision of the Secretary" may "be reviewed by any person, tribunal, or governmental entity." 42 U.S.C. § 405(h).

Plaintiff asserts jurisdiction under 42 U.S.C. § 1395oo(f), 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 28 U.S.C. § 1361. Am. Compl. ¶ 3. As explained above, it is beyond dispute that federal question jurisdiction, 28 U.S.C. § 1331, is squarely precluded under 42 U.S.C. § 405(h)

as incorporated into the Medicare statute by 42 U.S.C. § 1395ii.  Heckler v. Ringer, 466 U.S. 602, 614-15 (1984).  The Declaratory Judgment Act, 28 U.S.C. 2201, "is not an independent source of federal jurisdiction."  C&E Serv., Inc. v. D.C. Water & Sewer Auth., 310 F.3d 197, 201 (D.C. Cir. 2002).  "The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear and nondiscretionary duty."  Ringer, 466 U.S. at 616. Here, mandamus is foreclosed by Plaintiff's failure to exhaust its administrative remedies. Specifically, Plaintiff has not yet appealed CMS's November 9, 2007 final (post-remand) determination to the PRRB.  Finally, as demonstrated below, the Medicare Statute, 42 U.S.C. § 1395oo(f), does not confer jurisdiction in this case.

**III**.     **Plaintiff is Not Appealing a Final Decision of the Secretary**

Applying the jurisdictionally limiting provisions of 42 U.S.C. §§ 405(h) and 1395ii to this case means that Plaintiff must adhere to the procedures set out in 42 U.S.C. § 1395oo(f) before this Court may review Plaintiff's reimbursement claim.  The touchstone for judicial review of all Medicare disputes is a final decision of the Secretary.  Plaintiff's complaint seeks review of no such decision.  Rather, it asks the Court to review an interim order of the CMS Administrator.  The Court has no jurisdiction to review that order.  See Athens Cmty. Hosp., Inc. v. Schweiker, 686 F.2d 989, 993-94 (D.C. Cir. 1982) ("The first issue before the Court, therefore, is whether the decision by the PRRB . . . is a 'final decision' sufficient to establish jurisdiction").  Accord Washington Hosp. Ctr. v. Bowen, 795 F.2d 139, 150 (D.C. Cir. 1986); St. Francis Hosp. v. Bowen, 802 F.2d 697, 701 (4th Cir. 1986); Good Samaritan Med. Ctr. v. Secretary of Health & Human Servs., 776 F.2d 594, 598 (6th Cir. 1985).  In cases such as this

14

one, in order for a court to exercise subject matter jurisdiction over a Medicare provider's claim, the jurisdictional prerequisites for that review must be met, the provider must have received a final decision from the Secretary and the provider must timely file suit in the appropriate district court. 42 U.S.C. §§ 1395oo(a), (b), (f). Unless these statutorily prescribed procedures have been followed, and in this case they have not been followed, judicial review of any claim by the provider is simply not available.

Here, the Administrator issued a decision which vacated the Board's decision and remanded the case to the agency for a new determination on Plaintiff's exception application. Ex. 2 at 15-16. The Medicare statute clearly states that providers may obtain judicial review of "any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary," 42 U.S.C. 1395oo(f)(1); it does not provide for judicial review of remand decisions. The regulations likewise state that providers may obtain judicial review of "a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision," 42 C.F.R. § 405.1877(a); they do not provide for judicial review of a decision to remand to either the Board or to CMS.

Thus, Plaintiff here is not challenging a "final decision" of the Secretary that disposes of all issues in Plaintiff's appeal, namely, a decision on the merits of CMS's determination as to whether Plaintiff's SNF qualifies for a new provider exemption and, if so, for which cost reporting years. The proper procedure is for Plaintiff to pursue its appeal of CMS's November 9, 2007 final determination to the PRRB. In contrast, by appealing this remand order, Plaintiff asks the Court to step into the ongoing administrative process.

In a very similar case, <u>Goleta Valley Cmty Hosp. v. Leavitt</u>, CMS denied Plaintiff Goleta

Valley's request for a new provider exemption from routine cost limits.  No. 05-2323, 2006 WL 4050410, at *1 (D.D.C. Dec. 21, 2006) (Robinson, M.J.).  As here, the PRRB reversed CMS's decision and the Administrator subsequently vacated the Board's decision and remanded the case back to the agency.  Id. at *2.  Goleta Valley appealed the Administrator's remand decision to federal district court and the Secretary argued that the court lacked jurisdiction because the decision was not final.  Id.  Goleta Valley argued that the decision was a "reversal" of the Board's decision that could be appealed pursuant to 42 U.S.C. § 1395oo(f) (permitting judicial review of "any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary").  The court granted the Secretary's motion to dismiss, finding that it did not have jurisdiction to review the remand decision.  Id. at *6.

Since the filing of Plaintiff's Complaint, CMS has already acted upon the Administrator's remand order and denied Plaintiff's request for a new provider exemption.  Ex. 3.  Plaintiff's remedy is therefore to appeal the redetermination to the PRRB, not this Court.  Leaving aside the devastating effect that allowing intervention at this stage would have on any orderly administrative process, such intervention is not contemplated by the Medicare statute.  Indeed, it is precluded by the statute.  Plaintiff simply fails to meet the statutory requirements for district court jurisdiction.

## IV.    The Administrator's Remand Was Proper

Plaintiff alleges that, by regulation, the Administrator may remand to the PRRB, but not to CMS.  Am. Compl. ¶ 56. ("The governing statute and regulations make no provision for vacating a decision of the PRRB and remanding an appeal to CMS or any entity other than the PRRB."). Therefore, Plaintiff argues, the Board's decision became final and appealable.  Id. at ¶

16

59.

In fact, by its terms, the governing regulation does not prohibit the Administrator from
remanding an appeal to CMS, instead of to the PRRB.  42 C.F.R. § 405.1875(g) provides that
"[i]f the Administrator has notified the parties and CMS that he or she has decided to review a
Board decision, the Administrator will affirm, reverse, modify <u>or remand</u> the case." (Emphasis
added.)  It is the Secretary's view that the plain language of section 405.1875(g) permits the
Administrator to remand either to CMS or the Board.  At most, the regulation's silence
concerning what body may be the object of a remand decision by the Secretary makes the
provision ambiguous.  And so, the Secretary's interpretation of the regulation is neither plainly
erroneous nor inconsistent with the regulation.  The Secretary respectfully submits that this
interpretation must therefore be accorded "substantial deference" and "given controlling
weight."  <u>Thomas Jefferson Univ.</u>, 512 U.S. at 512 .

In addition to being consistent with the language of the regulation, the Secretary's
interpretation is reasonable because it promotes administrative economy.  The Plaintiff's
interpretation, in contrast, would apparently require the Administrator, when he or she feels that
further investigation by CMS is warranted, to remand to the PRRB with instructions for the
Board to then remand to the agency.  This extra step would only serve to delay the resolution of
the provider's request.

**V.    <u>Even If Improper, the Remand Is Not an Appealable Final Decision</u>**

Assuming <u>arguendo</u> that the Administrator's remand was improper, it is still not an
appealable final agency decision.  The requirement that all issues raised in a provider's appeal be
finally decided before the provider may seek judicial review is analogous to the rule requiring

that a party receive a "final judgment" from a district court before proceeding to the court of appeals. 28 U.S.C. § 1291. As the Supreme Court has consistently found, requiring a party to "raise all claims of error in a single appeal following final judgment" affirms the deference owed to the trier of fact, and "avoid[s] the . . . harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise." Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 374 (1981) (quoting Cobbledick v. United States, 309 U.S. 323, 325 (1940)). Additionally, the requirement "serves the important purpose of promoting efficient judicial administration." Firestone Tire & Rubber Co., 449 U.S. at 374.

Regarding remands specifically, as a general rule, a district court order remanding a case to an agency is not an appealable final order. Pueblo of Sandia v. Babbitt, 231 F.3d 878, 880 (D.C. Cir. 2000).[12] This rule not only serves the interests of judicial economy, but "also leaves open the possibility that no appeal will be taken in the event the proceedings on remand satisfy all parties." Id. These same underlying principles apply equally to appeals brought in district court from decisions of the Secretary as they do to appeals brought in the court of appeals from remand decisions of the district court. Like a court of appeals, a district court should refuse to hear an appeal until all "claims of error" have been finally decided by an administrative agency. Here, it is plain that the decision from which Plaintiff appeals does not finally resolve all its claims by the Secretary.

The Secretary recognizes that the rule that district court remands are not appealable is not absolute. In the Social Security context, the Supreme Court has held that district court remands

---

[12] Just as the Administrator did here, district courts appropriately remand matters to CMS for "additional investigation or explanation." Milton Hosp. Transitional Care Unit v. Thompson, 377 F. Supp. 2d 17, 31 (D.D.C. 2005) (remanding to CMS "for further consideration of the plaintiff's new provider exemption request for its skilled nursing facility").

to administrative agencies are appealable when the order at issue finally resolves an important

legal issue and review of that issue would be foreclosed as a practical matter if an immediate

appeal were not undertaken.  <u>Sullivan v. Finkelstein</u>, 496 U.S. 617, 626 (1990).  Even under the

<u>Finkelstein</u> exception, however, Plaintiff should be precluded from having an appeal of the

Administrator's remand order heard by this Court.  The Administrator's decision to remand the

matter to the agency is a typical fact-based remand of the type commonly ordered by

adjudicatory bodies, and involves no important legal matter requiring immediate review by this

Court.  Moreover, the remand will not prejudice Plaintiff's ability to obtain judicial review of the

final agency decision concerning its exemption request.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Secretary respectfully requests that the Court dismiss

Plaintiff's complaint with prejudice.

Respectfully submitted,


_____/s/_____

JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610


19

_____/s/_____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
N.Y. Reg. No. 4202982
Civil Division
555 4th St., N.W.
Washington, D.C. 20530
(202) 307-0372


_____/s/_____
BRIDGETTE KAISER
Attorney
D.C. Bar No. 492406
U.S. Department of Health and Human Services
Office of the General Counsel-CMS Division
Room 5309 Cohen Building
330 Independence Ave., S.W.
Washington, D.C. 20201
(202) 205-5872

OF COUNSEL:

JAMES C. STANSEL
Acting General Counsel

CAROL J. BENNET
Acting Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

United States Department of
Health and Human Services

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

2007-D23

**PROVIDER -**
Jordan Hospital
Plymouth, Massachusetts

Provider No.: 22-0060

**vs.**

**INTERMEDIARY -**
BlueCross BlueShield Association/
Associated Hospital Services

**DATE OF HEARING -**
December 15, 2005

Cost Reporting Period Ended -
September 30, 1998

**CASE NO.:** 01-2214

## INDEX

| | Page No. |
|---|---|
| Issue | 2 |
| Medicare Statutory and Regulatory Background | 2 |
| Statement of the Case and Procedural History | 3 |
| Jurisdictional Challenge | 5 |
| Findings of Fact, Conclusions of Law and Discussion | 6 |
| Decision and Order | 9 |
| Dissenting Opinion of Elaine Crews Powell and Gary B. Blodgett | 10 |

ISSUE:

Whether the Intermediary's denial of the application of Jordan Hospital for a new
provider exemption from the routine cost limits for its provider-based skilled nursing
facility was justified.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the proper amount of Medicare reimbursement due a provider of
medical services.

The Medicare program provides health insurance to aged and disabled persons. 42
U.S.C. §§1395-1395cc. The Secretary of the Department of Health and Human Services
(Secretary) is authorized to promulgate regulations prescribing the health care services
covered by the program and the methods of determining payments for those services.
The Centers for Medicare and Medicaid Services (CMS), formerly the Health Care
Financing Administration (HCFA), is the operating component of the Department of
Health and Human Services (DHHS) charged with the program's administration. CMS
has entered into contracts with insurance companies known as fiscal intermediaries to
maintain the program's payment and audit functions. Intermediaries determine payment
amounts due providers of health care services (e.g., hospitals, skilled nursing facilities,
and home health agencies) under Medicare law and interpretative guidelines issued by
CMS.

At the close of its fiscal year, each provider submits a cost report to its intermediary
showing the costs it incurred during the period and the portion of those costs to be
allocated to Medicare. 42 C.F.R. §413.20. The intermediary reviews the cost report,
determines the total amount of Medicare reimbursement due the provider, and notifies the
Provider in a Notice of Program Reimbursement (NPR). 42 C.F.R. §405.1803. A
provider dissatisfied with the intermediary's determination may file an appeal with the
Provider Reimbursement Review Board (Board) within 180 days of the NPR. 42 U.S.C.
§1395oo(a); 42 C.F.R. §405.1835.

The statute, 42 U.S.C. §1395 x(v)(1)(A), authorizes the Secretary to establish prospective
limits on provider costs that are reimbursed under Medicare. These limits on costs are
referred to as routine cost limits (RCLs).

Because new providers have difficulty meeting the applicable cost limits, HCFA
provided an exemption from the cost limits for approximately the first three years of
operation. 44 Fed. Reg. 31802 (June 1, 1979). The exemption may be granted if the
provider "has operated as the type of provider (or the equivalent) for which it is certified
for Medicare under present and previous ownership for less than three full years." An
exemption expires at the end of the first cost reporting period beginning at least two years
after the provider accepts its first patient. 42 C.F.R. §413.30(e).

Page 3                                                           CN: 01-2214

STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Jordan Hospital (Provider) is a non-profit, general acute care hospital located in
Plymouth, Massachusetts. The Provider opened the Peter Chapman Transitional Care
Unit (PCTCU), a twenty-five bed hospital-based skilled nursing facility (HB-SNF), in
December of 1995 to provide subacute care to patients who required a more sophisticated
level of care than could be provided in a nursing home. The SNF was located in a former
acute care ward on the third floor of the Provider's facility.

Massachusetts law required that providers obtain a Determination of Need (DON)[1] before
constructing new facilities. The Massachusetts Department of Public Health (MDPH)
imposed a moratorium on DON applications for new nursing facility beds in 1992. The
MDPH developed an exception process to this moratorium under which a hospital could
be granted a DON to open a new Level II SNF so long as it first arranged, by contract, for
the closure of a Level III nursing home.[2] To take advantage of this exception, a hospital
had to locate a nursing facility that was interested in closing its beds and apply to move
the rights to operate that Level III facility.[3]

The Provider began this process on March 31, 1995 when it entered into a contract for
services with Shirley Dionne, operator of Greenlawn Nursing Home.[4] The contract stated
that Ms. Dionne wished to surrender her license to operate Greenlawn and that the
Provider wished to obtain the right to operate a SNF. Under the contract, Ms. Dionne
agreed to assist the Provider in obtaining from MDPH the right to operate a SNF. In
exchange, the Provider agreed to pay Ms. Dionne $300,000. The contract stated that the
Provider did not ". . . acquire any interest in the real estate, license, furnishings,
equipment, receivables, notes or other assets of the Nursing Home" and that the Provider
agreed to cooperate with the operator of the Nursing Home ". . . in the Hospital's efforts
to obtain the right to operate a skilled nursing facility at its site as may be granted by the
Department. . . ." By January 11, 1995, Greenlawn had transferred its last patient out of
its facility. On March 2, 1995,[5] MDPH granted conditional approval to Greenlawn to
suspend its license as of January 11, 1995. On May 4, 1995, the MDPH notified the
Provider that the PCTCU was suitable to be licensed. MDPH extended the temporary
suspension of Greenlawn's license until the Provider's facility was constructed and a
license issued to PCTCU.

The Provider completed construction of a twenty-five bed hospital-based SNF in
December of 1995. The first patient was admitted to the PCTCU on December 11, 1995,
and CMS certified the PCTCU for Medicare participation effective December 15, 1995.

---

[1] Per Provider Post-Hearing Brief, page 13, the DON is commonly referred to in other states as a Certificate
  of Need, or "CON."
[2] See, MDPH letter to CMS explaining this policy in a letter dated February 27, 1996, Exhibit P-8.
[3] See, Tr. at 75-77.
[4] See, Provider Position Paper, Exhibit P-13.
[5] See, Provider Position Paper, Exhibit P-12.

Page 4                                                                CN: 01-2214

In July 1996, the Massachusetts legislature established an alternative basis for the issuance of DONs. Under the 1996 Mass. Acts ch. 203 § 31, any hospital which was issued a DON under the previous process would have its prior DON superseded and replaced by authorization under the 1996 DON Act. Accordingly, on September 20, 1996, the MDPH superseded the prior licensure that PCTCU had obtained and operated under since December of 1995, and replaced it with a DON under the 1996 DON Act.[6] This new DON was made effective retroactive to December 8, 1995.[7]

On June 17, 1997, the Provider applied to its fiscal intermediary at the time, C&S Administrative Services, for a new provider exemption to the Medicare RCLs for the PCTCU pursuant to 42 C.F.R. §413.30(e). In July of 1997, the Provider was assigned a new intermediary, and its initial application was returned by C&S Administrative Services. On December 31, 1997, the Provider resubmitted its application to its new intermediary, Associated Hospital Services (Intermediary).

By letter dated July 15, 1998, the Intermediary communicated to the Provider CMS' denial of the Provider's request for a new provider exemption. CMS stated that ". . . Jordan (the Provider) does not qualify for a new provider exemption because its distinct part unit has operated in a manner equivalent to a SNF, under past or present ownership, as evidenced by the fact that it provided skilled nursing and rehabilitative serves as a nursing facility (NF) for three or more years under past ownership prior to its current Medicare certification."[8] In summary, CMS' letter alleged the following: 1.) Jordan Hospital purchased Greeenlawn Nursing Home, including its bed rights and DON rights, thereby triggering a review of the services furnished by Greenlawn during the three-year "look-back" period; 2.) Greenlawn provided skilled nursing and rehabilitative services in a manner equivalent to a SNF during the three year look-back period; and 3.) PCTCU and Greenlawn served the same inpatient population. The CMS letter concluded that the Provider did not qualify for a new provider exemption as a new provider or as a relocated provider.

The NPR for the Provider's FYE 9/30/98 cost report was issued by the Intermediary on September 25, 2000, and the Provider filed a timely appeal of that NPR on March 22, 2001. The Provider added the RCL issue to the open appeal on April 7, 2005. The amount of Medicare funds in controversy for 1998 is approximately $825,155.

The Provider appealed the adjustment to the 1998 cost report to the Board and met the jurisdictional requirements of 42 C.F.R §§405.1835 - 405.1841. The Provider was represented by Barbara Straub Williams, Esquire, of Powers, Pyles, Sutter & Verville, PC. The Intermediary was represented by Arthur E. Peabody, Jr., Esquire, of Blue Cross Blue Shield Association.

---

[6] See, also Tr. at 67-69. The Provider's witness testified that the new state statute superseded the previous practice of transferring of beds.
[7] See, Provider Position Paper, Exhibit P-16.
[8] See, Provider Position Paper, Exhibit P-23.

CN: 01-2214

JURISDICTIONAL CHALLENGE:

The Intermediary contends that although the Provider appealed the 1998 cost report
adjustment, it has also requested relief for cost reporting periods ended September 30,
1996 and September 30, 1997. The Intermediary asserts that the Board lacks jurisdiction
over the Provider's request related to the FY 1996 and FY 1997 cost reporting periods
because the Provider did not appeal the NPR for the cost reporting period ended
September 30, 1996; although the Provider did file an appeal of the NPR for the cost
reporting period ended September 30, 1997, that appeal (Case No. 00-0762) was closed
in June 2001. In addition, the Provider also failed to appeal the initial CMS denial of its
new provider exemption dated July 15, 1998.

The Intermediary argues that for cost reporting years ended September 30, 1996 and
September 30, 1997, the Provider is well beyond the 180-day period in which an appeal
can be filed. See, 42 C.F.R §405.1811. Since the Provider does not have appeals
pending for the September 30, 1996 or September 30, 1997 cost reporting periods, there
is no vehicle for the Board to reverse the denial of the new provider exemption request
for those cost reporting periods. In addition, there is no open appeal to which the issue
can be added. In these circumstances, only the cost year ended September 30, 1998 is at
issue in this appeal.

The Provider asserts that it filed a timely and valid appeal of the September 30, 1998 cost
report in accordance with the requirements of 42 U.S.C. §1395oo(a). The Provider
argues that once it has complied with the prerequisites of subsection (a), subsection (d) of
the statute grants the Board broad authority to decide issues raised at a hearing that are
related to the Provider's cost reports:

> A decision by the Board shall be based upon the record
> made at such hearing . . . and shall be supported by
> substantial evidence when the record is viewed as a whole.
> The Board shall have the power to affirm, modify, or
> reverse a final determination of the fiscal intermediary with
> respect to a cost report and to make any other revisions on
> matters covered by such a cost report (including revisions
> adverse to the provider of services) even though such
> matters were not considered by the intermediary in making
> such final determination.

42. U.S.C. §1395oo(d). Similarly, the Provider asserts that the Medicare regulations
define the scope of the Board's authority to encompass matters "not considered in the
intermediary's determination." 42 C.F.R. §405.1869.

The Provider argues that the central issue in this case is whether the Provider is entitled to
an exemption from the routine cost limits as a new provider. If the Board agrees that the
Provider has established, by substantial evidence presented in the record and at hearing,
that it is entitled to a new provider exemption, then it is entitled to that exemption for all

three years that are covered by its exemption application. A decision by the Board with respect to any of these years would, therefore, comply with the substantial evidence limitation that Congress placed on the Board's authority.

The Provider also argues that the Board has accepted jurisdiction over multiple years of a new provider exemption application, even though the provider only appealed a single cost year. The Provider cites St. Elizabeth's Medical Center of Boston v. BlueCross BlueShield Association/Associated Hospital Service of Maine, PRRB Case. No. 98-0489, PRRB Dec. No. 2002-D49 in which the Board granted jurisdiction for a fiscal year 1998 cost reporting period when the Provider had instituted an appeal only for its 1997 cost year. The Provider also adds that this decision was upheld by the D.C. Circuit Court.

The Board majority finds that it has jurisdiction over the three cost reporting periods covered under a new provider exemption, which includes FYs 1996, 1997 and 1998. The Board majority finds that the new provider exemption regulation unambiguously applies to multiple years as it ". . . expires at the end of the provider's first cost reporting period beginning at least two years after the provider accepts its first patient." 42 C.F.R. §413.30(e). Therefore, if it is determined in any one year that the Provider meets the requirements to be granted a new provider exemption, the exemption is deemed granted for all applicable years. The amount of reimbursement in controversy for 1996 is $644,807, and for 1997 it is $799,848.[9]

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

After considering the Medicare law and program instructions, evidence and the parties' contentions, the Board finds and concludes as follows:

The Board finds that the Provider is entitled to an exemption from the routine cost limits pursuant to 42 C.F.R. §413.30(e). The Board notes that the exception process for obtaining a DON in the State of Massachusetts in 1995 required a provider to find another entity willing to close so that the "rights to operate" could be transferred. The Provider contracted with another facility to close, and made payment to that facility for its closure, in order to obtain bed rights to open the PCTCU, as this was the only available avenue for the Provider to obtain a license to operate during the relevant time period. The Board concludes that the purchase of the "rights to operate" does not, in itself, constitute a change of ownership (CHOW) and does not affect the Provider's right to a new provider exemption.

This issue is addressed in various other PRRB decisions and in U.S. District and Circuit Court decisions. Most recently, the Board addressed a very similar issue regarding the purchase of CON bed rights in Harborside Healthcare-Reservoir v. Blue Cross and Blue Shield Association/Empire Medicare Services.[10] In that case the Board found that ". . . the purchase of bed rights, in and of itself, does not constitutes a change of ownership (CHOW) and does not affect the [p]rovider's right to a new provider exception;" also that

---

[9] See, Provider Position Paper, Exhibit P-1.
[10] PRRB Dec No. 2006-D14, January 25, 2006, Medicare and Medicaid Guide (CCH) ¶81,462.

". . . imputing ownership based on the purchase of CON rights is inconsistent with the Medicare regulations." In its decision, the Board rejected the intermediary's contention that the transfer of bed rights constituted a ". . . continuation of services from the previously operating facility." In Ashtabula County Medical Center v. Thompson[11] the District Court found that the Secretary's interpretation of the new provider exemption regulation was arbitrary, capricious and erroneous. In that case, the Secretary manintained that when a provider acquires CON bed rights from an unrelated party, a CHOW has occurred;[12] and when a CHOW occurs, there must be a "look back" to determine whether the relinquishing provider had operated for more than three years.

The Court's analysis of this matter focused on the intent of the new provider exemption (to allow providers the opportunity to recoup higher costs associated with low occupancy and start-up) vis-a-vis the Secretary's position to "exclude [from such relief] as a class all providers that purchase CON rights from another, unrelated provider that has existed for more than three years. . . ." The Court found as ". . . little more than a generous amount of conjecture and guesswork . . ." the Secretary's argument that the existence of state CON moratorium programs can be interpreted as a finding by the state that additional beds are unnecessary for the efficient delivery of needed health care services.[13] After consideration of each of the Secretary's arguments the Court states in pertinent part:

> ACMC [Ashtabula County Medical Center] and other providers in moratorium states that purchase CON rights from unrelated providers fit comfortably within the language and purpose of the new provider exemption. The Secretary has advanced no reasonable argument to support a distinction between these providers and other "new providers" deserving of a subsidy to offset high startup costs in the first three years of operation.

Ashtabula at 897.

The Fourth Circuit also held that the term "provider" in the new provider exemption regulation unambiguously refers to an institution, not a single asset such as a CON. In Maryland General Hospital, Inc. v. Thompson, 308 F.3d 340 (4th Cir. 2002), the hospital obtained permission from the State of Maryland to open a new SNF by acquiring state operating rights, but nothing else, from pre-existing SNFs. The Secretary contended that prior ownership of SNF bed rights could be treated as prior ownership of the SNF because the term "provider" as used in 42 C.F.R §413.30(e) is ambiguous. The Fourth Circuit rejected this assertion, observing that in the Medicare program, "provider of services" means specified types of health care institutions – including, for example, hospitals, home health agencies, and SNFs. The Court further noted that PRM §2604.1 repeatedly characterizes a "provider" as an "institution" engaged in providing skilled

---

[11] Ashtabula County Medical Center v. Thompson, 191 F. Supp. 2d 884, 897 (N.D. Ohio 2002), aff'd 352 F. 3d 1090 (6th Cir. 2003).
[12] Id. at 890.
[13] Id. at 895.

nursing services.[14]  Thus, the Court ruled, the Secretary erred in treating prior ownership of operating rights as prior ownership of the "provider":

> In sum, we conclude that "provider" as used in section 413.30(e) unambiguously refers to the business institution providing the skilled nursing services.  It therefore follows that the regulation permits consideration of the institution's past and current ownership, but not the past and current ownership of a particular asset [the CON rights] of that institution.  The Secretary's interpretation, however, equates the ownership of an institution providing skilled nursing services with the ownership of a particular asset of that institution.  Since there is no language in the regulation that would permit the denial of the exemption because an asset of the new institution was previously owned by an unrelated SNF, the Secretary's interpretation is inconsistent with the plain language of the regulation and cannot be allowed to stand.

Maryland General at 347.

Additionally, the Board finds that the instant case is unique when compared to similar cases heard on this issue.  The Provider claims that it followed the DON exception process in place in the State of Massachusetts in 1995 by negotiating with a Level III facility that was willing to close so its bed rights could be transferred to Jordan Hospital and a new Level II hospital-based SNF could be established.  However, due to a subsequent, retroactive change in Massachusetts law in July 1996,[15] the approval of the DON the Provider secured through this process was suspended and replaced by a new DON as if the beds rights surrendered by the close facility first reverted to the state and were then reissued to the Provider.  By virtue of this retroactive change in Massachusetts law, the Provider argues, and the Board agrees, that any question as to whether the Provider "purchased" the closed facility becomes moot.  The new DON issued on September 20, 1996 retroactively replaced the prior DON.

The Board finds that the statute change that had the effect of granting the Provider operating rights directly from the state distinguishes this case from others in which the Secretary's interpretation has been upheld.  For example in South Shore Hospital, Inc v. Thompson, 308 F.3d 91, (1st Cir. 2002),[16] the First Circuit granted deference to the Secretary's interpretation of the term "provider," as it found that the term, as used in 42 C.F.R. §413.30(e), was "manifestly ambiguous."  The Court explained that the precise issue in that case, like the present case, turned on the meanings of "previous ownership," "provider," and "institution", none of which are unambiguous.  However in South Shore, the provider did not present factual evidence that a change in state statute altered the

---

[14]  Id. at 344.
[15]  See, Provider Position Paper, Exhibit P-10 – 1996 MASS Acts Ch. 203 §31.
[16]  See, Intermediary Position Paper, Exhibit I-20.

Page 9                                                        CN: 01-2214

entity from which the Provider received its DON.  In the instant case the Board finds that
the 1996 change in Massachusetts' statute  resulted in a new DON being issued by the
state on September 20, 1996 that superseded the DON granted as a result of the transfer
of beds from Greenlawn.  Consequently, there was no "previous owner" of the DON.
Accordingly, the South Shore  decision, although issued in the First Circuit, is not
controlling here.

DECISION AND ORDER:

The Intermediary improperly denied Jordan Hospital a new provider exemption from the
routine cost limits for its provider-based skilled nursing facility.  The Board majority also
finds that the exemption is granted for the FY 1996, 1997 and 1998 cost reporting periods
by operation of law.

BOARD MEMBERS PARTICIPATING:

Suzanne Cochran, Esquire
Gary B. Blodgett, D.D.S. (Dissenting as to jurisdiction)
Elaine Crews Powell, C.P.A. (Dissenting as to jurisdiction)
Anjali Mulchandani-West
Yvette C. Hayes

FOR THE BOARD:

FEB 2 8 2007

Suzanne Cochran
Chairperson

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**

MAY - 2 2007

Ms. Barbara Straub Williams
Powers, Pyles, Sutter & Verville
1875 Eye Street NW, Twelfth Floor
Washington, DC 20006-5409

Re: <u>Jordan Hospital</u>, PRRB Decision No. 2007-D23

Dear Ms. Williams:

Enclosed is an Administrator's Order remanding the above case to the Centers for Medicare &

Medicaid Services. Please send any future correspondence to:

> Mr. Laurence Wilson
> Director, Chronic Care Policy Group
> Center for Medicare Management
> Centers for Medicare & Medicaid Services
> 7500 Security Boulevard, Mailstop C5-02-23
> Baltimore, MD 21244-1850

> Sincerely yours,

> Jacqueline R. Vaughn
> Attorney Advisor

Enclosure

cc: Arthur E. Peabody, Jr., Esquire, Intermediary's Representative
    Mr. Laurence Wilson, CMM, CMS

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## *Decision of the Administrator*

| | |
|---|---|
| **In the case of:** | **Claim for:** |
| Jordan Hospital | Provider Reimbursement for Cost Reporting Period Ending: 9/30/98 |
| Provider | |
| vs. | |
| Blue Cross Blue Shield Association/ Associated Hospital Services | Review of: PRRB Dec. No. 2007-D23 Dated: February 28, 2007 |
| Intermediary | |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the Provider Reimbursement Review Board (Board) decision. The review is during the sixty-day period mandated in §1878(f)(1) of the Social Security Act (Act) [42 USC 1395oo(f)(1)], as amended. Comments were received from the Center for Medicare Management (CMM), requesting reversal of the Board's decision. The parties were then notified of the Administrator intention to review. The Provider submitted comments requesting affirmance of the Board's decision. Accordingly, the case is now before the Administrator for final administrative review.

## BACKGROUND

The Provider, Peter Chapman Transitional Care Unit (PCTCU), is a twenty-five bed hospital-based skilled nursing facility (HB-SNF), opened in December of 1995. The skilled nursing facility (SNF) was located in a former acute care ward on the third floor of the Hospital.

Massachusetts law required that providers obtain a Determination of Need (DON),[1] before constructing new facilities. The Massachusetts Department of Public Health (MDPH) imposed a moratorium on DON applications for new nursing facility beds in 1992. The MDPH developed an exception process to this moratorium under which a healthcare facility could be granted a DON to open a new Level II SNF so long as it first arranged, by contract, for the closure of a Level III nursing home.[2] To take advantage of this exception, a healthcare facility had to locate a nursing facility that was interested in closing its beds and apply to move the rights to operate that Level III facility.[3] Pursuant to the Provider acquiring the DON from Greenlawn Nursing Facility, the MDPH licensed the Provider as a skilled nursing facility (SNF) in 1995.[4] The Provider completed construction of a twenty-five bed hospital-based SNF in December of 1995. The first patient was admitted to the Provider's facility on December 11, 1995, and CMS certified the Provider for Medicare participation effective December 15, 1995.

In July 1996, the Massachusetts legislature established an alternative basis for the issuance of DONs. Under the 1996 Mass. Acts Ch. 203 § 31, any healthcare facility which was issued a DON under the previous process would have its prior DON superseded and replaced by authorization under the 1996 DON Act. Accordingly, on September 20, 1996, the MDPH superseded the prior licensure that the Provider had obtained and operated under since December of 1995, and replaced it with a DON under the 1996 DON Act.[5]

The Provider requested a new provider exemption from the routine cost limits (RCLs) in December 1997.[6] By letter to the Intermediary, CMS denied the exemption request, and the Intermediary notified the Provider of the denial by letter dated July 15, 1998.[7] CMS stated that the Provider does not qualify for a new provider exemption because its distinct part unit has operated in a manner equivalent to a SNF, under past or present ownership, as evidence by the fact that it provided skilled nursing and rehabilitative services as a nursing facility (NF) for

---

[1] Per Provider Post-Hearing Brief, page 13, the DON is commonly referred to in other states as a Certificate of Need, or "CON."

[2] See MDPH letter to CMS explaining this policy in a letter dated February 27. 1996, Exhibit P-8.

[3] See Transcript of Oral Hearing at 75-77.

[4] See Provider Position Paper, Exhibit P-12.

[5] See Transcript at 67-69. The Provider's witness testified that the new state statute superseded the previous practice of transferring of beds.

[6] See Provider Exhibit P-18.

[7] See Provider Exhibit P-23.

three or more years under past ownership prior to its current Medicare certification.[8] The Provider filed a timely appeal of it's FYE 9/30/98 cost report NPR on March 22, 2001, and added the RCL issue to the open appeal on April 7, 2005.

In regard to jurisdiction, the Intermediary contended that, although the Provider appealed the 1998 cost report adjustment, it also requested relief for cost reporting periods ended September 30, 1996 and September 30, 1997.  The Intermediary asserted that the Board lacks jurisdiction over the Provider's request related to the FY 1996 and 1997 cost reporting periods because the Provider did not appeal the NPR for the cost reporting period ended September 30, 1996; (although the Provider did file an appeal (Case No. 00-0762) was closed in June 2001).  In addition, the Provider also failed to appeal the initial CMS denial of its new provider exemption dated July 15, 1998.  The Intermediary contended that for the cost reporting years ended September 30, 1996 and September 30, 1997, the Provider was well beyond the 180-day period in which an appeal can be filed.  The Provider asserted that it filed a timely and valid appeal of the September 30, 1998 cost report in accordance with the requirements of 42. U.S.C. §1395oo(a).  The Provider argued that the central issue in this case was whether the Provider is entitled to an exemption from the routine cost limits as a new provider.  If the Board agreed that the Provider has established, by substantial evidence presented in the record at hearing, that it is entitled to a new provider exemption, then it is entitled to that exemption for all three years covered by its exemption application.

The Board found that it has jurisdiction over the three cost reporting periods covered under a new provider exemption, which includes FYs 1996, 1997, and 1998.  The Board majority found that the new provider exemption regulation unambiguously applies to multiple years as it "... expires at the end of the provider's first cost reporting period beginning at least two years after the provider accepts its first patient."  42 C.F.R. §413.30(e).  Therefore, the Board concluded that if it is determined in any one year that the Provider meets the requirements to be granted a new provider exemption, the exemption is deemed granted for all applicable years.

## ISSUE AND BOARD DECISION

The issue was whether the Intermediary's denial of the Provider's request for a new provider exemption from the routine cost limits (RCLs) was proper.

The Board found that the Provider is entitled to an exemption from the routine cost limits pursuant to 42 C.F.R. §413.30(e).  Moreover, the Board noted that the exemption proves for obtaining a DON in the State of Massachusetts in 1995

---

[8] Id.

required a provider to find another entity willing to close so that the "rights to operate" could be transferred. The Board reasoned that the Provider contracted with another facility to close, and made payment to that facility for its closure, in order to obtain bed rights to open the PCTCU, as this was the only available avenue for the Provider to obtain a license to operate during the relevant time period. The Board concluded that the purchase of the "rights to operate" does not, in itself, constitute a chance of ownership (CHOW) and does not affect the Provider's rights to a new provider exemption.

The Board further observed that the issue has been addressed in various other PRRB decisions and in U.S. District and Circuit Court decisions. Most recently, the Board addressed a very similar issue regarding the purchase of CON bed rights in Harborside Healthcare-Resevoir v. Blue Cross and Blue Shield Association/Empire Medicare Services.[9] In that case the Board found that "the purchase of bed rights, in and of itself, does not constitute a change of ownership (CHOW) and does not affect the [p]rovider's right to a new provider exception," and "imputing ownership based on the purchase of CON rights is inconsistent with the Medicare regulations." In Ashtabula County Medical Center v. Thompson,[10] the District Court found that the Secretary's interpretation of a new provider exemption regulation was arbitrary, capricious, and erroneous. The Secretary maintained that when a provider acquires CON bed rights from an unrelated party, a CHOW has occurred, and when a CHOW occurs, there must be a "look back" to determine whether the relinquishing provider had operated for more than three years. The Provider noted that the Fourth Circuit also held that the term "provider" in the new provider exemption regulation unambiguously refers to an institution, not a single asset such as a CON.[11]

The Board found that the instant case is unique when compared to similar cases heard on this issue, as the Provider claims that it followed the DON exception process in place in the State of Massachusetts in 1995 by negotiating with a level III facility that was willing to close so its bed rights could be transferred to Jordan Hospital and a new Level II hospital-based SNF could be established. The Board recognized that due to a subsequent retroactive change in Massachusetts law in July 1996, the approval of the DON the Provider secured through this process was suspended and replaced by a new DON, as if the beds rights surrendered by the close facility first reverted to the state and were then reissued to the Provider. The

---

[9] PRRB Dec. No. 2006-D14, January 25, 2006, Medicare and Medicaid Guide (CCH) ¶81,462.

[10] Ashtabula County Medical Center v. Thompson,[10] 191 F. Supp. 2d 884, 897 (N.D. Ohio 2002), aff'd 352 F.3d 1090 (6th Cir. 2003).

[11] Maryland General Hospital, Inc. v. Thompson, 308 F.3d 340 (4th Cir. 2002).

Board agreed with the Provider's contention that any question as to whether the Provider "purchased" the closed facility became moot.

Moreover, the Board continued, that the statute change that had the effect of granting the Provider operating rights directly from the State distinguishes this case from others in which the Secretary's interpretation has been upheld.[12]  However, the Board further noted that in <u>South Shore</u>, the provider did not present factual evidence that a change in State statute altered the entity from which the Provider received its DON.  The Board concluded that in the instant case, the 1996 change in Massachusetts' statute resulted in a new DON being issued by the State on September 20, 1996 that superseded the DON granted as a result of the transfer of beds from Greenlawn.  Consequently, the Board found that there was "no previous owner" of the DON, and the <u>South Shore</u> decision, although issued in the First Circuit, was not controlling.

The Board concluded that the Intermediary improperly denied the Provider a new provider exemption from the RCLs for it's provider-based skilled nursing facility.  The Board majority found that the exemption is granted for the FY 1996, 1997, and 1998 cost reporting periods by operation of law.

Two Board members dissented.  The Dissenters disagreed with the majority's conclusion that when a provider is granted a new provider exemption for any one year, the exemption is deemed granted for all applicable years.  They argued that the Provider never appealed CMS' July 15, 1998 denial of its new provider exemption request until April 2005, when the Provider added the new provider exemption denial to its pending PRRB case for FYE 09/30/98.  They additionally noted that, as of April 2005, the Provider did not have an appeal pending before the Board for either 1996 or 1997.  The Dissenters contended that individual cost report appeals are specific to the cost reporting year in dispute.  Had the Provider wished to protect its appeal rights relative to CMS' denial of its new provider exemption for fiscal years 1996 and 1997, it should have filed an appeal for those years from the notice it received regarding CMS' denial.  The Dissenters argued that when the Provider failed to timely appeal the denial, which is a final determination that can be appealed to the Board, it missed its opportunity to have fiscal years 1996 and 1997 covered in the three years envisioned by the new provider exemption regulation.  The

---

[12] In <u>South Shore Hospital, Inc. v. Thompson</u>, 308 F.3d 91 (1st Cir. 2002), the First Circuit granted deference to the Secretary's interpretation of the term "provider," as it found that the term, as used in 42. C.F.R. §413.30(e), was "manifestly ambiguous."  The Court explained that the precise issue in that case, like the present case, turned on the meanings of "previous ownership," "provider," and "institution," none of which are unambiguous.

Dissenters believe that the Provider is precluded from simply appending 1996 and 1997 to its 1998 individual cost report appeal, as the 1998 appeal is specific to fiscal year 1998 only. Therefore, since the Provider failed to timely appeal CMS' denial of its request for a new provider exemption for fiscal years 1996 and 1997, the Dissenters maintained that the Board does not have jurisdiction over the 1996 and 1997 cost reporting periods. However, based on the merits of the case, the Dissenters concurred with the Board's majority decision that the Provider is entitled to a new provider exemption, but only for FYE 09/30/98.


## SUMMARY OF COMMENTS

CMM commented, requesting that the Board's decision be reversed. CMM argued that the Board's finding that the Provider's purchase of the "rights to operate" does not, in itself, constitute a change of ownership is incorrect. CMM noted that, Mercy Medical Skilled Nursing Facility, PRRB No. 2002-D-31 decided on October 8, 2002, shows that a CON is an asset used to render patient care and that once transferred constitutes a CHOW for purposes of determining whether the Provider qualifies for an exemption as a new provider.

With respect to the CHOW issue, CMM pointed out that the Board failed to recognize the regulations set forth in Sections 1500 and 2533.1E(b) of the Provider Reimbursement Manual (PRM). In addition, CMM noted that the Request to Temporarily Discontinue Operation of the Facility, which was submitted by Greenlawn on behalf of both itself and the Provider, was not a request for a discontinuance of operation, hence was not to be deemed an abandonment of license. CMM emphasized the facts surrounding this issue and pointed to the Agreement between Greenlawn and the Provider and relevant state laws. CMM pointed to the fact that on May 19, 1995 the Provider completed a License Application for what was formerly Greenlawn Nursing Home and would now be known as the Jordan Hospital Transitional Care Unit, Provider's SNF. According to Massachusetts law, the purchasing entity that files the application as a result of a transfer of ownership will have the effect of a license from the date of transfer. Hence, the right to operate the facility remains intact and continues under the new owner. CMM asserts that this fact, in conjunction with others, serve as proof that the Provider acquired the license to operate Greenlawn and a CHOW did exist.

Moreover, CMM argued that the Board's decision was incorrect in distinguishing the facts here, where the Provider obtained a retroactive DON, from those cases in which the Secretary's interpretation had been upheld. CMM also asserted the fact that CMS was correct in applying Medicare provisions whereas the Board placed too much emphasis on the laws of Massachusetts. Since CMS must interpret

transactions in accordance with the principles of Federal Medicare law and it found a CHOW in this situation, its decision must be upheld since the revised State law has no effect on the application of Medicare law by the Secretary.

Finally, CMM asserted that individual cost report appeals are specific to the cost reporting year in dispute and that exemptions for the cost reporting periods in question, those ending at 9/30/96 and 9/30/97, are not mandated by law. CMM pointed out that the Provider was notified that its requests were denied by CMS. Citing Section 1878(a)(1)(A)(i), CMM pointed out that there was nothing interfering with the Provider's right to request a hearing and instead opted to not appeal its Notice for Program Reimbursement (NPR) for the cost reporting period for 9/30/96 but did appeal its NPR for 9/30/97. The appeal of the NPR for 9/30/97 was closed on 6/11/01 and all issues were deemed moot as a result of a settlement agreement that was entered into between the Intermediary and the Provider, dated June 11, 2001. Therefore, CMM asserted that the Board cannot assert jurisdiction over the 1996 and 1997 cost reporting periods since it is in direct conflict with the statutory and regulatory laws that apply to the appeals process.

The Intermediary commented and recommended that the Administrator review the adverse decision by the Board. The Intermediary maintained that the Provider did not meet the necessary regulatory requirements granting the Provider's new provider exemption request, and stand by the position articulated in its post hearing memorandum.

The Provider commented, requesting that the Board's decision be affirmed. The Provider argued that the transaction between the Provider and the operator of Greenlawn did not constitute a CHOW. Further, the Provider claimed that CMS' position to the contrary is based on a misunderstanding of the transaction between the Provider and Greenlawn and a misconstruction of Massachusetts DON law.

With respect the Provider's purchase of Greenlawn, the Provider maintained that it did not purchase any assets from Greenlawn and that the purchase of "rights to operate" did not affect the Provider's right to a new provider exemption. Further, the Provider asserted that the plain language of the agreement between the Provider and Greenlawn shows that it was a contract for services and included no transfer of DON rights or any other asset. Citing the contract as proof of the transfer, the Provider pointed to the language of the agreement to show that the Provider would not acquire "any interest in the real estate, license, furnishings, equipment, receivables, notes or other assets" of Greenlawn. Also, the Provider argued that under Massachusetts law, it received its DON from MDPH and that even if it had wanted to transfer Greenlawn's DON, the State's law prohibited such a transfer. The Provider obtained a new DON under the 1996 Act that retroactively replaced its

prior one.  Once Greenlawn surrendered the license to operate, it relinquished an asset to the Commonwealth of Massachusetts and created a new asset, DON rights which were subsequently granted to the Provider.  Citing <u>Chevron U.S.A. v. Natural Resources Defense Council, Inc</u>, 467 U.S. 837, 844 (1984) the Provider argued that while Federal agencies are normally afforded some deference, deference is inappropriate where a Federal agency construes State law.  Hence, CMS' denial of the Provider's new provider exemption request was erroneous because it disregarded the relevant state law.

Moreover, regarding transfer of rights, the Provider maintained that the Board correctly held that a transfer of "rights to operate" is not a transfer of ownership and does not trigger a review of services furnished by Greenlawn.  The Provider asserted that the term under 42 C.F.R. § 413.30(c) unambiguously refers to an institution and not a DON.  The Provider argued that CMS' interpretation of the term "provider" is erroneous and contradicts the definition in the Medicare statute since there is nothing within the statutory language that suggests that a provider or SNF equates to a DON only.  A DON simply grants an institution the right to eventually secure a license which will allow a facility to provide health care services.  Citing <u>Astabula County Med. Ctr. V. Thompson</u>, 352 F.3d 1090 (6th Cir. 2003) and <u>Maryland Gen. Hosp. V. Thompson</u>, 308 F.3d 340 (4th Cir. 2002) the Provider asserted that the term "provider" does not refer to a single asset, such as a DON.  Furthermore, the Provider argued that CMS' interpretation of the term "provider" is inconsistent with its own published applications of the term.  The Provider noted that the Medicare Intermediary Manual (MIM) states that a purchase of stock does not constitute a change of ownership for Medicare certification purposes unless there is a change in the entity that is legally responsible to the program.  Also, the Provider asserted that the Chairman of the Provider Reimbursement Review Board stated in <u>St. Elizabeth's Med. Ctr.</u>, PRRB Dec. No. 2002-D49 that the provisions of MIM show that the Medicare program views a provider as a business entity and that acquisition of DON rights alone do not represent a transfer.

Furthermore, the Provider maintained that CMS has reinterpreted the new provider exemption without notice and this constitutes a violation of due process rights and the Administrative Procedure Act (APA).  With respect to the violation of due process rights, the Provider contended that the Fourteenth Amendment requires that an agency provide fair notice to those whom it regulates.  Citing <u>Shalala v. Guernsey Mem'l Hosp.</u>, 514 U.S. 87, 100 (1995), the Provider argued that if an agency changes its interpretation of a regulation or policy in a way that drastically impacts the rights of those that are regulated, the agency must provide notice and comment rulemaking under the provisions of the APA.  Given that there is nothing in the Medicare statute, regulations or manual language that states that ownership would be imputed to a new provider simply by acquisition of a DON, CMS has created a

new interpretation while disregarding the APA and the due process clause of the Fourteenth Amendment.

The Provider noted that even if, for the sake of argument, there were a transfer of DON rights, CMS' past administrative decisions indicate that the transfer of DON rights do not constitute the sale of a provider. The Provider pointed to a letter dated May 23, 1994 where CMS granted a new provider exemption to Meridian Healthcare Center at Spa Creek, which had obtained some of its DON bed rights from another facility. Moreover, according to the Provider, CMS has approved new provider exemption requests by SNFs where the facility had converted from an NF. Hence, CMS' decision is inconsistent and conflicts with previous decisions thereby making it improper. In addition to this inconsistency, the Provider argued that CMS's reinterpretation of the new provider exemption goes against the Congressional intent of the Medicare statute, especially since the general goal is uniformity. CMS thwarts Congressional intent by its reinterpretation, which would bifurcate the reimbursement system into DON states and non-DON states. Hospitals in DON States would be denied exemptions because they would be forced to purchase DONs from another facility whereas States without a DON regime would automatically be granted an exemption because it would be a new provider of SNF services.

Also, the Provider claimed that CMS' interpretation is inconsistent with the purpose of the new provider exemption. CMS' interpretation of § 413.30(e)(1997) equates a provider with a DON. The purpose of the new provider exemption is to allow a provider to recover the higher costs that result from start up costs and low occupancy rates that occur while the provider attempts to build its patient population.[13] In the instant case, the Provider never operated a SNF and incurred a great deal of start up costs and had to undergo a great deal of construction, hiring of staff, and working to get Medicare certified. Moreover, the Provider's occupancy rate was low. By denying the Provider the exemption, CMS' actions were inconsistent with the purpose of the regulation. Despite the fact that CMS cites PRM § 2553.1 as the basis for its decision, the Provider argued that it cannot apply this provision retroactively. This provision did not become effective until September 1997. The Provider entered into its agreement with Greenlawn in March 1995 and submitted its new provider exemption request in June of 1997. Given that both of these dates were prior to the effective date of the provision, the Provider argued that CMS is engaging in retroactive rulemaking by applying this provision to the Provider. Citing Maryland General Hospital, the Provider asserted that this same

---

[13] See Astabula, 191 F. Supp.2d at 895.

provision was deemed inapplicable because it did not exist at the time of the transaction, which gave rise to the case.[14]

Notwithstanding the fact that the Board did not address the issue of whether Greenlawn operated as a SNF, the Provider maintained that CMS' determination that Greenlawn operated as such was erroneous.  First, the Provider argued that SNFs and NFs are defined differently under Federal law and CMS' denial letter ignores this fact.  The Medicare statute defines a Medicare-certified SNF as an institution that is primarily engaged in providing skilled nursing or rehabilitation services.  42 U.S.C. § 1395i-3(a).  The Medicaid statute defines an NF as an institution that may be primarily engaged in either skilled nursing, rehabilitative care or "custodial care."  In order for an NF to be equivalent to a SNF, the NF must provide primarily skilled or rehabilitation services.  42 U.S.C. § 1395i-3(a)(1).  According to the Provider, CMS' assertion that Greenlawn existed as a SNF fails to acknowledge the Medicare statute since Greenlawn must have been "primarily" engaged in providing skilled nursing care or rehabilitative services in order to be considered a SNF.

Moreover, the Provider argued that CMS implemented an incorrect standard for determining new provider exemption applications.  The Provider pointed out that CMS' stated practice was to deny a new provider exemption if it determined that a previous owner of the facility had provided a single skilled service to a patient during the look back period.  As a result, CMS ignored definitions of SNFs and NFs and denied exemptions where the prior owner was not "primarily" engaged in providing skilled nursing or rehabilitation services.  Despite the Provider having complied with all of the requirements for a new provider exemption, CMS used an erroneous standard when evaluating the Provider's request.  The Provider also noted that Massachusetts law prohibited Greenlawn from operating as a SNF.  As a Level III facility, Greenlawn was not licensed to provide regular skilled care especially since Massachusetts law would not allow it.  If Greenlawn were to operate beyond the Level III it would have to obtain written approval from the MDPH and would require a new DON to be issued, but the Provider submitted evidence showing that Greenlawn never made such a request.  In addition to ignoring Massachusetts law, the Provider accused CMS of relying on unreliable evidence in its claims that Greenlawn operated as a SNF.  CMS cited reports from single dates in the years 1991-1993 respectively derived from the On-Line Survey and Certification System (OSCAR).  The three year look back period precludes CMS from relying on reports from 1991 and 1992 and the OSCAR system lacks reliability as a basis for deriving the type of services rendered by a nursing facility, especially since the OSCAR reports cited by CMS do not represent ongoing services.  In fact, according to the

---

[14] Maryland General Hospital, Inc. v. Thompson, 308 F.3d 340 (4th Cir. 2002).

Provider, the available evidence shows that Greenlawn was primarily engaged in custodial care and not skilled nursing care.

The Provider asserted that it was primarily engaged in providing skilled services. The Provider intended to serve many of its joint replacement patients as well as surgical patients, patients with fractures and cardiac problems, oncology patients and respiratory patients.  The care received was from skilled professionals and all patients were seen at least daily by a physician. Moreover, the Provider contended that it did not engage in a great deal of unskilled, personal care services. Furthermore, the Provider argued that the exception requests indicate that it was primarily engaged in providing skilled services.  The exception requests show that the average length of stay was 10.7 days in 1996 and 9.79 days in 1998. Furthermore, in 1996, 76 percent of the patients were discharged to their homes and in 1998, 78 percent were discharged to their homes.  Given the short length of stay and that the majority of patients were discharged to their homes, the Provider argued that these facts show the intensity and purpose of the services it provided, which was that skilled care was being given to its patients.  Since Greenlawn did not operate as a SNF, its operations cannot be imputed to the Provider since it was engaging in skilled services.

While the Provider admitted that the aforementioned arguments do not require further inquiry, the Provider sought to show that it was also entitled to a new provider examination based on relocation.  Citing PRM § 2604.1, the Provider argued that it meets the requirements for an exemption based on relocation.  The Provider noted the provision that requires that a new inpatient population be served and argued that the discharge of Greenlawn's entire inpatient population before it opened served as proof that the Provider was servicing a new group of people. Moreover, the Massachusetts licensure law precluded the two facilities from serving the same types of patients.  The Provider also argued that this difference is proven by the fact that Greenlawn served patients with chronic conditions, generally mental illness, while its patients required short-term, skilled nursing and rehabilitation services so that the patients could return home.  Although CMS' denial of the relocation decision was based on § 2533.1, the Provider maintained that this was improper.  CMS' denial letter stated that the Provider did not qualify for a relocation based exemption because the Provider and Greenlawn are both located in HSA V and most of the patients in both facilities came from HSA V.  The Provider asserted that § 2533.1 implements a new set of standards for exemption based relocation that were not included in the prior PRM provision.  Also, the Provider argued that § 2533.1 cannot be applied retroactively.  The Provider reasoned that even if the exemption were based solely on geography, it would still qualify for one.  The Provider cited to St. Elizabeth's Medical Center of Boston v. BlueCross BlueShield

Association/Associated Hospital Services of Maine, [15] for the test articulated for an exemption. First, if the two locations are in the same HSA, CMS looks to the extent of the overlap in the cities and towns served by the old and new providers. While the Provider and Greenlawn were both located in HSA V, the patients that the two had in common came from only a small percentage within the towns served. Greenlawn served 24 towns, and the Provider served 29 of those towns. Of those towns, there were only three that overlapped. Although a large number of the Provider's patients came from the three overlapping towns, these patients only made up 49.8 percent of it's population. Even if this overlap percentage was considered substantial, the Provider contended that it should not be used in comparing the two facilities. The Provider asserted that § 2604.1 requires CMS to look at the patient population of the old facility to determine whether those patients will be served at the new location and not the other way around. In this instance, the Provider stated that the disparity would show, if anything, that a majority of Greenlawn's patients would not be served by the Provider.

With respect to jurisdiction over the years in question, the Provider argued that the Board correctly determined that it had jurisdiction over the issue of whether the Provider qualified for exemptions in fiscal years 1996, 1997 and 1998. The Provider maintained that the Medicare statute grants the Board jurisdiction that is broader than its prerequisites for an appeal. Citing Maine General Med. Center,[16] the Provider stated that the Board has the authority to decide matters beyond those enumerated in subsection (a). Even though the typical scenario would involve only the cost report from which the Provider appealed, the plain language of the statute does not require the Board to limit its review only to the single cost report being appealed by the provider. Furthermore, in prior decisions the Board has accepted jurisdiction over multiple years of a new provider exemption application, even though the provider only appealed a single cost year. Citing St. Elizabeth's Medical Center of Boston, the Provider argued that the Board has the right to look at other cost reporting years if it is relevant to the substance of the issue under dispute.[17] The Provider asserted that the new provider exemption regulation applies to multiple years. The Provider's annual cost reporting period runs from October 1 through September 30 and the first patient was accepted on December 11, 1995. Consequently, the exemption period would be from December 11, 1995 through the end of the fiscal year 1999, which represents the first cost reporting period beginning at least two years after the first patient was accepted.[18] The Provider maintained that it would be inefficient to require the Provider to appeal each NPR affected by the

---

[15] 396 F.3d 1228 (D.C.Cir. 2005).
[16] Maine General Medical Center v. Shalala, No. 98-1065, (1st Cir. 2000).
[17] 396 F.3d 1228 (D.C.Cir. 2005).
[18] See 42 C.F.R. § 413.30(c).

Provider's exemption application. There are no facts that distinguish one year from the other thereby it would be unnecessary and a waste of the Board's resources.

Finally, the Provider responded to CMM's comments which argued that the Administrator should reverse the Board's holdings. First, the Provider noted that CMM's assertion that the facts and the law support the finding of a CHOW thereby requiring the three year look back are erroneous. The Provider maintained that CMM mischaracterizes the actual transaction between the parties and ignored that the contract is for services and nothing else. Furthermore, the Provider argued that CMM cannot contend that the 1996 Massachusetts DON Act is inapplicable. The Provider reasoned that if CMM asserted that State law has no impact on the application of Medicare law, then all of Massachusetts DON law has no effect on the application of Medicare law, thereby precluding the Secretary from considering whether Medicare certification requirements when a Medicare provider changes ownership. Also, the Provider pointed to the fact that Greenlawn was not a Medicare provider and that CMM cannot support its argument by referencing CHOW regulations. Lastly, the Provider asserted that CMM misinterpreted the Board's authority to determine whether a new provider exemption determination should apply to multiple years. The Provider reiterated the fact that Medicare regulations allow the Board to consider cost reporting periods at the end of the SNFs first cost reporting period beginning at least two years after the provider accepts its first patient.

## DISCUSSION

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments are included in the record and have been considered.

Since its inception in 1966, Medicare's reimbursement of health care providers was governed by § 1861(v)(1)(A) of the Act. Section 1861(v)(1)(A), provides that, "reasonable cost shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."

However, the Secretary has also been granted authority under § 1861(v)(1)(A) of the Act to establish:

> limits on the direct and indirect overall incurred costs or incurred costs
> of specific items or services or groups of items or services to be
> recognized as reasonable based on estimates of the costs necessary in

the efficient delivery of needed health services to individuals covered by the insurance programs established under this title....

Implementing § 1861(v)(1)(A) of the Act, the Secretary has promulgated the regulation at 42 CFR 413.30 which sets forth the general rules under which CMS may establish routine cost limits on the reasonable costs of providers. The regulation further establishes rules which govern exemptions from and exceptions to limits on cost reimbursement in order to address the special needs of certain situations and certain providers. In this case, the Provider requested an exemption from the routine cost limits for new providers. This exemption is set forth in the regulation at section 413.30(e), which reads:

> Exemptions from the limits imposed under this section may be granted to a new provider. A new provider is a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years. An exemption granted under this paragraph expires at the end of the provider's first cost reporting period beginning at least two years after the provider accepts its first patient.

In this case, the issue is whether the Provider was operating as "the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years." When determining whether a SNF provider has operated as a SNF or its equivalent for three years, CMS looks at the services of the institution as a whole prior to certification.

Notably, the U.S. Court of Appeals for the District of Columbia recently rendered St. Elizabeth's v. Thompson.[19] In St. Elizabeth's, a SNF had requested a new provider exemption after purchasing operating rights from a Medicaid nursing facility (NF). CMS determined that, under the law, both NFs and SNFs are required to provide the same fundamental range of services, i.e., nursing and specialized rehabilitative services meeting a certain standard. Thus, CMS found that the Provider was not a "new provider" for purposes of the 42 CFR 413.30(e) exemption. However, on review, the Court of Appeals found that the record did not show that the NF was "primarily engaged"[20] in providing skilled nursing or rehabilitative

---

[19] 396 F.3d 1228 (D.C.Cir. 2005).

[20] The Act defines a SNF at §1819(a)(1) as an institution which: "is primarily engaged in providing to residents – (A) skilled nursing care and related services for residents who require medical or nursing care, or (B) rehabilitation services for the

services. Thus, the Court reversed CMS' determination that the NF operated as a SNF or equivalent provider of services.

The Administrator continues to maintain the validity of CMS policy as set forth in the CMS determination litigated in <u>St. Elizabeth's</u>.[21]  However, under §1878(f)(1), the District of Columbia is a judicial district in which this Provider may file suit and, thus, <u>St. Elizabeth's</u> is binding case law here. Accordingly, the Administrator finds it proper to remand the instant case to CMS to apply the Court's criteria in <u>St. Elizabeth's</u> to the particular facts of this Provider's exemption request and to determine whether the Provider's request for a new provider exemption should be allowed under the <u>St. Elizabeth's</u> criteria.[22]  This remand is limited to the facts, circumstances, and cost year presented in this specific case.[23]

Accordingly, the Administrator orders:

THAT the decision of the Provider Reimbursement Review Board be vacated; and

THAT this case is remanded to CMS to apply the Court's criteria in <u>St. Elizabeth's Medical Center of Boston v. Thompson</u> to the Provider's exemption request; and

THAT a CMS decision on the Provider's exemption request will be rendered as expeditiously as possible; and

---

rehabilitation of injured, disabled, or sick persons, and is not primarily for the care and treatment of mental diseases." 42 CFR 409.33 of the regulations also sets forth examples of skilled nursing and rehabilitative services.

[21] Admr. Dec. 2002-D49; 396 F.3d 1228 (D.C.Cir. 2005).

[22] The Provider has pointed out that a CMS analyst responsible for staff work on provider exemptions testified before the Board. However, this staff person does not have the delegated authority to make new provider exemption determinations. As no determination has been made by CMS as to whether the prior owner was "primarily engaged" in providing SNF or rehabilitative services, remanding the case to CMS for such determination is appropriate.

[23] The Administrator agrees with the Dissenters that this case is limited to the FYE 9/30/98 cost report appeal of the new provider exemption. <u>See also</u> <u>Larkin Chase Nursing and Restorative Care Center</u>, PRRB Nos. 98-0388 and 00-3079 (12/12/00)(a provider is required to challenge a CMS determination on a RCL request pursuant to its appeal of its NPR). Moreover, Section 1878 (a)(1) of the Act refers to appeals of final determinations "for which payment may be made under this Title for the period covered by such report." Thus, as the right to a Board hearing is specifically for a cost reporting period, the proper appeal of one cost report does not confer to the Board jurisdiction to review other cost reports not otherwise appealed.

THAT the CMS decision on the Provider's exemption request pursuant to the criteria set forth in <u>St. Elizabeth</u> will follow the provisions of 42 CFR 413.30(c).

Date: 4/30/07

Herb B. Kuhn
Acting Deputy Administrator
Centers for Medicare & Medicaid Services

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C5-06-27
Baltimore, Maryland 21244-1850



**Center for Medicare Management**

Refer to: FAHB4

0 9 NOV 2007

Mr. Vinnie Guarino
Director
Medicare Audit and Reimbursement
Associated Hospital Service
50 Salem Street
Lynnfield, Massachusetts 01940-2694

     Re:    Medicare New Provider Exemption Request for
             Peter Chapman Transitional Care Unit

Dear Mr. Guarino:

This is the final determination of the CMS as it relates to the request of Jordan Hospital (aka Peter Chapman Transitional Care Unit (the TCU)) for an exemption to the skilled nursing facility routine service cost limit (SNF RCL) for the cost reporting period ended September 30, 1998.

By letter dated June 25, 2007, CMS requested that the TCU submit documentation acquired from medical records and/or other clinical and/or business records kept in the ordinary course of operating the Greenlawn Nursing Home for FY's 1992, 1993 and 1994 that would demonstrate the types of services and in what proportion such services were provided to the residents at the Greenlawn Nursing Home during these years. The TCU responded by letter dated August 24, 2007 stating that the TCU had previously furnished all of the documentation it has available regarding the services furnished by Greenlawn Nursing Home. The TCU specifically relies upon the following documents to establish that Greenlawn Nursing Home was providing skilled nursing and related services to less than half of the residents who were admitted, discharged or whom resided in the Greenlawn Nursing Home during FYs 1992, 1993 and 1994:

- Provider Exhibit 48 entitled "Excerpts from Greenlawn Discharge Summary Ledger for Last Year Operation" which includes redacted name, admission date, date of discharge, years in facility, age at discharge, birth date, major diagnosis, financial responsibility, discharge to and reason for discharge.
- A picture of the building housing Greenlawn Nursing Home.
- Testimony at the PRRB hearing.

- The employment practices of the Greenlawn Nursing Home
- The assertion that Greenlawn Nursing Home was not required to provide skilled services to any of its residents because it was licensed as a Level III not a Level II facility by the State of Massachusetts.

The documents listed above as submitted by the TCU do not document the type of services received by each of the residents admitted to, discharged or residing at the Greenlawn Nursing Home prior to its relocation and subsequent participation in the Medicare Program as the Peter Chapman Transitional Care Unit during FY's 1992, 1993 or 1994.

Provider Exhibit 48 contains no reference to the types of services each resident received who was admitted to, discharged from or residing at Greenlawn Nursing Home during FYs 1992, 1993 and 1994. Instead, the document sets forth certain patient characteristics of the residents discharged at the time the license to operate as a nursing home was temporarily suspended as agreed in Section 3.12 of the Agreement dated March 31, 1995 among and between Shirley Dionne (Operator) and Jordan Hospital, pending relocation to the hospital campus.

A picture of the physical building that housed Greenlawn Nursing Home is clearly not a medical record and/or other clinical and/or business record kept in the ordinary course of operating the Greenlawn Nursing Home that would provide information about the type of services each resident received at the Greenlawn Nursing Home.

The testimony of Ms. Kemp, a Med/Surg Registered Nurse, employed by Jordan Hospital testified that she had never visited Greenlawn Nursing Home and that the only documentation from Greenlawn Nursing Home that she had reviewed was Provider Exhibit I-41. As we state above, Provider Exhibit I-41 contains no reference to the types of services each resident received who was admitted to, discharged from or residing at Greenlawn Nursing Home during FYs 1992, 1993 and 1994.

Nor does the number of skilled staff present bear any indication of whether or not skilled services were provided to less than half of the residents in any given year. Skilled services are provided directly by, or under the supervision of, professional personnel, such as licensed and registered nurses.[1] As testified by Ms. Kemp, certified nursing assistants (CNAs) work under the supervision of a licensed or registered nurse. Since CNAs have extensive daily contact with each patient, they are key to providing vital information on the patients' conditions to professional personnel.

Lastly, the Provider's assertion that it was not eligible to be reimbursed under the Massachusetts Medicaid program for furnishing skilled services because it was licensed as a level III and not a

---

1 "Under the supervision of technical or professional personnel" means that an aide may perform skilled services under the general supervision of technical or professional personnel who is on the premises of the institution at the time the service is performed.

level II nursing home by the State of Massachusetts is not evidence of whether or not skilled services were provided to less than half of the residents who received nursing services in the facility in any given year. Nor is it a medical record and/or other clinical and/or business record kept in the ordinary course of operating the Greenlawn Nursing Home. In fact, the Provider failed to corroborate this broad statement which could very easily be supported by the inclusion of all of the Management Minutes Questionnaire (MMQ) documents filed by Greenlawn Nursing Home during its last three full years of operation with the Massachusetts Department of Public Welfare for purposes of Medicaid reimbursement. The MMQ is a document that is not only a clinical record (it identifies the types of services each resident has actually received during a specific period of time), but also a business record as it is required for payment under the State's Medicaid program.

In the case of Peter Chapman Transitional Care Unit, Jordan Hospital assumed ownership and operation of the Greenlawn Nursing Home on May 18, 1995. The facility's license was subsequently temporarily suspended as agreed in Section 3.12 of the Agreement dated March 31, 1995 among and between Shirley Dionne (Operator) and Jordan Hospital. The State of Massachusetts subsequently approved a change of ownership of the temporarily suspended license and provided for a relocation of such license to the hospital campus in accordance with the process for a transfer of site. The Peter Chapman Transitional Care Unit re-opened on December 8, 1995, and was subsequently certified to participate in the Medicaid program effective December 8, 1995, and the Medicare program effective December 15, 1995.

Greenlawn Nursing Home had been certified to participate in the Medicaid program as a nursing facility through January 11, 1995. Even though certified as a NF prior to its relocation in 1995, Greenlawn Nursing Home was required to furnish, and was eligible to be reimbursed under the Massachusetts Medicaid program for furnishing skilled nursing and related services and rehabilitation services to many of the same groups of individuals for which Peter Chapman Transitional Care Unit was later entitled to reimbursement under Medicare and Medicaid.

The U.S. Court of Appeals for the D.C. Circuit has ruled that in order to determine if a facility has operated as a SNF or its equivalent CMS shall look beyond the facility's defined capabilities and examine the quantity of SNF services actually provided. Thus, how a facility is licensed, what type of physical structure the facility is located in, the facility's employment practices, or the basic characteristics of its patient population are not determinative of whether or not the facility meets the standard set forth in St. Elizabeth's which was applied in Milton Hospital Transitional Care Unit v. Thompson. In Milton, the court found it important to determine whether skilled services "were provided to less than half of the residents." 377 F. Supp. 2d 17, 27-28 (D.D.C. 2005) (citing cases). The court found that such a determination was necessary in evaluating whether a facility was "primarily engaged" in operating as a SNF. The definition of a SNF for purposes of certification set forth in 1819(a)(1) of the Act states:

"**Skilled Nursing Facility Defined.** In this title, the term "skilled nursing facility" means an institution (or a distinct part of an institution) which – (1) is primarily engaged

in providing to residents (A) skilled nursing care and related services for residents who require medical or nursing care, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons."

Being "primarily engaged" in furnishing skilled nursing care under the basic SNF definition in 1819(a)(1) refers to the type of care that a facility, or distinct part of a facility, provides to its patients generally rather than the type of care a particular patient may receive at a given point in time. However, to determine the type of care generally provided in the facility, or a distinct part of the facility, a review of the care provided to each patient throughout their stay is critical.

A Nursing Facility (NF) is defined, for purposes of certification in Section 1919(a)(1) of the Act, as a facility, or distinct part of a facility, that primarily provides skilled nursing care and related services for the rehabilitation of injured, disabled or sick persons, or on a regular basis, health related care services *above the level of custodial care* to other then mentally retarded individuals (Resident Assessment Instrument, December 2002).

Both SNFs and NFs are classified as long term care facilities. Long term care facilities ("LTCs") provide care to a very heterogeneous resident population. Some individuals require short-term, intense rehabilitation services; others, on the other hand, may be incontinent, mentally impaired, or so seriously disabled that they require extensive and continuous care for months or years. Providing consistently high quality of care in nursing homes to a varied group of frail, very old residents, many of whom have mental impairments as well as physical disabilities, requires that functional, medical, social, and psychological needs of residents be individually determined and met by careful assessment and care planning – steps that require professional skill and judgment. See Improving the Quality of Care in Nursing Homes, Institute of Medicine, pgs. 8, 10 (1986). For these reasons, skilled nursing care is required by many persons who suffer from chronic diseases necessitating the kinds of treatment and care that require frequent or continuous observation and/or specialized services that can safely be performed for them only by, or under the supervision of, professional or licensed practical nurses.

The critical factor in distinguishing skilled from unskilled or supportive care is the need for the services of licensed health personnel. Skilled nursing care and rehabilitation services are furnished directly by, or under the supervision of, technical or professional personnel such as registered nurses, licensed practical nurses, physical therapists, occupational therapists, speech pathologists or audiologists, working under the direction of a physician. 42 CFR 409.31(a). For example, physicians need to know from nursing staff a patient's response to treatments (e.g., drugs) in order to determine whether drugs should be adjusted in dosage or the regimen altered.

In summary, the TCU has failed to provide documentation clearly demonstrating that skilled nursing and related services or rehabilitative services were provided to less than half of the residents of the Greenlawn Nursing Home for less than three full years prior to participating in the Medicare program as a SNF. Accordingly, its request to be exempt from the SNF RCL for the cost reporting period ended September 30, 1998 is denied. CMS will reopen this decision if

the TCU submits to CMS: 1) all of the MMQ documents submitted by Greenlawn Nursing Home to the State of Massachusetts Department of Public Welfare in the three full years prior to its closure and subsequent relocation to Jordan Hospital and 2) Greenlawn Nursing Home's Medicaid cost report for FY 1994 and/or FY 1995. Greenlawn Nursing Home was decertified from the Medicaid program on January 11, 1995. These reports could have been produced and filed either by either the former owner or by Jordan Hospital.

If you have any questions regarding this letter please contact Julie Stankivic of my staff at (410) 786-5725.

Sincerely,

Sheila Lambowitz

Sheila Lambowitz
Director
Division of Institutional Post-Acute Care
Chronic Care Policy Group

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JORDAN HOSPITAL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civ. No. 07-01160 (JDB) |
| | ) | |
| **MICHAEL O. LEAVITT, Secretary** | ) | |
| **of Health and Human Services** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## <u>ORDER</u>

Upon consideration of Defendant's Motion to Dismiss and the entire record herein, it is

this _____ day of _____, 2008,

ORDERED that Defendant's Motion to Dismiss be, and hereby is, GRANTED; and it is

further

ORDERED that Plaintiff's Complaint be, and hereby is, dismissed with prejudice.


_____
John D. Bates
United States District Judge


Copy to:          ECF Counsel