# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

_____

JORDAN HOSPITAL,                                    )
                                                    )
         Plaintiff,                         )
                                                    )
         vs.                                )          Case No. 1:07-cv-01160
                                                    )
MICHAEL O. LEAVITT, Secretary of the                )
United States Department of Health and              )
Human Services,                                     )
                                                    )
         Defendant.                         )
_____)

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### INTRODUCTION

Plaintiff in the above-captioned civil action, Jordan Hospital, hereby opposes Defendant's Motion to Dismiss this case. While the Defendant's memorandum of law accurately recites certain legal principles that pertain to this case, Defendant seeks to apply those principles in a manner that fails to reflect the full range of facts and legal concepts bearing on proper disposition of this action. The Plaintiff agrees with the Defendant's principal argument that, generally, an order for remand is not a final agency action subject to review, but the Defendant's argument misses the point of Plaintiff's Amended Complaint. The basis of Plaintiff's Amended Complaint is that the Administrator does not have the authority to remand to the Centers for Medicare and Medicaid Services ("CMS") and, therefore, the Administrator's action is *ultra vires.* Defendant should not be permitted to elude review of this *ultra vires* action by asserting that it is not final agency action. Moreover, Defendant's failure to issue a legally valid order relating to the PRRB decision

rendered the Board's decision a final agency action.  As is explained in more detail below,

a more searching analysis of the factual circumstances presented by this action, and the

legal authorities relevant to it, reveals that the Court's jurisdiction over this case is firmly

established.

STATUTORY AND REGULATORY FRAMEWORK

A provider of health care services that is dissatisfied with a final determination of

its fiscal intermediary may appeal that determination to the provider reimbursement review

board ("PRRB" or the "Board").  42 U.S.C. § 1395oo(a).  A decision of the Board is final

unless the Secretary "reverses, affirms, or modifies the Board's decision" within 60 days

after the provider receives notification of the Board's decision.  Id. at § 1395oo(f)(1).  The

Secretary has delegated authority to review Board decisions to the Administrator of CMS,

a component agency of the Department of Health and Human Services.  Medicare

Program; Administrator's Review of Provider Reimbursement Review Board Decision 48

Fed. Reg. 45,766, 45,767 (Oct. 7, 1983); see also 42 C.F.R. §§ 405.1801(a) and 405.1875.

A final administrative decision may be appealed to federal court:

> Providers shall have the right to obtain judicial review of any final
> decision of the Board, or of any reversal, affirmance, or modification by
> the Secretary, by a civil action commenced within 60 days of the date on
> which notice of any final decision by the Board or of any reversal,
> affirmance, or modification by the Secretary is received.

42 U.S.C. § 1395oo(f)(1).  If the Administrator fails to act, after having notified the parties

that he would do so, the Administrator's "inaction constitutes an affirmance" of the PRRB

decision.  42 C.F.R. § 405.1877(c).

Although not mentioned in the statute, CMS regulations permit the Administrator

to remand decisions to the Board.  After notifying the parties that he intends to review a

Board decision, the regulations at 42 C.F.R. § 405.1875(g) permit the Administrator to

"affirm, reverse, modify or remand the case."  The next subsection, 405.1875(h), is titled

"Remand" and addresses the specific contours of the Administrator's remand authority.  A

remand "to the Board" vacates the Board's decision.  42 C.F.R. § 405.1875(h)(1).  The

Administrator may instruct "the Board" to further develop the facts, new issues, or

consider certain additional legal authority.  Id. at § 405.1875(h)(2).  Once remanded, "the

Board" will follow the Administrator's instructions and issue a new decision.  Id. at

§ 405.1875(h)(3).  Nowhere in this regulation, or in any other regulation, is the

Administrator empowered to remand a Board decision to CMS.

STATEMENT OF FACTS

  I.  Factual and Procedural Background

  The Defendant's account of the factual and procedural background giving rise to

this case are generally accurate and will not be repeated here in detail.  It is important,

however, to emphasize a few additional points of fact for the Court's consideration.

  First, the Defendant states that the Administrator vacated the decision of the Board

and remanded the matter to CMS.  Def. Mem. Supp. Mot. Dismiss p. 9.  The Defendant

fails to explain, however, that three of Plaintiff's cost years were at issue before the PRRB

(fiscal years 1996, 1997 and 1998), and that the Administrator remanded only as to fiscal

year 1998.  In the PRRB proceedings, the fiscal intermediary took the position that the

Board did not have jurisdiction over the Plaintiff's fiscal years 1996 and 1997.  Def. Ex. 1,

p. 5.  The Board ruled that the Plaintiff should be granted a new provider exemption, but

also that its ruling applied to all three fiscal years.  Def. Ex. 1, p. 6.  With regard to the

issue of whether the Board had jurisdiction over fiscal years 1996 and 1997, the

Administrator appears to have reversed the PRRB's decision.[1]  Def. Ex. 2, p. 15, n. 23.

Plaintiff challenged the Administrator's ruling as to fiscal years 1996 and 1997.  Amended

Complaint, ¶ 61, 66, 67.

Second, the Defendant recounts the long procedural history of this case and ends

with the statement that CMS denied Plaintiff's request for an exemption (for a second

time) by letter dated November 9, 2007.  Def. Mem. Supp. Mot. Dismiss p. 10.  The

Defendant also states, "Since the filing of Plaintiff's Complaint, CMS has already acted

upon the Administrator's remand order and denied Plaintiff's request for a new provider

exemption."  Def. Mem. Supp. Mot. Dismiss p. 16.  The Plaintiff, did not become aware of

the November 9, 2007 letter until January 4, 2008 when it was faxed to Plaintiff's counsel.

Pl. Ex. 1.  In addition, the Intermediary did not issue a letter confirming the CMS

determination until February 5, 2007.  Pl. Ex. 2.  These dates put in context Defendant's

assertion that "Plaintiff has not yet appealed CMS's November 9, 2007 final (post-remand)

determination to the PRRB."  Def.'s Mem. Supp. Motion p. 14.  Plaintiff was only made

aware of this "post-remand" decision a little more than three weeks before Defendant

submitted its Motion to Dismiss.

<u>ARGUMENT</u>

I.     <u>The Administrator Lacked Authority to Remand This Case to CMS</u>

Defendant's motion is premised on its assertion that the Administrator's action

remanding to CMS was proper and, therefore, no final agency action exists upon which

jurisdiction in this Court may rest.  Defendant's argument is based upon a superficial

---

[1] The Administrator's decision does not state explicitly that it reverses the PRRB on this issue, but the effect appears to be the same.  The Administrator stated in footnote 23 of his decision that he "agrees with the dissenters that this case is limited to the FYE 9/30/98 cost report appeal of the new provider exemption." Def. Ex. 2 at 15.  Furthermore, CMS's post-remand determination applies only to fiscal year 1998.  Def. Ex. 3, p. 1.

analysis of only one portion of the remand regulation at 42 C.F.R. § 405.1875. An analysis

of the entire regulation and CMS's historical interpretation of that regulation reveals that

the Administrator may not remand a PRRB decision to CMS. The Administrator's action

was, therefore, *ultra vires*, and, as a result, the PRRB's decision became final agency

action.

> A.    The Plain Wording of the Medicare Regulations Limits the
> Administrator's Authority to Remand to Only the Board

Proper disposition of Defendant's Motion turns in large part on the question of

whether the Administrator had legal authority to remand Plaintiff's appeal back to CMS.

If the Administrator had such authority, that remand, as Defendant contends, would not

represent a "final agency action." If, however, applicable law and regulations do not

authorize remand by the Administrator to CMS (as opposed to the PRRB) then this case

stands in a very different posture. Under that scenario, the action subject to review is not

the Administrator's remand, but rather Defendant's failure to act to implement the PRRB's

decision, a decision which became final agency action when it was not "reversed, affirmed,

or modified" by the Administrator. 42 U.S.C. § 1395oo(f).

Stated differently, Plaintiff does not contest Defendant's general proposition that a

remand is ordinarily not a final, appealable action. If the Administrator effectively

remanded this case to CMS, there is as yet no final agency action from which Plaintiff can

appeal to this Court pursuant to 42 U.S.C. § 1395oo(f). Plaintiff contends, however, that

no remand within the meaning of Medicare regulations took place; instead what has

transpired is CMS's failure to act to implement a decision that became final and binding by

operation of law.

The core of the Defendant's argument is that the federal regulation at 42 U.S.C.
§ 405.1875 authorizes the Administrator to "reverse, affirm, or modify" a decision of the
PRRB, or to "remand" it to any previous level of the administrative process preceding the
Administrator's review.  According to Defendant's brief, the regulatory reference to a
"remand" in Section 405.1875(g) is at least ambiguous, and because the Defendant now
claims to construe that reference to include remand to CMS (not only to the Board), the
Court must defer to that interpretation.

The argument has one glaring fallacy.  The regulation in question is not at all
ambiguous, and instead clearly uses the word "remand" to refer exclusively to a remand to
the PRRB, not to CMS.  Defendant finds "ambiguity" only by reading one subsection of a
federal regulation in isolation, without attention to the immediately following subsection of
the very same rule.

Section 1878(f) of the Medicare statute, 42 U.S.C. § 1395oo(f), authorizes the
Administrator to "reverse, affirm, or modify" a decision of the PRRB, but does not
explicitly give authority to remand a case subject to the Administrator's review.  The
Administrator's authority to remand a case is authorized by regulation at 42 C.F.R. §
405.1875.  Section 405.1875(g) describes the actions the Administrator may take upon
review of a PRRB decision as action to "affirm, reverse, modify or remand" the case, and
Defendant is correct that subsection (g) of § 405.1875 uses the word "remand" with no
limiting description.

However, the immediately succeeding subsection of the same regulation,
subsection 405.1875(h), is entitled "Remand," and very plainly defines the scope of the
term as used in § 405.1875(g).  Subsection (h) expressly establishes the procedural effect

of, and standards for, remand of a case "to the Board," but does not give even a hint that remand to any other entity might be permissible. Nothing in § 405.1875(h) — or in any other part of § 405.1875 for that matter — makes reference to a remand to any entity other than the Board. For example, the regulation states that, "[a] remand to the Board by the Administrator vacates the Board's decision," but does not state anything about a remand to CMS. 42 C.F.R. § 405.1875(h)(l). The regulation itself, in other words, belies Defendant's current contention that the published rule gives the Administrator open-ended authority to remand to any range of entities, including CMS. A "remand" within the meaning of § 405.1875 is confined exclusively to a "remand to the Board by the Administrator." See 42 C.F.R. § 405.1875(h)(1).

> B.    CMS Interprets the Regulation to Permit a Remand Only to the PRRB

Any possible doubt that Plaintiff's reading of 42 C.F.R. §§ 405.1875(g) and (h) is the correct interpretation of the Administrator's remand authority is easily dispelled by reference to Defendant's own explanation of that rule when it was originally promulgated in 1983. When Defendant promulgated the remand regulation, it interpreted the regulation to apply only to remands to the PRRB. Defendant has not modified its interpretation through notice and comment rulemaking, and, therefore, it is bound by its original interpretation that the Administrator's remand authority is limited to remands to the PRRB.

Prior to 1983, CMS took the position that it had no remand authority because the statute at 42 U.S.C. § 1395oo(f) empowered the Secretary only to reverse, modify, or affirm a PRRB decision and contained no specific authority to remand. See Gulf Coast Home Health Serv., Inc. v. Califano, 1978 U.S. Dist. Lexis 15069 (D.D.C. 1978). In Gulf Coast, the Administrator reversed a PRRB decision despite believing that a remand to the

PRRB would have been more appropriate.  Id. at *2-3.  On appeal, the court held that the

Administrator had inherent power to remand to the PRRB, absent an explicit statutory bar.

Id. at *4-5.

Relying on Gulf Coast, CMS then promulgated regulations permitting the

Administrator to remand to the PRRB:

> The current regulations do not explicitly authorize the Administrator to remand a
> case to the Board.  However, the U.S. District Court for the District of Columbia
> concluded that the Secretary's authority inherently includes remanding a case to the
> Board for further action consistent with the statute and regulations.

48 Fed. Reg. at 45,770 (citation omitted).

The discussion of the rule and responses to public comments in the preamble to the

rule describe the intent and rationale for the rule.  Id. at 45770-71.  This preamble

discussion indicates that CMS never contemplated anything other than that the

Administrator would remand to the PRRB.  The preamble expressly noted that the statute

is silent as to any authority of the Administrator to remand a case, and only authorizes the

Secretary "to reverse, affirm, or modify a decision of the Board provided he or she does so

within 60 days."  Id. at 45,770.  Defendant interpreted Gulf Coast as holding that "the

Administrator has the inherent power to remand to the previous decision maker."  Id. at

45,771.

Thus, CMS "proposed to amend the regulations to provide for the remand of a case

to the Board by the Administrator."  Id. at 45,770.  Indeed, "[t]he essential purpose of the

remand authority is to have the Board consider additional evidence or issues essential to a

full development of the record."  Id. at 45,770.  Nowhere in the preamble to the 1983

remand regulations did the agency state, or even intimate, that the regulations permitted the

Administrator to bypass the PRRB and remand directly to CMS.  The Defendant made numerous references to a remand to the Board and no references to a remand to CMS.[2]

In light of the Defendant's clear explanation of the intent of, and rationale behind, the rule regarding remand of PRRB appeals, it is difficult to take seriously Defendant's current assertion that he interprets 42 C.F.R. § 405.1875 to authorize remands to entities other than the Board.  The authoritative and legally binding construction of the regulation at issue is, instead, the construction articulated by the Defendant in the Federal Register when the regulation was initially published as a final rule — specifically, that the rule authorized the Administrator to remand cases to the Board, and nowhere else.

C.    Defendant's Interpretation Is Not Entitled to Deference

Plaintiff agrees with the Defendant that, generally, an agency's interpretation of its own regulation is entitled to deference.  For several reasons, however, the Defendant's interpretation of 42 C.F.R. § 405.1875(g) is not owed any deference in this case.  First, an agency's interpretation of its own regulation is not accorded deference if "it is plainly erroneous or inconsistent with the regulation."  Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994) (internal quotation omitted).  As discussed in detail above, the Defendant's reading of 42 C.F.R. § 405.1875(g) completely ignores the immediately succeeding section.  Defendant's interpretation of the regulation would render the

---

[2] These regulations . . . authorize the Administrator to remand cases to the Board."  48 Fed. Reg. 45,766, col. 2 (Oct. 7, 1983).  "§ 405.1875 continues HCFA's right to request the Administrator to affirm, modify, reverse or remand a Board decision . . . ."  48 Fed. Reg. at 45,767, col. 2.  "If there are unresolved factual issues, an appropriate motion to remand the case to the Board for further action will be filed with the Court."  48 Fed. Reg. at 45,768, col. 2.  "The current regulations do not explicitly authorize the Administrator to remand a case to the Board.  However, . . . the Secretary's authority inherently includes remanding a case to the Board for further action consistent with the statute and regulations."  48 Fed. Reg. at 45,770, col. 3.  "In the NPRM, we proposed to amend the regulations to provide for the remand of a case to the Board by the Administrator."  48 Fed. Reg. at 45,770, col. 3.  "[A] remand action by the Administrator may direct the Board to take further action . . . ."  48 Fed. Reg. at 45,771, col. 1.  "[T]he Administrator has the inherent power to remand to the previous decision maker."  48 Fed. Reg. at 45,771, col. 1.  "This section now clarifies that . . . [t]he Administrator may direct the Board to develop additional facts or new issues, or to consider laws or regulations that have not been applied . . . ."  48 Fed. Reg. at 45,771, col. 3.

9

regulation internally inconsistent, and is not, therefore, entitled to deference. <u>Shalala</u>, 512 U.S. at 512.

Second, interpretations set forth in a regulation are given more weight than interpretations that are not subject to notice and comment, such as those set forth by the Defendant in its Motion. <u>United States v. Mead Corp.</u>, 533 U.S. 218, 231 (2001); <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000). Once an agency articulates an interpretation of a regulation, it can only modify that interpretation through the notice and comment process. <u>Alaska Prof'l Hunters Ass'n, Inc., v. FAA</u>, 177 F.3d 1030, 1033-34 (D.C. Cir. 1999); <u>Paralyzed Veterans of Am. v. D.C. Arena L.P.</u>, 117 F. 3d 579, 587 (D.C. Cir. 1997). Therefore, even if the language of the regulation were ambiguous, the interpretation of the relevant regulation now articulated in Defendant's brief is not entitled to any judicial deference because it is inconsistent with the more authoritative and binding agency interpretation of the same rule, published in the Federal Register when the regulation was promulgated.

Finally, given the Defendant's clear and detailed explanation of 42 C.F.R. § 405.1875(g) at the time the Defendant adopted it, Defendant's interpretation of the regulation in this case appears to be no more than a litigating posture. The Supreme Court has held that, "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." <u>Bowen v. Georgetown University Hospital</u>, 488 U.S. 204, 213 (1988). Defendant's current interpretation is transparently a product of advocacy in litigation and not an administrative construction of law entitled to judicial deference.

D.      Defendant's Interpretation Decidedly Does Not Promote
        Administrative Efficiency

Defendant argues that his interpretation of the remand regulation "is reasonable

because it promotes administrative economy." Def. Mem. Supp. Mot. Dismiss p. 17. The

Defendant's interpretation, in fact, creates administrative roadblocks and places the

Plaintiff in a potentially never-ending loop of redundant reviews.

Plaintiff is contesting Medicare reimbursement related to its fiscal years 1996, 1997

and 1998. To state the obvious, the most recent of these cost years ended almost ten years

ago. Because of the CMS Administrator's remand, CMS has, in essence, started the entire

lengthy and costly administrative review process of these cost years over again. Defendant

argues that, "Plaintiff's remedy is therefore to appeal the redetermination to the PRRB, not

this Court." Def. Mem. Supp. Mot. Dismiss p. 16. The Plaintiff has already appealed the

Defendant's determination to the PRRB and requiring it to do so again cannot in any way

be viewed as advancing administrative efficiency.

The PRRB proceedings from the date of the Plaintiff's appeal until issuance of the

Board's decision (which, pursuant to applicable requirements, included the parties'

submission of preliminary and final position papers, an adversary hearing before the

PRRB, and submission of post-hearing briefs) took 22 months. Sixty days after Plaintiff

completed this lengthy and expensive administrative process, the Administrator's

ostensible remand of the case to CMS purported to render the entire 22 month

administrative process a nullity.

The cost to Plaintiff of pursuing this administrative avenue of redress has totaled

approximately $135,000 for attorneys' fees and expenses through January 2008, which

does not include a significant portion of fees that were waived by Plaintiff's attorneys. See

Declaration of Kelly Baskerville. Pl. Ex. 3. In addition to a significant financial outlay, the Provider devoted a substantial investment of effort in helping to prepare position papers and by participating in the PRRB hearing. For the PRRB hearing alone, three individuals traveled from the Boston area (two of them Provider employees) to appear as witnesses for the Plaintiff.

The Defendant's position that remand to CMS promotes administrative efficiency in this case loses more ground in light of certain pertinent facts. First, CMS's second determination leaves open the possibility that it might reopen even that determination if the Plaintiff can manage to unearth certain documents from the early to mid-1990s. Def. Ex. 3, p. 5. CMS seems to want a limitless opportunity for a "bite at the apple;" each bite forcing Plaintiff to start the administrative process over again.

Second, the reason that the Administrator gave for the remand was "to apply the Court's criteria in St. Elizabeth's Medical Center of Boston v. Thompson [396 F.3d 1228 (D.C. Cir. 2005)] to the Provider's exemption request." Def. Ex. 2, p. 15. Remand to CMS to review the Plaintiff's request in light of the St. Elizabeth's case was absolutely unnecessary because the Board considered that case in rendering its decision. The Board cited to St. Elizabeth's in its opinion. Def. Ex. 1, p. 6. Moreover, both counsel for the Plaintiff and opposing counsel cited to the St. Elizabeth's case in their Supplemental Position Papers, which were presented to the Board prior to hearing.[3] Asking CMS to

---

[3] Plaintiff's counsel cited to the St. Elizabeth's case 13 times in its Supplemental Position Paper. Pl. Ex. 4, p. 8, 18, 26, 34-35, 51-53. The attorney for the fiscal intermediary also cited to the St. Elizabeth's case in its Supplemental Position Paper. Pl. Ex. 5, p. 31. (Plaintiff's counsel does not have on file a signed copy of the Intermediary's Supplemental Position Paper, but believes that the version included as an exhibit here is almost identical to the signed copy submitted to the Board. No exhibits are included for either Supplemental Position Paper because they are quite voluminous and not pertinent to this issue.)

consider a case about which the Board had full knowledge is clearly not a step toward administrative efficiency.

Under Defendant's construct of the law, Plaintiff must give up challenging what it believes to be an incorrect and unlawful agency decision, and must launch into a second PRRB appeal, running the risk that even if it prevails at that level, after another several years and many thousands of dollars of additional expense, the Administrator may simply choose to remand the matter back to CMS again, thereby continuing to deny Plaintiff either relief or a final decision subject to judicial review. To argue, therefore, that the Secretary's remand "promotes administrative economy" defies logic.

II.     Plaintiff is Appealing From a Final Determination

A.     The PRRB's Decision Is Final Agency Action

Defendant argues that the Plaintiff is not appealing from a final decision of the Administrator. This argument seems to be a variation on Defendant's argument that a remand is not an appealable decision and, similarly, misses the point of Plaintiff's Amended Complaint. The PRRB's decision became final agency action once the Administrator failed to take lawful action on that decision. Therefore, Plaintiff is appealing from a final determination, and jurisdiction is proper under 42 U.S.C. § 1395oo(f).

The Medicare statute states, "A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision." 42 U.S.C. § 139500(f). The Medicare regulations state that, if the Administrator notifies the parties that he or she has decided to review a Board decision, but does not issue a decision within

13

the 60 days allotted for review, "this subsequent inaction constitutes an affirmance."  42
C.F.R. § 405.1877(c).

The PRRB's decision in this matter constitutes final agency action.  The PRRB's
decision is dated February 27, 2007.  Assuming that five days transpired before the
Plaintiff received the decision, the Administrator's deadline to act was May 3, 2007.  The
Administrator notified the parties by letter dated March 28, 2007 that he would review the
PRRB decision.  Pl. Ex. 6.  The Administrator's April 30, 2007 remand to CMS was *ultra
vires*, and therefore the Administrator missed the deadline to act lawfully on the PRRB's
decision.  When the Administrator failed to act lawfully by May 3, 2007, the PRRB's
decision became final by operation of the Medicare statute and regulations.  42 U.S.C.
§ 1395oo(f); 42 C.F.R. § 408.1877(c).

Although a plaintiff would not normally appeal from a decision that is favorable to
it (as was the PRRB's decision for this Plaintiff), there is nothing in the Medicare statute
that suggests a Plaintiff may appeal only "favorable decisions."  Moreover, it is axiomatic
that a Plaintiff be permitted to enforce a PRRB decision through appeal to the District
Court.[4]

B.    The Goleta Valley Case Is Not Controlling

The Defendant cites Goleta Valley Community Hospital v. Leavitt as authority for
its argument that a remand from the Administrator to CMS is not a final decision subject to
court review.  No. 05-2323, 2006 WL 4050410 at *1 (D.D.C. Dec. 21, 2006) (Robinson,
M.J.).  The Goleta case is not controlling in this case for several reasons.

---

[4] Plaintiff contends that jurisdiction for this type of action is grounded in 42 U.S.C. § 1395oo(f), but as
explained in more detail subsequently, can also be grounded in mandamus.

First, the plaintiff in <u>Goleta</u> did not argue that the Defendant did not have the authority to remand to CMS. Accordingly, it is unclear whether the Magistrate even considered the question.

Second, the procedural posture in <u>Goleta</u> distinguishes it from this case. In <u>Goleta</u>, CMS's initial determination was that it did not have enough documentation to make a decision on the provider's new provider exemption request. <u>Id.</u> at *1. The Board held that: 1) there was sufficient documentation and 2) that the provider should be granted a new provider exemption. <u>Id.</u> at *2. The Administrator remanded the case to CMS. <u>Id.</u> Upon appeal to the District Court, the Magistrate's view was that, "[t]he Administrator vacated the Board's decision to grant the exemption because CMS had not made a final decision in the matter, and therefore review by the Board was not available." <u>Id.</u> at *5. Although the Administrator characterized his action as a decision to vacate and remand, the remand was superfluous. The Administrator vacated the Board's decision because the Board did not have jurisdiction over the case, thus rendering the Board decision null and void.[5] In effect, the substantive issue in the <u>Goleta</u> case never left CMS.

A final distinguishing factor in the <u>Goleta</u> case is that CMS had decided in favor of the plaintiff on the exemption request after remand and before the Magistrate rendered her decision. <u>Id.</u> at *2. Although not stated in the decision, the Magistrate may have considered the fact that a plaintiff cannot complain about an action that ultimately results in the relief that it initially sought.

---

[5] Black's Law Dictionary defines "vacate" as "[t]o nullify or cancel; make void; invalidate." BLACK'S LAW DICTIONARY 1546 (7th ed. 1999).

III.    An Improper Remand Is Subject to Judicial Review

Defendant argues that, "[a]ssuming _arguendo_ that the Administrator's remand was proper, it is still not an appealable final agency decision."  Def.'s Mem. Supp. Mot. Dismiss, p. 17.  Case law does not support Defendant's position.

In Leedom v. Kyne, a union president brought an action against the National Labor Relations Board to set aside certification of a bargaining unit that included both professional and (unlawfully) nonprofessional employees.  358 U.S. 184 (1958).  The Supreme Court held that, although an order in a certification proceeding is generally not subject to judicial review, it may be reviewed if the Board acts in excess of its delegated powers.  Id. at 190-91.  Likewise, the Administrator in this case has acted outside his powers and this Court has jurisdiction over the Administrator's determination.

The Defendant cites Sullivan v. Finkelstein as support for its argument that, even if the Administrator's remand is improper, it is not appealable.  496 U.S. 617 (1990).  In Finkelstein, the Supreme Court held that remands by a District Court are subject to appeal if the order at issue resolves an important legal issue and review of that issue would be foreclosed as a practical matter if an immediate appeal were not undertaken.  Id. at 626. The question of whether the CMS Administrator has unfettered authority to remand to any entity he wishes is an important legal issue.  Moreover, if the Plaintiff does not appeal the Defendant's remand in this action, it will be forever foreclosed from contesting the Administrator's remand.  Rather than supporting Defendant's argument, therefore, the Finkelstein case supports a determination that this appeal is proper.

IV.    Exceptions to the Medicare Statute's Limitations on Judicial Review

As explained above, jurisdiction for this action is firmly rooted in the 42 U.S.C.
§ 1395oo(f).  Even if this Court does not have jurisdiction under 42 U.S.C. § 1395oo,
however, it has jurisdiction under 28 U.S.C. §§ 1331 and 1361.

A.    Federal Question Jurisdiction Under 28 U.S.C. § 1331

Defendant's description of the statutory provisions pertinent to federal question
jurisdiction is largely accurate.  Plaintiff agrees that, generally, jurisdiction over Medicare
cost report disputes must be grounded in 42 U.S.C. § 1395oo(f) and cannot be brought
under 28 U.S.C. § 1331.  Defendant's account of the relevant law gives short shrift,
however, to certain recognized exceptions to the Medicare statute's "preclusion of review"
provisions under 42 U.S.C. § 1395ii.

In Shalala v. Illinois Council on Long Term Care., Inc., 529 U.S. 1 (2000), the
Supreme Court discussed case law interpreting 42 U.S.C. § 405(h), which bars federal
question jurisdiction for most issues raised under the Medicare statute (through application
to the Medicare statute under 42 U.S.C. § 1395ii).  Specifically, it discussed its decision in
Bowen v. Michigan Acad. of Family Physicians, 476 U.S. 667 (1986).  The Supreme Court
explained that Michigan Academy holds that "§ 1395ii does not apply §405(h) where
application of § 405(h) would not simply channel review through the agency, but would
mean no review at all."  Illinois Council, 529 U.S. at 19.

The Defendant would argue that the Plaintiff has a means of review by going
through the administrative PRRB appeal process a second time, including an appeal to the
PRRB and further appeal to the District Court.  That argument misses one crucial point:
the second administrative process would not afford the Plaintiff any opportunity to contest
the remand order at issue in this case.  Plaintiff had only one opportunity to seek judicial

review of the CMS Administrator's decision to remand to CMS, which is the current

appeal.  If Plaintiff were to subject itself to the administrative process a second time, and

subsequently appeal from either the second PRRB decision or the Administrator's

decision, Defendant would not allow it to raise before the District Court the issue of

whether the Administrator's remand during the first administrative process was proper.

Defendant no doubt would argue that the Plaintiff had missed the appeal deadline for

contesting the remand.  Similar to <u>Michigan Academy</u>, therefore, barring federal question

jurisdiction in this case would mean that Plaintiff has no avenue for review of the

Defendant's illegal remand.

  The Defendant makes the somewhat galling argument that, "if a provider desires

judicial review of a reimbursement decision of the Secretary, it must follow the

administrative procedures provided by the Medicare statute, that is, the procedures 'herein

provided.'  (citation omitted.)  If the provider does not follow the established procedures,

the statute is quite clear that…" an appeal is not permitted.  Def.'s Mem. Supp. Mot.

Dismiss, p. 13.  Plaintiff has quite scrupulously followed all of the administrative

procedures set forth in the Medicare statute.  Indeed, it is Defendant that ignored those

procedures by issuing an improper remand.

  In <u>Illinois Council</u>, the Supreme Court also discussed its decision in <u>Mathews v.</u>

<u>Eldridge</u>, 424 U.S. 319 (1976), in which it allowed federal question jurisdiction in a

lawsuit challenging the constitutionality of agency procedures authorizing termination of

Social Security disability payments without a predetermination hearing.  <u>Illinois Council</u>,

529 U.S. at 14-15.  The Supreme Court distinguished this case from other cases in which

§ 405(h) acted as a bar to federal question jurisdiction because "the respondent *had*

*followed* the special review procedures set forth in § 405(g), thereby *complying with,* rather than *disregarding,* the structures of § 405(h). Id. at 15 (emphasis in original). Similarly, in this case, the Plaintiff has followed the appeal procedures in 42 U.S.C. § 1395oo (the Medicare equivalent of § 405(g)) and, therefore, § 405(h) should not bar this action.

The Mathews case also holds that there is a "nonwaivable and nonexcusable" requirement that a plaintiff present his or claim to the government, as well as a "waivable" requirement to exhaust administrative remedies. 424 U.S. at 328. Plaintiff has amply satisfied the "nonwaivable and nonexcusable" presentment requirement. Plaintiff first presented its claim for a new provider exemption to its Medicare fiscal intermediary on June 17, 1997. Plaintiff provided additional information to the fiscal intermediary on January 26, 1998, February 3, 1998, and March 3, 1998. On March 22, 2001, Plaintiff appealed to the PRRB and presented additional arguments and documentation as part of that appeal. On December 15, 2005, the PRRB held an evidentiary hearing during which Plaintiff presented testimonial evidence. In short, Plaintiff has now been presenting its claim for more than eleven years.

In contrast to the presentment requirement, exhaustion is waivable. Weinberger v. Salfi, 422 U.S. 749, 766-767 (1975). The Court has repeatedly indicated that federal question jurisdiction over a dispute arising under the Medicare statute can exist where to conclude otherwise would effectively preclude judicial review of a claimed legal violation. Illinois Council on Long Term Care, 529 U.S. at 19-20; McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 497 (1991); Bowen v. Michigan Academy of Family Physicians, 476 U.S. at 680-81; see also Action Alliance of Senior Citizens v. Leavitt, 483 F.3d 852, 856-58 (D.C. Cir. 2007); American Chiropractic Ass'n, Inc. v. Leavitt, 431 F.3d 812, 816 (D.C.

{D0180625.DOC / 7}

Cir. 2005); American Lithotripsy Soc. v. Thompson, 215 F.Supp.2d 23, 28-30 (D.D.C. 2002). As explained in the preceding pages, that is precisely the case here. If the Plaintiff is not afforded an opportunity to contest the Defendant's *ultra vires* remand in this appeal, it will be forever foreclosed from contesting it.

     B. <u>Mandamus Jurisdiction</u>

  Even if the preclusive effect of 42 U.S.C. 405(h) bars § 1331 jurisdiction, mandamus relief under the jurisdictional grant of 28 U.S.C. § 1361 is available. <u>See, e.g.</u>, <u>City of New York v. Heckler</u>, 742 F.2d 729 (2d Cir. 1984). Mandamus is warranted where the plaintiff has a clear right to relief, the defendant has a clear duty to act, and no visible alternative remedies are available to the plaintiff. <u>See, e.g.</u>, <u>In re Medicare Reimbursement Litigation</u>, 414 F.3d 7, 10 (D.C. Cir. 2005).

  The Defendant has a clear duty to act in this case. As stated above, the Medicare statute states, "A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision." 42 U.S.C. § 1395oo(f). This directive is perfectly clear – the Board's decision "shall be final unless. . ." Moreover, the Medicare regulations state that, "[i]f the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance…" 42 C.F.R. § 405.1877(c). Both the statute and the regulations, therefore, clearly state that the Administrator's failure to act renders the Board's decision final.

  The Defendant did not take any of the actions that would render the Board decision an interim decision. He did not reverse, affirm or modify the Board's decision (at least

with regard to fiscal year 1998), nor did he remand to the PRRB as he is permitted to do by regulation. The Board's decision, therefore, is final and the Defendant must implement it.

Similarly, Plaintiff has a clear right to relief. If the Board's decision is final, the Plaintiff certainly has a right to enforcement of that decision.

Lastly, as discussed in detail above, there are no alternative remedies available to the Plaintiff with regard to the Administrator's remand. Going through the PRRB appeal process again will not afford Plaintiff an opportunity to contest the remand. Moreover, it is extremely unlikely that going through that process again will result in a favorable decision for the Plaintiff. As stated above, after the Administrator's *ultra vires* remand, CMS again determined that the Plaintiff does not qualify for a new provider exemption. It is hardly plausible that, even if the PRRB decides a second time, after a second hearing, that the Plaintiff is entitled to a new provider exemption, the CMS Administrator would let that decision stand.

V.    At the Very Least, This Court Has Jurisdiction Over the Administrator's Decision As To Fiscal Years 1996 and 1997

Defendant's Motion to Dismiss is apparently limited to the single fiscal year that the Administrator remanded to CMS. As stated above, the Board's decision applied to three fiscal years, 1996, 1997, and 1998. The Administrator did not remand fiscal years 1996 and 1997 to the PRRB. Instead, he apparently reversed the Board's decisions for these years, finding that the Board lacked jurisdiction.[6] Plaintiff then appealed the Administrator's decision to remand fiscal year 1998, as well as his decision that the Board lacked jurisdiction over fiscal years 1996 and 1997. Amended Complaint ¶ 61, 66, 67.

---

[6] See footnote 1.

Even if the Court determines that it does not have jurisdiction over the Administrator's order to remand as to fiscal year 1998, the Administrator's decision reversing the Board for fiscal years 1996 and 1997 is a final agency action, and jurisdiction is proper under 42 U.S.C. § 1395oo(f).  Defendant concedes this point in its extensive arguments that a remand may not be appealed, but a reversal may.  Thus, even if the Court finds that it lacks jurisdiction over fiscal year 1998, it nonetheless has jurisdiction to determine whether the Administrator's decision as to fiscal years 1996 and 1997 was proper.

<u>CONCLUSION</u>

For all of the foregoing reasons the Government's Motion to Dismiss should be denied.

<u> s/Barbara Straub Williams</u>
Barbara Straub Williams
(D.C. Bar No. 396582)
Ronald S. Connelly
(D.C. Bar No. 488298)
POWERS PYLES SUTTER & VERVILLE, PC
1501 M Street, N.W., 7th Floor
Washington, D.C.  20005
(202) 466-6550

Attorneys for Plaintiff, Jordan Hospital

Dated: <u>March 24, 2008</u>



Department of Health &
 Human Services
Office of the General Counsel
Centers for Medicare &
 Medicaid Division
Room 5309 - Cohen Building
330 Independence Avenue, SW
Washington, D.C. 20201


TELEFAX NO. (202) 260-0490


FACSIMILE       TRANSMISSION       REQUEST

| ADDRESSEE: (Name, Organization, City, State & Phone # | FROM: (Name, Organization, & Phone #) |
|---|---|
| *Barbara Staub Williams* | *Bridgette Kaiser* |
| *Fax 2/785-1756* | (NAME) |
| PHONE: *2/ 872 6733* | *2.05* <br> PHONE: *2/ 5872* |

| TOTAL PAGES | FAX MACHINE PHONE # | DATE | CHARGE SYMBOL |
|---|---|---|---|
| + cover | | | OS/OGC/CMS |

COMMENTS


IF RETRANSMISSION IS NECESSARY CALL: (202) 619-0736

PLAINTIFF'S EXHIBIT 1



DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C5-06-27
Baltimore, Maryland 21244-1850

**Center for Medicare Management**

Refer to: FAHB4

0 9 NOV 2007

Mr. Vinnie Guarino
Director
Medicare Audit and Reimbursement
Associated Hospital Service
50 Salem Street
Lynnfield, Massachusetts 01940-2694

Re:    Medicare New Provider Exemption Request for
       Peter Chapman Transitional Care Unit

Dear Mr. Guarino:

This is the final determination of the CMS as it relates to the request of Jordan Hospital (aka Peter Chapman Transitional Care Unit (the TCU)) for an exemption to the skilled nursing facility routine service cost limit (SNF RCL) for the cost reporting period ended September 30, 1998.

By letter dated June 25, 2007, CMS requested that the TCU submit documentation acquired from medical records and/or other clinical and/or business records kept in the ordinary course of operating the Greenlawn Nursing Home for FY's 1992, 1993 and 1994 that would demonstrate the types of services and in what proportion such services were provided to the residents at the Greenlawn Nursing Home during these years. The TCU responded by letter dated August 24, 2007 stating that the TCU had previously furnished all of the documentation it has available regarding the services furnished by Greenlawn Nursing Home. The TCU specifically relies upon the following documents to establish that Greenlawn Nursing Home was providing skilled nursing and related services to less than half of the residents who were admitted, discharged or whom resided in the Greenlawn Nursing Home during FYs 1992, 1993 and 1994:

- Provider Exhibit 48 entitled "Excerpts from Greenlawn Discharge Summary Ledger for Last Year Operation" which includes redacted name, admission date, date of discharge, years in facility, age at discharge, birth date, major diagnosis, financial responsibility, discharge to and reason for discharge.
- A picture of the building housing Greenlawn Nursing Home.
- Testimony at the PRRB hearing.

- • The employment practices of the Greenlawn Nursing Home
- • The assertion that Greenlawn Nursing Home was not required to provide skilled services to any of its residents because it was licensed as a Level III not a Level II facility by the State of Massachusetts.

The documents listed above as submitted by the TCU do not document the type of services received by each of the residents admitted to, discharged or residing at the Greenlawn Nursing Home prior to its relocation and subsequent participation in the Medicare Program as the Peter Chapman Transitional Care Unit during FY's 1992, 1993 or 1994.

Provider Exhibit 48 contains no reference to the types of services each resident received who was admitted to, discharged from or residing at Greenlawn Nursing Home during FYs 1992, 1993 and 1994. Instead, the document sets forth certain patient characteristics of the residents discharged at the time the license to operate as a nursing home was temporarily suspended as agreed in Section 3.12 of the Agreement dated March 31, 1995 among and between Shirley Dionne (Operator) and Jordan Hospital, pending relocation to the hospital campus.

A picture of the physical building that housed Greenlawn Nursing Home is clearly not a medical record and/or other clinical and/or business record kept in the ordinary course of operating the Greenlawn Nursing Home that would provide information about the type of services each resident received at the Greenlawn Nursing Home.

The testimony of Ms. Kemp, a Med/Surg Registered Nurse, employed by Jordan Hospital testified that she had never visited Greenlawn Nursing Home and that the only documentation from Greenlawn Nursing Home that she had reviewed was Provider Exhibit I-41. As we state above, Provider Exhibit I-41 contains no reference to the types of services each resident received who was admitted to, discharged from or residing at Greenlawn Nursing Home during FYs 1992, 1993 and 1994.

Nor does the number of skilled staff present bear any indication of whether or not skilled services were provided to less than half of the residents in any given year. Skilled services are provided directly by, or under the supervision of, professional personnel, such as licensed and registered nurses.[1] As testified by Ms. Kemp, certified nursing assistants (CNAs) work under the supervision of a licensed or registered nurse. Since CNAs have extensive daily contact with each patient, they are key to providing vital information on the patients' conditions to professional personnel.

Lastly, the Provider's assertion that it was not eligible to be reimbursed under the Massachusetts Medicaid program for furnishing skilled services because it was licensed as a level III and not a

---

[1] "Under the supervision of technical or professional personnel" means that an aide may perform skilled services under the general supervision of technical or professional personnel who is on the premises of the institution at the time the service is performed.

level II nursing home by the State of Massachusetts is not evidence of whether or not skilled services were provided to less than half of the residents who received nursing services in the facility in any given year. Nor is it a medical record and/or other clinical and/or business record kept in the ordinary course of operating the Greenlawn Nursing Home. In fact, the Provider failed to corroborate this broad statement which could very easily be supported by the inclusion of all of the Management Minutes Questionnaire (MMQ) documents filed by Greenlawn Nursing Home during its last three full years of operation with the Massachusetts Department of Public Welfare for purposes of Medicaid reimbursement. The MMQ is a document that is not only a clinical record (it identifies the types of services each resident has actually received during a specific period of time), but also a business record as it is required for payment under the State's Medicaid program.

In the case of Peter Chapman Transitional Care Unit, Jordan Hospital assumed ownership and operation of the Greenlawn Nursing Home on May 18, 1995. The facility's license was subsequently temporarily suspended as agreed in Section 3.12 of the Agreement dated March 31, 1995 among and between Shirley Dionne (Operator) and Jordan Hospital. The State of Massachusetts subsequently approved a change of ownership of the temporarily suspended license and provided for a relocation of such license to the hospital campus in accordance with the process for a transfer of site. The Peter Chapman Transitional Care Unit re-opened on December 8, 1995, and was subsequently certified to participate in the Medicaid program effective December 8, 1995, and the Medicare program effective December 15, 1995.

Greenlawn Nursing Home had been certified to participate in the Medicaid program as a nursing facility through January 11, 1995. Even though certified as a NF prior to its relocation in 1995, Greenlawn Nursing Home was required to furnish, and was eligible to be reimbursed under the Massachusetts Medicaid program for furnishing skilled nursing and related services and rehabilitation services to many of the same groups of individuals for which Peter Chapman Transitional Care Unit was later entitled to reimbursement under Medicare and Medicaid.

The U.S. Court of Appeals for the D.C. Circuit has ruled that in order to determine if a facility has operated as a SNF or its equivalent CMS shall look beyond the facility's defined capabilities and examine the quantity of SNF services actually provided. Thus, how a facility is licensed, what type of physical structure the facility is located in, the facility's employment practices, or the basic characteristics of its patient population are not determinative of whether or not the facility meets the standard set forth in St. Elizabeth's which was applied in Milton Hospital Transitional Care Unit v. Thompson. In Milton, the court found it important to determine whether skilled services "were provided to less than half of the residents." 377 F. Supp. 2d 17, 27-28 (D.D.C. 2005) (citing cases). The court found that such a determination was necessary in evaluating whether a facility was "primarily engaged" in operating as a SNF. The definition of a SNF for purposes of certification set forth in 1819(a)(1) of the Act states:

"**Skilled Nursing Facility Defined.** In this title, the term "skilled nursing facility" means an institution (or a distinct part of an institution) which – (1) is primarily engaged

in providing to residents (A) skilled nursing care and related services for residents who require medical or nursing care, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons."

Being "primarily engaged" in furnishing skilled nursing care under the basic SNF definition in 1819(a)(1) refers to the type of care that a facility, or distinct part of a facility, provides to its patients generally rather than the type of care a particular patient may receive at a given point in time. However, to determine the type of care generally provided in the facility, or a distinct part of the facility, a review of the care provided to each patient throughout their stay is critical.

A Nursing Facility (NF) is defined, for purposes of certification in Section 1919(a)(1) of the Act, as a facility, or distinct part of a facility, that primarily provides skilled nursing care and related services for the rehabilitation of injured, disabled or sick persons, or on a regular basis, health related care services *above the level of custodial care* to other then mentally retarded individuals (Resident Assessment Instrument, December 2002).

Both SNFs and NFs are classified as long term care facilities. Long term care facilities ("LTCs") provide care to a very heterogeneous resident population. Some individuals require short-term, intense rehabilitation services; others, on the other hand, may be incontinent, mentally impaired, or so seriously disabled that they require extensive and continuous care for months or years. Providing consistently high quality of care in nursing homes to a varied group of frail, very old residents, many of whom have mental impairments as well as physical disabilities, requires that functional, medical, social, and psychological needs of residents be individually determined and met by careful assessment and care planning – steps that require professional skill and judgment. See Improving the Quality of Care in Nursing Homes, Institute of Medicine, pgs. 8, 10 (1986). For these reasons, skilled nursing care is required by many persons who suffer from chronic diseases necessitating the kinds of treatment and care that require frequent or continuous observation and/or specialized services that can safely be performed for them only by, or under the supervision of, professional or licensed practical nurses.

The critical factor in distinguishing skilled from unskilled or supportive care is the need for the services of licensed health personnel. Skilled nursing care and rehabilitation services are furnished directly by, or under the supervision of, technical or professional personnel such as registered nurses, licensed practical nurses, physical therapists, occupational therapists, speech pathologists or audiologists, working under the direction of a physician. 42 CFR 409.31(a). For example, physicians need to know from nursing staff a patient's response to treatments (e.g., drugs) in order to determine whether drugs should be adjusted in dosage or the regimen altered.

In summary, the TCU has failed to provide documentation clearly demonstrating that skilled nursing and related services or rehabilitative services were provided to less than half of the residents of the Greenlawn Nursing Home for less than three full years prior to participating in the Medicare program as a SNF. Accordingly, its request to be exempt from the SNF RCL for the cost reporting period ended September 30, 1998 is denied. CMS will reopen this decision if

the TCU submits to CMS: 1) all of the MMQ documents submitted by Greenlawn Nursing Home to the State of Massachusetts Department of Public Welfare in the three full years prior to its closure and subsequent relocation to Jordan Hospital and 2) Greenlawn Nursing Home's Medicaid cost report for FY 1994 and/or FY 1995. Greenlawn Nursing Home was decertified from the Medicaid program on January 11, 1995. These reports could have been produced and filed either by either the former owner or by Jordan Hospital.

If you have any questions regarding this letter please contact Julie Stankivic of my staff at (410) 786-5725.

Sincerely,

Sheila Lambowitz
Director
Division of Institutional Post-Acute Care
Chronic Care Policy Group



National Government Services, Inc.
PO Box 4846
Syracuse, New York 13221-4846
*A CMS Contracted Agent*

# Medicare

February 5, 2008

Mr Elliot Schwartz
Chief Financial Officer
Jordan Hospital
275 Sandwich Street
Plymouth, Ma. 02360

       Re:  Medicare New Provider Exemption Request for
            Peter Chapman Transitional Care Unit

Dear Mr. Schwartz:

I am writing this letter to inform you that the Centers for Medicare & Medicaid Services (CMS) has issued a final determination to deny the request of Jordan Hospital (aka Peter Chapman Transitional Care Unit) for an exemption to the skilled nursing facility routine service cost limit for the cost reporting period ended September 30, 1998.
To avoid any confusion, please note that the attached CMS letter had previously been faxed to your facility on January 7, 2008, however this letter should serve as the official notification from the Fiscal Intermediary.

Although CMS has denied this request, the last page of the attached letter does indicate that CMS will reopen this decision if the specifically noted documentation is submitted to CMS for further review.

If you have any questions regarding this letter please call me at (781)-224-0460.

               Sincerely,

               Vincent Guarino
               Manager of Audit and Reimbursement

cc: Michael Corcoran
     Bridgette L. Kaiser



*Before the:*
## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Jordan Hospital<br>275 Sandwich Street<br>Plymouth, MA  02360<br><br>        Plaintiff,<br><br>        vs.<br><br>Michael O. Leavitt, Secretary of the U.S.<br>Department of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, DC  20201<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)        Case No. 1:07-cv-01160<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT REGARDING LEGAL COSTS INCURRED

I, Kelly Baskerville, Billing Supervisor, Powers, Pyles, Sutter & Verville, PC hereby certify that, based on my review of all available documentation, Jordan Hospital has incurred the following legal costs with the law firm of Powers Pyles Sutter & Verville, PC from April 2005, (the month in which Jordan Hospital appealed the issue of the denial of its new provider exemption request with the Provider Reimbursement Review Board), through January 31, 2008:

- One hundred twenty eight thousand three hundred nineteen dollars and fourteen cents ( $ 128,319.14 ) in attorneys' fees

- Ten thousand, four hundred eleven dollars and four cents ( $ 10,411.04 ) in expenses

In addition, forty seven thousand five hundred eighty dollars and eighty-six cents

PLAINTIFF'S EXHIBIT 3

1

($ 47,580.86 ) in attorneys' fees have been written off.

I declare under penalty of perjury that the foregoing is true and correct.

Kelly Baskerville
Billing Supervisor
Powers Pyles Sutter & Verville, PC

NOTARY PUBLIC:

SUBSCRIBED AND SWORN BEFORE ME
THIS _21st_ DAY OF MARCH 2008.

DENISE A. JONES
NOTARY PUBLIC DISTRICT OF COLUMBIA
EXPIRES: My Commission Expires August 14, 2008

2

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
PROVIDER REIMBURSEMENT REVIEW BOARD

| | | |
|---|---|---|
| JORDAN HOSPITAL, | ) | |
| | ) | |
| Provider | ) | Provider No. 22-0060 |
| v. | ) | PRRB Case No. 01-2214 |
| | ) | |
| ASSOCIATED HOSPITAL SERVICE, | ) | |
| | ) | |
| Intermediary. | ) | |
| | ) | |

## PROVIDER'S SUPPLEMENTAL POSITION PAPER

Barbara Straub Williams
Ronald S. Connelly
Powers, Pyles, Sutter &
    Verville, P.C.
1875 Eye Street, NW
12th Floor
Washington, DC 20006
(202) 466-6550

Counsel for the Provider

PLAINTIFF'S EXHIBIT 4

# <u>TABLE OF CONTENTS</u>

I.     ISSUES ........................................................................................................1

II.    PARTIES ....................................................................................................1

III.   BACKGROUND ........................................................................................2

     A.     Legal Background ..............................................................................2

           1.     Federal Statute, Regulations and Manual Provisions ...................2
                 a)    Definition of SNFs and Nursing Facilities ("NFs")..............2
                 b)    SNF Reimbursement and New Provider Exemptions ...........3
           2.     Massachusetts Law .......................................................................5
                 a)    Licensure – Nursing Facilities ..............................................5
                 b)    Determinations of Need ("DON") .........................................6

     B.     Factual Background ...........................................................................8

IV.   PROVIDER'S POSITION ........................................................................12

     A.     Introduction .....................................................................................12

     B.     CMS's Determination that the Provider Purchased Greenlawn is Based on a Misunderstanding of the Facts and Applicable State Law ........................................13

           1.     The Provider Did Not Purchase Greenlawn's DON or Any Other Assets .....14
           2.     Under Massachusetts Law, the Provider Received Its DON From MDPH ....15

     C.     Even if Greenlaw Had Transferred Its DON to Jordan, a Transfer of DON Rights Is Not a Transfer of Ownership and Does Not Trigger a Review of Services Furnished by Greenlawn .........................................................................16

           1.     The Term "Provider" in 42 C.F.R. § 413.30(e) Unambiguously Refers to an Institution, Not a DON .....................................16
           2.     CMS's Interpretation of "Provider" is Inconsistent with Its Own Published Interpretations of That Term ...........................22
           3.     CMS's Reinterpretation of the New Provider Exemption Without Notice Violates Due process and the Administrative Procedure Act .....................24
           4.     CMS's Denial of the Provider's Request Is Inconsistent With Its Past Policy on New Provider Exemptions ...............................26
           5.     CMS's Interpretation of Its Regulation Is Contrary to Congressional Intent of Uniform National Administration of the Medicare Program .....................28
           6.     CMS's Interpretation of its Regulation is Inconsistent with the Purpose of the New Provider Exemption .....................................28

      7.   CMS Cannot Apply PRM § 2533.1 Retroactively.............................................30

   D.   CMS's Determination that Greenlawn Operated as a SNF Is Erroneous .................31

      1.   SNFs and NFs Are Defined Differently Under Federal Law ...........................32
      2.   Massachusetts Licensure Law Prohibited Greenlawn From Operating as a
           SNF .........................................................................................................................33
      3.   CMS's Evidence on Greenlawn's Services Is Sparse and Unreliable ..............34
      4.   The Available Evidence Does Not Support CMS's Conclusion About
           Greenlawn's Services............................................................................................37

   E.   The Provider Is Entitled to a New Provider Exemption Based on Relocation ..........41

      1.   The Provider Met the Requirements for an Exemption Based on Relocation
           Under PRM § 2604.1. ...........................................................................................41
      2.   CMS May Not Base Its Relocation Decision on PRM § 2533.1 ......................45

   F.   The Board Has Jurisdiction Over All years Covered By The Provider's New
        Provider Exemption Application .................................................................................46

      1.   Statutory Background – Jurisdiction......................................................................46
      2.   The Medicare Statute Grants The Board Jurisdiction That Is Broader Than
           The Provider's Prerequisites For An Appeal .......................................................47
      3.   Board Review of the Provider's 1996 and 1997 Cost Years Will Be
           Supported by Substantial Evidence as Required by The Statute .......................48
      4.   The Board Has Extended Its Jurisdiction Over Cost Years Not Directly
           Appealed by a Provider..........................................................................................48
      5.   Board Review is Warranted in This Case Because One Exemption Applies to
           Multiple Years .......................................................................................................49

V.   CONCLUSION....................................................................................................................52

## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
## PROVIDER REIMBURSEMENT REVIEW BOARD

| | |
|---|---|
| JORDAN HOSPITAL, ) | |
| ) | |
| Provider ) | Provider No. 22-0060 |
| v. ) | PRRB Case No. 01-2214 |
| ) | |
| ASSOCIATED HOSPITAL SERVICE, ) | |
| ) | |
| Intermediary. ) | |
| ) | |

## PROVIDER'S SUPPLEMENTAL POSITION PAPER

### I.    ISSUES

Whether the Intermediary improperly denied the application of Jordan Hospital (the "Provider") for a new provider exemption from the routine cost limits ("RCLs") for its provider-based skilled nursing facility ("SNF").[1]   The amount in controversy is approximately $2,269,810.[2]  Exhibit P-1.

### II.    PARTIES

The Provider is a 139-bed acute care, not-for-profit hospital located in Plymouth, Massachusetts that began furnishing care to patients in 1901.  It has participated in the Medicare program since the program's inception in 1965.  The Provider's Medicare intermediary is Associated Hospital Service.

---

[1] The Provider added this issue to its appeal by letter dated April 7, 2005.  In accordance with the Board's instructions, this supplemental position paper addresses the new provider exemption issue.  All other issues have been resolved or transferred to group appeals.

[2] This amount includes $644,807 for the fiscal year ending September 30, 1996, $799,848 for the fiscal year ending September 30, 1997, and $825,155 for the fiscal year ending September 30, 1998.

III.    **BACKGROUND**

 A.    **Legal Background**

  1.    Federal Statute, Regulations and Manual Provisions

   a)    Definition of SNFs and Nursing Facilities ("NFs")

The Medicare statute defines a SNF as an institution that is *primarily* engaged in providing skilled nursing or rehabilitation services:

> [T]he term "skilled nursing facility" means an institution (or a distinct part of an institution) which—
>
> (1)  is primarily engaged in providing to residents—
>
> > (A) skilled nursing care and related services for residents who require medical or nursing care, or
> >
> > (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons . . . .

42 U.S.C. § 1395i-3(a).

In contrast, the Medicaid statute defines a NF as an institution that *may be* primarily engaged in providing skilled nursing or rehabilitative services, or instead may be primarily engaged in furnishing custodial care:

> [T]he term "nursing facility" means an institution (or a distinct part of an institution) which—
>
> (1)  is primarily engaged in providing to residents—
>
> > (A) skilled nursing care and related services for residents who require medical or nursing care,
> >
> > (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or
> >
> > (C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities . . . .

42 U.S.C. § 1396r(a).

b)      SNF Reimbursement and New Provider Exemptions

Medicare law in effect during the Provider's fiscal years ending September 30, 1996 ("FY 1996"), September 30, 1997 ("FY 1997"), and September 30, 1998 ("FY 1998") required that SNFs be reimbursed for their "reasonable cost" of providing services.  42 U.S.C. § 1395x(v). Reasonable cost is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services . . . ." 42 U.S.C. § 1395x(v)(1)(A).  The Secretary of Health and Human Services has authority to issue regulations setting reasonable cost limits calculated on any of several criteria, including "per diem, per unit, per capita, or other basis." *Id.*

The regulations implementing this provision empower the Health Care Financing Administration ("HCFA"), now known as the Centers for Medicare and Medicaid Services ("CMS"), to establish reasonable cost limits ("RCLs"):

> Reimbursable provider costs may not exceed the costs estimated by HCFA to be necessary for the efficient delivery of needed health services. HCFA may establish estimated cost limits for direct or indirect overall costs or for costs of specific items or services or groups of items or services. These limits will be imposed prospectively and may be calculated on a per admission, per discharge, per diem, per visit, or other basis.

42 C.F.R. 413.30(a)(2) (1997).

The Medicare statute, however, gives the Secretary the authority to exempt SNFs from the RCLs and directs the Secretary to issue criteria for an exemption.  42 U.S.C. § 1395yy(c). Pursuant to this authority, CMS has created an exemption for SNFs that qualify as new providers.  42 C.F.R. § 413.30(e) (1997).  A new provider exemption entitles a SNF to reimbursement from Medicare for all of its actual operating costs, without the cap imposed by the RCLs, and expires at the end of the provider's first cost reporting period beginning at least two years after the provider accepts its first patient.  42 C.F.R. § 413.30(e) (1997).  The purpose

3

of the new provider exemption regulation is to accommodate the risks that accompany a new start-up. New providers take the chance that their initial patient occupancy will be low or that they will incur significant expenses associated with developing a new service. See 44 Fed. Reg. 31802 (1979). Exhibit P-2.

During the period at issue in this case, the Medicare regulations defined a "new provider" as:

> a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years.

42 C.F.R. § 413.30(e) (1997); [3] The Provider Reimbursement Manual ("PRM") provision in effect during the relevant time period largely mirrored the language of 42 C.F.R. § 413.30(e). PRM § 2604.1, *reprinted in* Medicare and Medicaid Guide [CCH] ¶ 7578.01. Exhibit P-3. Specifically, PRM § 2604.1 stated:

> A new provider is an institution that has operated in the manner for which it is certified in the program (or the equivalent thereof) under present and previous ownership for less than three full years. For example, an institution that has been furnishing only custodial care to patients for two full years prior to its becoming certified as a hospital furnishing covered services to Medicare beneficiaries, shall be considered a "new provider" for three full years from the effective date of its certification. However, if an institution had been furnishing hospital health care for two full years prior to its certification, it shall only be considered a "new provider" in its third full year of operation, which is its first full year of participation in the program. . . .
>
> [A] provider which relocates may be granted new provider status where the normal inpatient population can no longer be expected to be served at the new location. The distance moved from the old location will be considered but will not be the determining factor in granting new provider status. For example, a specialty hospital may move a considerable distance and still care for generally the

---

[3] This regulation has since been redesignated to 42 CFR 413.30(d).

> same inpatient population, while the relocation of a general hospital a relatively short distance within a metropolitan area may greatly affect the inpatient population served. A provider seeking such new provider status must apply to the intermediary and demonstrate that in the new location a substantially different inpatient population is being served. In addition, the provider must demonstrate that the total inpatient days at the new location were substantially less than at the old location for a comparable period during the year prior to the relocation. The periods compared must be at least three months in duration.

*Id.*

CMS rescinded Section 2604.1 in September 1997. Transmittal No. 400, *reprinted in* [1997-2 Transfer Binder] Medicare and Medicaid (CCH) ¶ 45,575. Exhibit P-4. In its place, CMS added PRM § 2533.1, which states that in situations in which a provider purchases bed rights, such as a Determination of Need, the years of operation at the previous location will count toward determining the new provider status of the new SNF. PRM § 2533.1B3. Exhibit P-5, p. 013. This provision also states that CMS will regard a NF as *per se* equivalent to a SNF. PRM § 2533.1. Exhibit P-5, p. 017. PRM § 2533.1 also added new requirements related to nursing facilities that relocate. For the first time, CMS announced that it will not consider a nursing facility that moves within the same health service area ("HSA") to have relocated, unless 50% or more of its admissions are from a different HSA. PRM § 2533.1B.3. Exhibit P-5, p. 010.

> 2. <u>Massachusetts Law</u>

>> a) <u>Licensure – Nursing Facilities</u>

Under Massachusetts law, nursing facilities are licensed according to the level of care that they furnish and are assigned either Level I, II, III, or IV. *See generally* 105 MASS. CODE REGS. 153.027, 151.020. Exhibits P-6 and P-7. A Level II facility must furnish "continuous skilled nursing care and meaningful availability of restorative services and other therapeutic services in addition to the minimum, basic care and services required for patients who show

potential for improvement or restoration to a stabilized condition or who have a deteriorating

condition requiring skilled care." 105 MASS. CODE REGS. 151.020. Exhibit P-7. In contrast, a

Level III facility furnishes "routine nursing services and periodic availability of skilled nursing,

restorative and other therapeutic services, as indicated, in addition to the minimum, basic care

and services required for patients whose condition is stabilized to the point that they need only

supportive nursing care, supervision, and observation." *Id.* Exhibit P-7.

b)     Determinations of Need ("DON")

Massachusetts law requires that health care providers obtain a Determination of Need

("DON") before constructing new facilities. MASS. GEN. LAWS ch. 111, § 25C; 105 MASS. CODE

REGS. 100.000-981. The Massachusetts Department of Public Health ("MDPH") imposed a

moratorium on DON applications for new nursing facility beds in 1992. 105 MASS. CODE REGS.

100.302(D)[4]; *see also St. Elizabeth's Med. Ctr. of Boston, Inc. v. Thompson*, 396 F.3d 1228,

1231(D.C. Cir. 2005); *Milton Hosp. Transitional Care Unit v. Thompson*, 377 F. Supp. 2d. 17,

21 (D.D.C. 2005). The MDPH developed an exception to this moratorium under which a

hospital was granted a DON to open a new Level II SNF so long as it first arranged, by contract,

for the closure of a Level III nursing home. The MDPH Commissioner explained this policy to

the Director of CMS' Office of Chronic Care and Insurance Policy in a letter dated February 27,

1996. Exhibit P-8.

---

[4] This regulation states that no CON applications will be accepted before May 1, 2006. In testimony before the Provider Reimbursement Review Board, Paul I. Dreyer, Associate Commissioner for the Massachusetts Center for Quality Assurance and Control, testified that the Massachusetts moratorium was first imposed in 1992 and that the method by which Massachusetts imposes moratoriums is to establish a date for applications at some time in the future. Exhibit P-24, p. 250. Mr. Dreyer testified in *St. Elizabeth's Medical Center of Boston v. Associated Health Service*, PRRB Case No. 98-0489. Exhibit P-24.

Hospitals utilizing this exception applied to MDPH for so-called "suitability" approval through the filing of an application for licensure. 105 Mass. Code Regs. 100.153.006. Exhibit P-9. If MDPH approved the application, that approval results in the grant of an original license.

In July 1996, however, the Massachusetts legislature established, an alternative basis for the issuance of DONs (and, therefore, for original licensure), the act of contracting for the closure of a nursing home. The Massachusetts statute adopted in 1996 states:

> The department of public health is hereby directed to issue a deter-mination of need to any hospital . . . that can demonstrate the following:--
>
> (1) a binding contractual commitment with a nursing home . . . that results in the nursing home's surrender of its license;
>
> (2) that such license holder has ceased operation of its facility;
>
> (3) that the hospital has developed a hospital based skilled nursing facility and meets the qualifications for licensure and Medicare certification; and
>
> (4) that the hospital agrees to be responsible for all overpayments owed to the division of medical assistance by the nursing facility which surrenders its license.
>
> Any determination of need awarded pursuant to this section, shall be deemed awarded on the date that such a hospital first demon-strates compliance with the above criteria; provided, however, that any hospital based skilled nursing facility established as the result of closure of a rest home licensed pursuant to said section seventy-one of said chapter one hundred and eleven [licensure of nursing homes and other facilities] shall have demonstrated compliance with the above criteria prior to April twenty-first, nineteen hundred and ninety-five; and, provided further, that any determination of need granted pursuant to this section shall supersede and replace any prior authorization that such a hospital may have received for the operation of a hospital based skilled nursing facility and any other basis for the award of licensure shall be revoked.

1996 Mass. Acts ch. 203, § 31 (the "1996 DON Act"). Exhibit P-10. Under the 1996 DON Act, therefore, a hospital that wishes to establish a SNF does not acquire any operating rights from another facility; instead, the hospital receives its DON for a new SNF directly from the MDPH.

B.    **Factual Background**

In the 1990s, the Provider decided that many of its acute care patients would have a better opportunity for successful outcomes upon discharge if an intensive subacute care setting was available in close proximity to the Provider. With this goal in mind, the Provider began planning to open a hospital-based SNF to provide subacute care to the Provider's patients who no longer required acute care but were nonetheless too ill to be discharged to their homes.

Because the only exception to the DON moratorium on SNF beds in Massachusetts required the closure of an existing facility, the Provider had no choice but to locate a nursing facility that was interested in closing its beds. The Provider entered into discussions with Greenlawn Nursing Home ("Greenlawn"), located in Middleboro, Massachusetts, regarding the possible closure of its beds. Greenlawn, licensed as a Level III facility (Exhibit P-11), was primarily engaged in providing long-term custodial care to elderly or disabled patients who did not require skilled care but who were nonetheless too infirm to live independently. Greenlawn agreed to close its beds in order to allow the Provider to carry out its plans. By January 11, 1995, Greenlawn had transferred its last patient out of its facility. Exhibit P-12. On March 2, 1995, MDPH granted conditional approval to Greenlawn to suspend its license as of January 11, 1995. *Id.*

On March 31, 1995, the Provider entered into a contract for services with Shirley Dionne, operator of Greenlawn Nursing Home. Exhibit P-13. The preamble to the contract stated that Dionne wished to surrender her license to operate Greenlawn and the Provider wished to obtain the right to operate a SNF. *Id.* The services specified by the contract were for Dionne to assist the Provider in obtaining from MDPH the right to operate a SNF. *Id.* at Article 1. In exchange, the Provider agreed to pay Dionne $300,000. *Id.* at Article 2, § 2.01. The Provider did not

8

acquire any assets, either tangible or intangible, directly from Dionne. *Id.* at Article 1. Instead, the Provider contracted for Dionne's services and cooperation in closing Greenlawn, which allowed it to obtain a DON from MDPH.

On May 4, 1995, the MDPH notified the Provider that the Provider was suitable to be licensed. Exhibit P-14. MDPH extended the temporary suspension of Greenlawn's license until the Provider's facility was constructed. *Id.*

The Provider completed construction of a twenty-five bed hospital-based SNF, the Peter A. Chapman Transitional Care Unit ("PCTCU"), in December 1995. The SNF was located in the Provider's acute care facility at 275 Sandwich Street in Plymouth, Massachusetts. The first patient was admitted to the PCTCU on December 11, 1995 and CMS certified the PCTCU for Medicare participation effective December 15, 1995. Exhibit P-15, P-17.

As stated above, the 1996 DON Act provided that any approval issued prior to the 1996 DON Act was superseded and replaced by authorization under the 1996 DON Act. Exhibit P-10. Accordingly, on September 20, 1996, the MDPH superseded and replaced its prior licensure for the PCTCU with a DON under the 1996 DON Act. Exhibit P-16. This DON was effective December 8, 1995. *Id.*

On June 17, 1997, the Provider applied to its fiscal intermediary, C&S Administrative Services, for a new provider exemption to Medicare RCLs for the PCTCU pursuant to 42 C.F.R. § 413.30(e). Exhibit P-17. The Provider applied for this exemption because the PCTCU opened for the first time on December 11, 1995 and had not been under previous ownership. Exhibit P-17.[5] When the Provider was assigned a new fiscal intermediary in July 1997, C&S

---

[5] The Provider included with its application a letter from HCFA dated January 30, 1996 approving PCTCU as a SNF under the Medicare program; a letter from the Massachusetts Department of Health issuing a DON to PCTCU based on compliance with the 1996 DON Act; an explanation of the 1996 DON Act; the Provider's signed Medicare

*footnote continued*

Administrative Services returned the Provider's application. Exhibit P-18. On December 31, 1997, the Provider resubmitted its application to its new intermediary, Associated Hospital Service. *Id.*

By letter dated January 19, 1998, the Intermediary requested additional information from the Provider, the majority of which related to "an institution or institutional complex that has undergone a change in location." Exhibit P-19.[6] In addition, the Intermediary requested a "CON" (in many states the DON is referred to as a Certificate of Need or "CON") application letter; a state licensure application for three years prior to establishing the SNF; and leasing information, if applicable. The Intermediary requested all documents within 45 days. Exhibit P-19.

By letter dated January 26, 1998, the Provider responded to the Intermediary's January 19, 1998 letter. Exhibit P-20. The Provider pointed out that under the 1996 DON Act, no DON application was required or completed; the only state licensure application for the PCTCU was submitted with the Provider's December 31, 1997 application; and the PCTCU did not operate under any lease agreement. The Provider sent a follow-up letter on February 3, 1998 attaching the Provider's contract for services with Shirley Dionne, a list of the PCTCU's patient days by payer for fiscal years 1996 and 1997, and a list of all patients admitted to the PCTCU from December 1, 1995 through June 30, 1996. The Provider also stated that additional information would be forthcoming. Exhibit P-21. On March 3, 1998, the Provider submitted documents

---

agreement; and the Provider's worksheet S-2 from its cost report for the period ending September 30, 1996. Exhibit P-17.
[6] The items requested by the Intermediary related to the change in location were: the contract between "the prior owner (facility) where the SNF beds were located and the new owner (facility) where the SNF beds are going to be located"; a list of all patients from the old location for one year prior to its closure; a list of all patients from the new location for the first six months of operation; total inpatient days in the new location for the first three months of operation; and total inpatient days at the old location for the same three month period in the year prior to the relocation. Exhibit P-19.

regarding the inpatient days at Greenlawn in December 1994 and January 1995 and a patient

discharge summary ledger for Greenlawn's last year of operation.[7]  Exhibit P-22.  This

submission completed the supplementary documentation required by the Intermediary's January

19, 1998 letter.

By letter dated July 15, 1998, CMS denied the Provider's request for a new provider

exemption.  Exhibit P-23.  In pertinent part, CMS's letter states:

> As stated in the Agreement between Jordan Hospital and Shirley
> Dionne (Operator of Greenlawn Nursing Home) dated March 31,
> 1995, in order to establish its distinct part, Jordan Hospital
> purchased Greenlawn Nursing Home's right, title and interest in
> the forty-seven (47) licensed nursing home beds in operation at
> Greenlawn Nursing home, including without limitation Greenlawn
> Nursing Home's Determination of Need ("DON") rights to own
> and operate such beds (the "Contracted Services").  Greenlawn
> Nursing Home operated as a nursing facility, Provider Number
> 22E561, certified to participate in the Medicaid Program since
> March 31, 1974. . . . Jordan does not qualify for a new provider
> exemption because its distinct part has operated in a manner
> equivalent to a SNF, under past and present ownership, as
> evidenced by the fact that it provided skilled nursing and
> rehabilitative services as a nursing facility (NF) for three or more
> years under past ownership prior to its current Medicare
> certification.

The CMS letter also concludes that the Provider did not qualify for a new provider

exemption as a relocated provider.  CMS stated that to be eligible based on relocation, "an

institution or institutional complex must demonstrate that in the new location a substantially

different inpatient population is being served."  CMS stated that, because the PCTCU and

Greenlawn were located in the same HSA, they were presumed to be serving substantially the

same inpatient population, unless 50% or more of the PCTCU's and Greenlawn's admissions

---

[7] The Provider noted that Greenlawn closed on or about January 12, 1995, and so there were no inpatient days
following that date.  Exhibit P-22, p. 184.  The Provider also attached to its March 3, 1998 letter all of the
documents previously submitted with its February 3, 1998 letter.  *Id.*

were from different HSAs. CMS stated that the majority of Greenlawn's and the PCTCU's admissions came from the same HSA and, therefore, the Provider did not qualify for a new provider exemption based on relocation. It also stated that it would not consider whether the PCTCU's inpatient days were lower than Greenlawn's because that issue is moot if the two entities serve substantially the same inpatient population.

In summary, CMS's letter alleges the following:

1.   Greenlawn was the prior owner of PCTCU because PCTCU purchased all of Greenlawn's bed rights, including DON rights, thereby triggering a review of the services furnished by Greenlawn during the three-year "look back" period.[8]

2.   Greenlawn provided skilled nursing and rehabilitative services as a NF during the three year look back period.

3.   PCTCU and Greenlawn served the same inpatient population.

## IV.   PROVIDER'S POSITION

### A.   Introduction

CMS determined that Greenlawn sold its DON to the Provider and therefore was the previous owner of the PCTCU (thereby allowing CMS to review the services that Greenlawn provided during the three year look back period). CMS's determination that Greenlawn sold its DON to the Provider is incorrect for two reasons. First, it is based on a misunderstanding of the transaction between the Provider and Greenlawn and second, it is based on a misunderstanding of Massachusetts DON law.

Even if CMS were correct (which it is clearly not) that Greenlawn sold its DON to the Provider, such a transaction would not make Greenlawn the previous owner of the PCTCU as a

---

[8] The period that the Secretary may review to determine a facility has operated as a SNF or its equivalent is commonly referred to as the "look back" period. *Milton Hospital*, 377 F. Supp. 2d 17, 27 n.12.

matter of law.  As two federal circuit courts have concluded, the transfer of a DON does not equate to the transfer of a "provider" as that term is used in the Medicare program.  In addition, CMS's interpretation of the term "provider" is inconsistent with its own published interpretations of that term, violates both due process and the Administrative Procedure Act, is inconsistent with CMS's past policy on new provider exemptions, is contrary to Congressional intent regarding uniform administration of the Medicare program, and is inconsistent with the purpose of the new provider exemption.  Also, to the extent that CMS's denial was based on PRM § 2533.1, that provision cannot be retroactively applied to the Provider.

Furthermore, even if the transaction that occurred equates to the transfer of a DON as a matter of law, a SNF is only considered a new provider if it the previous owner did not operate as a SNF.  In this case, CMS's determination that Greenlawn operated as a SNF is erroneous.

In any event, the Provider is entitled to an exemption based on relocation.  The PCTCU and Greenlawn furnished services to substantially different inpatient populations and the inpatient days at the PCTCU were significantly lower than at Greenlawn.

Finally, the Board's determination with regard to the Provider's new provider exemption is applicable to the Provider's FY 1996, FY 1997 and FY 1998.

**B.     CMS's Determination that the Provider Purchased Greenlawn is Based on a Misunderstanding of the Facts and Applicable State Law**

As stated above, CMS claims that the Provider "purchased Greenlawn Nursing Home's right, title and interest in the forty-seven (47) licensed nursing home beds in operation at Greenlawn Nursing Home, including without limitation Greenlawn Nursing Home's Determination of Need ('DON') rights to own and operate such beds (the 'Contracted Services')."  Exhibit P-23.  Consequently, CMS reviewed the services furnished by Greenlawn in the previous three years to determine if Greenlawn had furnished SNF services.  CMS's

13

conclusions are incorrect.  The Provider did not purchase any bed rights or a DON from Greenlawn: CMS incorrectly interpreted the contract between the Provider and Greenlawn as well as Massachusetts law governing DONs.

       1.      <u>The Provider Did Not Purchase Greenlawn's DON or Any Other Assets</u>

The plain language of the contract between the Provider and Shirley Dionne states that it was a contract for services.  Dionne agreed to assist the Provider in obtaining its DON from the Commonwealth of Massachusetts, and payment was conditioned on the Provider obtaining the DON.  Exhibit P-13.  Specifically, Dionne's only service under the contract was to assist the Provider to "obtain the right to operate a skilled nursing facility at its site as may be granted by the [Massachusetts] Department [of Public Health]."  Exhibit P-13, Article I.  Dionne would be paid only if her services proved efficacious to the Provider obtaining a DON from the Commonwealth of Massachusetts.

The contract included no transfer of DON rights or any other asset.  To the contrary, the contract explicitly stated that the services to be provided would not result in the Provider acquiring "any interest in the real estate, license, furnishings, equipment, receivables, notes, or other assets" of Greenlawn.  Exhibit P-13, Article I.  Accordingly, CMS's statement that the Provider acquired the "right, title and operation" of Greenlawn, including its DON, is factually incorrect.  Admittedly, because of the Massachusetts moratorium on DONs, the Provider could not have obtained a DON without the services and cooperation of Dionne.  Nonetheless, this does not change the fact that Dionne did not transfer DON rights to the Provider.

Not only does the contract between the Provider and Greenlawn state that no assets were transferred, it would have been impossible, as a practical matter, for Greenlawn to have transferred any assets to the provider.  Greenlawn ceased operations on January 11, 1995 and all

14

of its patients were transferred to other facilities. Exhibit P-12. By the time that the PCTCU admitted its first patient on December 11, 1995, Greenlawn had been closed for eleven months. Because Greenlawn ceased operations almost one year before the PCTCU opened, it could not have, in any realistic sense, transferred any assets to the PCTCU.

2.    Under Massachusetts Law, the Provider Received Its DON From MDPH

Even if the Provider had wanted to transfer Greenlawn's DON, Massachusetts law did not allow for such a transfer. The Massachusetts law under which the Provider obtained its DON states that, "[t]he department of public health is hereby directed to issue a determination of need to any hospital" that meets certain criteria. 1996 DON Act. Exhibit P-10. The law required the issuance of a *new* DON from MDPH for a hospital-based SNF once a license for a long-term care nursing home was released.

Thus, Dionne relinquished an asset to the Commonwealth of Massachusetts by surrendering the license to operate Greenlawn. The Commonwealth of Massachusetts extinguished that asset and then created a new asset, DON rights for Level II SNF beds, which it granted to the Provider. The Chairperson of the Provider Reimbursement Review Board has described the Massachusetts law as follows:

> [t]he new state law specified that the transferring facility had to close and the acquiring facility had to assume responsibility for the transferor's Medicaid overpayment, if any. The new procedure fostered the State's policy of shifting approved nursing home beds from lower level care to higher level. Moreover, the state law set up a new route by which the acquiring facility obtained its DON. *Instead of the old facility directly transferring the DON, the DON went back into the state's pool of approved nursing beds and the state issued the DON to the new owner.*

*St. Elizabeth's Med. Ctr. (Boston, MA) v. Blue Cross and Blue Shield Ass'n/Associated Hosp. Svc. of Maine*, PRRB Dec. No. 2002-D49, [2002-2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 80,908 at 203,051 (2002) (Cochran, concurring) (emphasis added). In a Board

hearing in which the same Massachusetts statutory provision played a critical factor, an MDPH

official testified that the 1996 DON Act required the MDPH to issue the DON. Exhibit P-24, pp.

253-54.[9]

CMS has adopted its own, and incorrect, interpretation of Massachusetts DON law in this

case. Although federal agencies are normally afforded some deference by the Courts, deference

is not warranted where a federal agency construes state law. *Chevron U.S.A. Inc. v. Natural

Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984) (deference to a federal agency's

construction of a statute is appropriate only where the agency is entrusted with administration of

the statute). The CMS letter denying the Provider's new provider exemption rests on the

conclusion that the Provider purchased Greenlawn's DON, which is clearly erroneous under a

plain reading of Massachusetts law.

### C.    Even if Greenlawn Had Transferred Its DON to Jordan, a Transfer of DON Rights Is Not a Transfer of Ownership and Does Not Trigger a Review of Services Furnished by Greenlawn

Even if CMS were correct that the Provider's agreement with Dionne constituted a

transfer of Greenlawn's DON, CMS erred in its conclusion that such a transfer of DON rights

would make Greenlawn the previous owner of the PCTCU, and thereby allow CMS to review the

services by Greenlawn during the three year look back period.

#### 1.    The Term "Provider" in 42 C.F.R. § 413.30(e) Unambiguously Refers to an Institution, Not a DON

As stated above, the Medicare regulations define "new provider" as "a provider of

inpatient services that has operated as the type of provider (or the equivalent) for which it is

certified for Medicare, under present and previous ownership, for less than three full years." 42

---

[9] This official was Paul I. Dreyer, Associate Commissioner for the Center for Quality Assurance and Control. Exhibit P-24, p 245-46. Mr. Dreyer testified in *St. Elizabeth's Medical Center of Boston, Inc. v. Associated Health Service*, PRRB Case No. 98-0489. Exhibit P-24.

C.F.R. § 413.30(e) (1997). Exhibit P-25. By equating a provider with a DON, CMS has added

an interpretation that is simply not in the regulations. Although CMS may want 42 C.F.R.

§ 413.30(e) to support its view, regulations cannot be construed to mean what CMS has failed to

express. *See McElroy Elecs Corp. v. FCC*, 990 F.2d 1351, 1366 (D.C. Cir. 1993); *L.R. Willson*

*& Sons, Inc. v. Donovan*, 685 F.2d 664, 675 (D.C. Cir. 1982). An agency interpretation of a

regulation is not entitled to deference if the interpretation is contrary to the regulation's plain

meaning. *See Mun. Resale Serv. Customers v. Fed. Energy Regulatory Comm'n*, 43 F.3d 1046,

1053 (6th Cir. 1995); *Univ. of Cincinnati v. Bowen*, 875 F.2d 1207, 1209 (6th Cir. 1989); *Rio*

*Hondo Mem'l Hosp. v. United States*, 689 F.2d 1025, 1034 n.11 (Ct. Cl. 1982).

More importantly, CMS's interpretation of the term "provider" is at odds with the

definition in the Medicare statute. The statute defines a "provider of services" to include entities

such as hospitals, skilled nursing facilities, comprehensive outpatient rehabilitation facilities,

home health agencies, and hospice programs." 42 U.S.C. §1395x(u). In addition, the Medicare

statute defines a "skilled nursing facility" as "an institution (or a distinct part of an institution)."

42 U.S.C. § 1395i-3(a). *See also* 42 U.S.C. § 1395x(j). There is nothing in the Medicare statute

that suggests that a provider or SNF equates to a DON only.

A DON cannot be a "provider" for the commonsense reason that a DON cannot

"provide" anything. A DON simply grants an institution the *right* to provide health care

services. These services are then actually provided by the institution, not the slip of paper

granting the institution the legal authority to admit patients. A DON is no more a "provider"

than a driver's license is a driver. In both cases, the state grants permission to a person or

institution to do something—drive a car or treat patients—and it is the person or institution that

acts: a person drives a car and a hospital *provides* health care services. In the absence of the

PCTCU facility, nothing would be provided. Greenlawn ceased doing business before the PCTCU opened. The DON, by itself, would aid no one. No patients would be served by the DON. No beds would be filled. Only a person or an institution can do these things. To permit CMS such definitional fluidity would be a "conveniently postmodernist view of the English language" that is not warranted by the new provider exemption regulation. *Ashtabula County Med. Ctr. v. Thompson*, 191 F. Supp. 2d 884, 892 n.8 (N.D. Ohio 2002).

In CMS's view, an institution that is established in part through the reallocation of the right to operate even a single nonoperating long-term bed is a change in ownership of an "institution." This absurd result demonstrates that CMS has changed the definition of a "provider" from the reasonable definition of an "institution" as a collection of assets and personnel into a new definition of a provider: the intangible right to operate the beds.

Two circuit courts of appeals have held that the term "provider" in the new provider exemption regulation unambiguously refers to an institution, not a single asset such as DON rights. *Ashtabula County Med. Ctr. v. Thompson*, 352 F.3d 1090 (6th Cir. 2003); *Maryland Gen. Hosp. v. Thompson*, 308 F.3d 340 (4th Cir. 2002). In *Maryland General Hospital*, the hospital obtained permission from the state of Maryland to open a new SNF by acquiring state operating rights, but nothing else, from pre-existing SNFs.[10] *Maryland Gen. Hosp.*, 308 F.3d at 343. The Secretary contended that prior ownership of SNF bed rights could be treated as prior ownership of the SNF because the term "provider" as used in 42 C.F.R. § 413.30(e) is ambiguous. The Fourth Circuit rejected this assertion, observing that in the Medicare program, "provider of

---

[10] The fact that Maryland General Hospital acquired the operating rights for its new SNF from other SNFs led the *Maryland General Hospital* dissent to comment that the grant of a new provider exemption to Maryland General Hospital would not serve the exemption's purposes of assisting new SNFs and increasing the overall number of SNF beds in the market. 308 F.3d at 350. That concern has no place in this case because Greenlawn was not a Level II SNF. The alleged transfer of operating rights from Greenlawn to the Provider indisputably increased the number of Level II SNF beds in Massachusetts.

18

services" means specified types of health care institutions—including, for example, hospitals, home health agencies, and SNFs. *Maryland Gen. Hosp.*, 308 F.3d at 344 (citing 42 U.S.C. § 1395x(u)). The court further noted that PRM § 2604.1 repeatedly characterizes a "provider" as an "institution" engaged in providing some form of health care services. *Id.* In accord with commonsense and parlance, the court noted that the term "institution" indicates that a provider is the business entity that is providing the services. *Id.* A single, intangible asset like operating rights is not itself the business entity. Thus, the court ruled, the Secretary erred in treating prior ownership of operating rights as prior ownership of the "provider."

> [T]he [new provider] regulation permits consideration of the institution's past and current ownership, but not the past and current ownership of a particular asset of that institution. The Secretary's interpretation, however, equates the ownership of an institution providing skilled nursing services with the ownership of a particular asset of that institution. Since there is no language in the regulation that would permit the denial of the exemption because an asset of the new institution was previously owned by an unrelated SNF, the Secretary's interpretation is inconsistent with the plain language of the regulation and cannot be allowed to stand.

*Id.* at 347.

The *Ashtabula* court based its holding on similar reasoning. As in *Maryland General*, *Ashtabula* involved a hospital, Ashtabula County Medical Center ("ACMC") that had opened a new SNF after acquiring state CON rights from a pre-existing, but entirely separate, institution, Ashtabula County Home ("ACH"). 352 F.3d at 1091-92. The Sixth Circuit upheld the district court's determination that 42 C.F.R. § 413.30(e) is unambiguous:

> Relevant definitions elsewhere in the statute and PRM as well as ordinary English usage lead this Court to conclude that the term provider can only be understood to refer to an institution or distinct part of an institution, not to a mere characteristic or attribute of such an institution.

352 F.3d at 1095-96 (quoting 191 F. Supp. 2d at 892-93). The circuit court agreed that "the plain meaning" of § 413.30(e) is that a provider is a business entity, not a single asset:

19

ACMC set up a SNF in its hospital. In order to do so, it purchased a single asset form ACH in the form of a CON for fifteen nursing home beds, just as if it had bought a used x-ray machine or kitchen oven. Such a purchase does not make ACMC into ACH repackaged. Accordingly, we hold that ACMC is entitled to "new provider" status pursuant to section 413.30(e).

*Id.* at 1097.

In three cases involving the same issue and somewhat similar facts, the Ninth, First, and Seventh Circuits have ruled in favor of the Secretary, based on a finding that the applicable regulation is ambiguous and, therefore, deferring to the Secretary's interpretation of it. *Providence Health System-Wash. v. Thompson*, 353 F.3d 661 (9th Cir. 2003); *South Shore Hosp., Inc. v. Thompson*, 308 F.3d 91 (1st Cir. 2002); *Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141 (7th Cir. 2001).[11] The Board should follow *Ashtabula* and *Maryland General*, not *Paragon*, *South Shore*, or *Providence*. The courts in *Paragon*, *South Shore*, and *Providence* did not look to the definitions of "provider" or "skilled nursing facility" in the Medicare statute, with the result that all three deemed the definition of provider a fit area for administrative discretion.[12] Given Congress's clear statutory definitions, discerning the meaning of "provider" or "provider of inpatient services" is not nearly so difficult as CMS and the *Paragon*, *South Shore*, and

---

[11] The Provider notes that *South Shore* was decided by the First Circuit Court of Appeals, which includes Massachusetts, the state in which the Provider is located. The Board should not apply the First Circuit's precedent to the Provider, however. The Medicare statute does not mandate that a circuit court precedent is binding on all providers in that circuit. To the contrary, the statute provides judicial review of final agency action in either the district court in which the provider is located *or* in the District Court for the District of Columbia. 42 U.S.C. § 1395oo(f)(1). The D.C. Circuit has not yet ruled on whether the transfer of DON rights triggers the three year look back for purposes of the new provider exemption regulation. *See St. Elizabeth's*, 396 F.3d at 1233-34 (deciding only the issue of whether the CMS Administrator's determination—that the nursing home from which the SNF obtained its DON rights had operated as a SNF—was based on substantial evidence). For this reason, there is currently no circuit court precedent that is binding upon the Board's disposition of this issue in this case. As argued above, the Board should defer to the well reasoned analyses of the Fourth and Sixth Circuits, both of which held that the transfer of DON rights does not mean that there was a previous owner of the provider for purposes of the new provider exemption regulation.

[12] Although CMS, too, has largely ignored the statutory provision in evaluating the Provider's new provider exemption request, CMS actually followed Congress's definitions in the PRM guideline that governs this case: PRM § 2604.1 repeatedly makes the term "provider" synonymous with "institution."

*Providence* courts would have it.[13]  Applying the relevant statutes, there is no way reasonably to interpret "provider" or "provider of inpatient services" to mean a single intangible asset like operating rights.  The "provider" at issue in this case is the PCTCU itself as a business institution, not merely its operating rights.[14]

Moreover, the *Ashtabula* court correctly pointed out that the Seventh Circuit erroneously conflated the terms "new" and "provider."  *Ashtabula*, 352 F.3d at 1095-96 (citing 191 F. Supp. 2d at 892-96).  The ambiguity perceived by the Seventh Circuit was in the term "new," but "new" is unambiguously defined in § 413.30(e) as a provider in operation less than three years. *Id.*  The term "provider" is equally unambiguous when interpreted in light of its plain meaning and the definition given it elsewhere in the statute.  *Id.*  Consequently, there is no ambiguity in the new provider exemption regulation, and the Seventh Circuit's analysis is, therefore, flawed. *Id.*  Because the First and Ninth Circuits relied heavily upon the Seventh Circuit's reasoning, their holdings are equally flawed.

Two recent Supreme Court rulings indicate that the *Paragon*, *South Shore* and *Providence* courts afforded CMS an inappropriately high level of deference.  *United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001); *Christensen v. Harris County*, 529 U.S. 576, 587 (2000).  In these two cases, the Supreme Court held that federal agency "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack

---

[13] As the Ninth Circuit has stated, "We fully agree with a sister Circuit that the Medicare and Medicaid provisions 'are among the most completely impenetrable texts within the human experience.' *Rehab. Ass'n of Virginia v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994).  We also recognize that the Secretary is entitled to considerable deference in interpreting his own regulations particularly in a regulatory scheme as complex as Medicare.  But not every Medicare provision is of Delphic obscurity, explicable only through the Secretary's oracular powers." *Alhambra Hosp. v. Thompson*, 259 F3d 1071, 1076 (9th Cir. 2001).

[14] *Paragon* is also factually dissimilar from the Provider's situation.  *Paragon* involved one facility of a health care company transferring DON rights to another facility owned by the same company.  *Paragon*, 251 F.3d at 1144.  Paragon bought a DON from itself and was indeed the "provider" both at the old and the new facility.  Unlike the provider in *Paragon*, the Provider in this case built a new SNF and obtained bed rights from the state after a nursing home, with which it had no connection, ceased doing business.

the force of law" do not warrant a high level of deference. *Christensen*, 529 U.S. at 587; *see also Mead*, 533 U.S. at 230-231. Because these types of agency statements have not been subjected to "notice and comment" under the federal Administrative Procedure Act and have not been informed by that process, they are not owed the sort of deference that a rule adopted through that process would be given. *Mead*, 533 U.S. at 229-30. At least one court has applied the principle enunciated in the *Mead* and *Christensen* cases to CMS's interpretation of 42 C.F.R. § 413.30 (the new provider exemption regulation) as articulated in the PRM and determined that CMS's interpretation is owed "little" deference. *St. Luke's Methodist Hosp. v. Thompson*, 182 F. Supp. 2d 765, 777-781 (N.D. Iowa 2001); *af'd on other grounds,* 315 F.3d. 984 (8th Cir. 2003). Similarly, the *Maryland General Hospital* court determined that the provisions of the PRM are permitted deference only to the extent that they afford a reasonable construction of the relevant statute or regulations. *Maryland Gen. Hosp.*, 308 F.3d at 347 n. 3. CMS's interpretation of the new provider exemption regulation, which equates (what it calls) transfer of a DON to the transfer of a provider, has not been subject to notice and comment and does not afford a reasonable interpretation of the regulation. Accordingly, CMS's interpretation should be given little or no deference.

    2.    <u>CMS's Interpretation of "Provider" is Inconsistent with Its Own Published Interpretations of That Term</u>

CMS's interpretation of "provider" for purposes of the new provider exemption is inconsistent with CMS's longstanding interpretation of that term. During the time that the Provider entered into the transaction with Greenlawn and submitted its exemption request, CMS's official interpretation of the new provider rule was that "[a] new provider is an *institution* that has operated . . . for less than three years." PRM § 2604.1 (emphasis added), Exhibit P-3.

CMS thus explicitly and very clearly viewed a "provider" as an "institution" rather than an

intangible right such as a DON.

Other manual provisions also consistently refer to a "provider" as a business enterprise

and recognize that a provider does not transfer ownership unless a significant portion of its assets

are transferred. *See* PRM § 1500.7, Exhibit P-26; State Operations Manual, § 3210, Exhibit P-

27; Medicare Intermediary Manual ("MIM"), §§ 4502.5, 4502.8, Exhibit P-28.  For instance, the

MIM states that the sale of "all or substantially all" of a corporation's tangible assets constitutes

a change of ownership for Medicare certification purposes.  MIM § 4502.5, Exhibit P-28.  A

purchase of stock does not constitute a change of ownership for Medicare certification purposes

unless "a change in [the] *entity* legally responsible to the program has occurred."  MIM § 4502.8

(emphasis added), Exhibit P-28.  The PRM refers to sale of assets of the "entity" as a change of

ownership if the assets are "used to render patient care."  PRM § 1500.7, Exhibit P-26.  The

Chairperson of the Provider Reimbursement Review Board has stated that these manual

provisions demonstrate that the Medicare program views a provider as a business entity, not one

asset of that entity, and that acquisition of DON rights alone is not a transfer of the business

entity:

> [The manual provisions] indicate the Agency's consistent view during the
> relevant time period that a 'provider' is a legal entity that operates a business
> enterprise and that a change of ownership of a provider envisions a continuity of
> the business enterprise. . . . Nothing in these provisions support[s] the Agency's
> position that . . . acquisition of a single asset, DON rights, from the unrelated
> [nursing home] makes [the provider the nursing home's] legal successor.

*St. Elizabeth's Med. Ctr.*, PRRB Dec. No. 2002-D49 [2002-2 Transfer Binder] Medicare &

Medicaid Guide [CCH] ¶ 80,908 at 203,053 (2002) (Cochran, concurring).  Accordingly, CMS's

interpretation of "provider" and its notion of a transfer of ownership for purposes of the new

provider exemption is completely at odds with PRM § 2604.1 and with CMS's other manual provisions.

3.    <u>CMS's Reinterpretation of the New Provider Exemption Without Notice Violates Due process and the Administrative Procedure Act</u>

The Due Process Clause of the Fourteenth Amendment requires that an agency provide fair notice to those whom it regulates: "The due process clause thus 'prevents . . . deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires.'" *Gen. Elec. Co. v. E.P.A.*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (*quoting Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986)). This is true whenever sanctions are "drastic," such as when a fine is imposed or an important benefit is denied. *Id.* at 1329 (*citing Radio Athens, Inc. v. FCC*, 401 F.2d 398, 404 (D.C. Cir. 1968). Where an agency changes its interpretation of a regulation or policy in a way that significantly affects the rights of those regulated, it is well-established that the agency must go through notice and comment rulemaking under the Administrative Procedure Act ("APA"). *See, e.g., Shalala v. Guernsey Mem'l Hosp*, 514 U.S. 87, 100 (1995); *Caruso v. Blockbuster-Sony Music Entertainment*, 193 F.3d 730, 736-37 (3rd Cir. 1999).

Nothing in the Medicare statutory, regulatory, or manual language states, or even leads to the reasonable inference, that ownership would be imputed to a new provider simply by acquisition of a DON. The PRM does not even hint that the acquisition of DON rights constitutes the sale of a provider. More importantly, the language of the PRM provision in effect at the time that the Provider entered into its agreement with Greenlawn affirmatively indicated that the Provider's new provider exemption would be approved. The examples provided by CMS in the PRM support the Provider's position that it is entitled to a new provider exemption. PRM-1, § 2604.1 states that:

24

[A]n institution that has been furnishing only custodial care to patients for 2 full years prior to its becoming certified as a hospital furnishing covered services to Medicare beneficiaries, shall be considered a "new provider" for 3 full years from the effective date of its certification.

The situation of the Provider and PCTCU is almost identical to the this example, except that in this case, the Provider had been furnishing hospital care prior to PCTCU becoming certified to provide skilled nursing care. Based on that example, PCTCU should be entitled to a new provider exemption. The PRM language therefore fails to provide any notice that CMS would interpret this provision to prohibit a new provider exemption to an entity that is found to have purchased bed rights from a closed facility.

Regulated parties cannot be held to a standard unless the regulations provide fair warning. *See, e.g., Alaska Prof. Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1034-35 (D.C. Cir. 1999); *United States v. Chrysler Corp.*, 158 F.3d 1350, 1354 (D.C. Cir. 1998); *General Elec. Co. v. EPA*, 53 F.3d 1324, 1328-1334 (D.C. Cir. 1995); *Vencor, Inc. v. Shalala*, 988 F. Supp. 1467, 1472-1473 (N.D. Ga. 1997). In this case, the regulation and CMS's PRM provision provided no warning of CMS's interpretation. If CMS did not like 42 C.F.R. § 413.30(e), it was required to change the regulation by following the notice and comment procedures applicable to all regulatory changes. 5 U.S.C. § 553; *State of Ohio Dep't of Human Serv. v. U.S. Dep't of Health and Human Serv.*, 862 F.2d 1228, 1233-37 (6th Cir. 1988) (holding that adoption of additional requirement not compelled by or implicit in Secretary's existing regulations required notice and comment).

The benefit that CMS has denied the Provider is significant. As CMS itself acknowledges, the new provider exemption "was implemented to recognize the difficulties in meeting the applicable cost limits due to underutilization during the initial years of providing skilled nursing and/or rehabilitative services . . . ." PRM § 2533.1, Exhibit P-5. The regulation

assumes that new SNFs will be underutilized and that this underutilization should excuse new

SNFs from the RCLs. The exemption's purpose is therefore to allow health care providers to

take the risks necessary to provide important health care services to the public. When it

undertook to build its SNF, the Provider reasonably assumed, based on PRM § 2604.1, that it

would be allowed to exceed the RCLs while it developed its new service.

> As the court in *Maryland General Hospital* stated:

> If Section 413.30(e) fails to adequately address the consideration the Secretary
> believes important when determining whether the new provider exemption should
> be applied in any given case, then the Secretary should amend the regulation; he
> cannot reach the desired result by interpreting the regulation in a way wholly
> unconnected to the regulation's plain language.

308 F.3d at 347-48. The Supreme Court held in *Christensen v. Harris County* that an agency's

position is not entitled to deference if to do so "would be to permit the agency, under the guise of

interpreting a regulation, to create *de facto* a new regulation." 529 U.S. 576, 588 (2000). This is

exactly what CMS has done with PRM § 2533.1. CMS simply did not give the Provider

sufficient notice that the additional costs associated with start-up of the PCTCU would not be

reimbursed at the time it undertook the time, effort, and expense of building its SNF.

Accordingly, CMS's decision should be reversed.

> 4.    CMS's Denial of the Provider's Request Is Inconsistent With Its Past
>        Policy on New Provider Exemptions

CMS's past administrative decisions demonstrate that the transfer of DON rights does not

constitute the sale of a provider. CMS has, prior to its decision in this case, approved new

provider exemptions for providers that had obtained DON operating rights from another facility.

By letter of May 23, 1994, CMS granted a new provider exemption to Meridian Healthcare

Center at Spa Creek ("Spa Creek"). Exhibit P-29. That facility, located in Annapolis, Maryland,

obtained some of its DON bed rights from another facility. The State of Maryland approved the

facility's DON for construction of 75 comprehensive care beds where 40 of those beds were being relocated from another Meridian facility in Anne Arundel County. *See* "Modified Certificate of Need," dated June 11, 1991, and Spa Creek's Application for New Provider Exemption.[15]  Exhibit P-30.  Thus, even though Spa Creek had obtained DON bed rights from another existing facility, its request for a new provider exemption was granted.

Furthermore, CMS has, on numerous occasions, approved new provider exemption requests by SNFs where the facility had converted from an NF.  Exhibits P-31 and P-32.  If CMS had reviewed the Provider's new provider exemption application under the principles and CMS policies applied in these cases, the Provider's application clearly would have been approved. Thus, CMS's position in this case represents an about-face from its longstanding interpretation of the new provider exemption regulation.

For the court in the *Paragon* case, consistency was a crucial factor in determining that CMS's interpretation of the term "relocate" in the context of a new provider exemption was entitled to deference.  The Seventh Circuit held that CMS had interpreted the term "relocate" consistently in its prior decisions, but stated, "[I]f the parties' submissions had demonstrated that the Secretary [of Health and Human Services] had in fact reversed course, we would be confronted with a different case . . . ." *Paragon*, 251 F.3d at 1147 n.4.[16]  As demonstrated above, CMS has in fact reversed course, and CMS's denial of the Provider's new provider exemption application conflicts with its previous discussions.  Accordingly, CMS's decision is improper and should be reversed.

---

[15] In Maryland, a DON is known as a "certificate of need" or "CON."

[16] Other courts have reached similar conclusions in other contexts.  *INS v. Cardoza Fonseca*, 480 U.S. 421, 446 n.30 (1987) (when an agency's position conflicts with the agency's earlier interpretation it is entitled to considerably less deference than an agency view that has been consistently applied); *see also New York City Health and Hosp. v. Perales*, 954 F.2d 854, 861 (2d Cir.), *cert. denied*, 506 U.S. 972 (1992).

5.    CMS's Interpretation of Its Regulation Is Contrary to Congressional Intent of Uniform National Administration of the Medicare Program

CMS's reinterpretation of the new provider exemption is contrary to the Congressional intent underlying the Medicare statute. The general goal of Medicare is national uniformity. *Ashtabula*, 191 F. Supp. 2d at 895. CMS's reinterpretation frustrates this goal by creating, in essence, two separate regimes for the new provider exemption. Hospitals in states with DON programs will typically be denied the exemption because these hospitals may be forced to purchase a DON from another facility. In a non-DON state, on the other hand, an identically situated hospital would be granted an exemption because in all respects it would be a new provider of SNF services.

CMS's policy creates a bifurcated reimbursement system where the amount that a new SNF facility will be paid for services to Medicare patients will depend upon the DON laws of the state in which it is located. This "deviation from Medicare's well-established uniform reimbursement norm . . . is based on an arbitrary and capricious interpretation of the new provider exemption." *Ashtabula*, 191 F. Supp. 2d at 897. The disparity in treatment of providers in DON and non-DON states is particularly inequitable given that providers in DON states have even greater start-up costs than providers in non-DON states. *Id.* at 896-97. The Provider has expended considerable time, effort, and expense developing a new SNF, and it should not be penalized simply because it is located in a state with a DON statute.

6.    CMS's Interpretation of its Regulation is Inconsistent with the Purpose of the New Provider Exemption

CMS's interpretation of § 413.30(e), which equates a provider with a DON, is contrary to the intent of the regulation and should be rejected. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). The purpose of the new provider exemption, as CMS has acknowledged

28

many times, is "'to allow a provider to recoup the higher costs normally resulting from low occupancy rates and start-up costs during the time it takes to build its patient population.'" *Ashtabula*, 191 F. Supp. 2d at 895 (quoting *Maryland Gen. Hosp. Transitional Care Ctr. v. Blue Cross and Blue Shield Ass'n*, PRRB Case No. 99-D69 (Admin. Dec. Nov. 22, 1999)).[17] The regulation was designed to aid health care institutions in the Provider's precise position. CMS now thwarts that goal by limiting benefits of § 413.30(e) to providers who are able to obtain a new DON or who are fortuitously located in non-DON states.

The Provider never before operated a SNF and has incurred significant start-up costs in establishing the PCTCU. The PCTCU had to be entirely constructed, equipment purchased, staff hired, and licensure and Medicare certification obtained. Also, during PCTCU's FY 1996, utilization was only 68%. Exhibit P-33, p. 332.[18] Accordingly, the PCTCU experienced the type of low utilization typical of new facilities that the new provider exemption was intended to address.

Granting new provider status to PCTCU is consistent with the purpose of the regulation. The Provider incurred substantial start-up costs and its occupancy rate was low. Even if the Provider had acquired a DON from Greenlawn, that fact would not ameliorate the significant start-up costs that it incurred in opening the PCTCU. In short, CMS's interpretation of its

---

[17] *See also* 57 Fed. Reg. 39803 (Sept. 1, 1992) in which CMS stated that the exemption to the hospital rate-of-increase limits for new hospitals is in recognition of start-up costs and low utilization during the initial period of operation; 44 Fed. Reg. 31802 (June 1, 1979); *San Diego Physicians & Surgeons Hosp. v. Aetna Life Ins. Co.*, [1991 Transfer Binder] Medicare and Medicaid Guide [CCH] ¶ 39,007, 25,062 (Admin. Dec. Jan.12, 1991).

[18] Exhibit P-33 is pertinent data from the Provider's RCL *exception* request for FY 1996. (The attachments to the exception request, which are support for the request, are not included because they are voluminous, but can be furnished by the Provider if necessary.) The Medicare regulations allow SNFs to apply for an exception from the RCLs for various reasons, including the provision of atypical services and extraordinary circumstances. 42 C.F.R. § 413.30(f) (1997). The Provider applied for and received an RCL exception for FY 1996. Accordingly, the Intermediary has already reviewed the information in the RCL exception request. The Provider also applied for an RCL exception request for FYs 1997 and 1998. Pertinent information from the FY1998 exception request is at Exhibit P-34. (Again, the voluminous support for this request is not included here, but can be furnished.) The Intermediary granted the Provider's exception request for FY 1997 and FY 1998. Exhibit P-35.

regulation to deny a new provider exemption to a new facility simply because it purchased a DON from a closed facility is completely at odds with the purpose of the new provider exemption, which was to shield new entities from the effect of the RCLs during their first three years while they increased utilization and recouped start-up costs.

      7.      <u>CMS Cannot Apply PRM § 2533.1 Retroactively</u>

      CMS's denial of the Provider's request for a new provider exception cites PRM § 2553.1 as the basis for its decision. Exhibit P-23. Unlike the previous PRM provision dealing with new provider exemptions, PRM § 2533.1 states that the purchase of bed rights (such as a DON), is a change in ownership and the years of operation of the previous owner will count toward determining new provider status. PRM § 2533.1B3. Exhibit P-5, p. 013. In addition, PRM § 2533.1G.2b states that a Medicaid NF is the equivalent to a Medicare SNF under the statutory definitions of SNF and NF. Exhibit P-5, p. 017-018.[19] As stated above, PRM § 2533.1 became effective in September 1997. Exhibit P-4, p. 9. The Provider entered into its agreement with Greenlawn in March 1995 and submitted its request for a new provider exemption in June 1997, both before the effective date of PRM § 2533.1. Exhibits P-13 and P-17.

      Assuming, *arguendo*, that PRM § 2533.1 is a valid interpretation of the pertinent regulation, CMS may not apply PRM § 2533.1 in its evaluation of the Provider's new provider exemption. The *Maryland General Hospital* court held that PRM § 2533.1 was not applicable in that case because it did not exist at the time of the transaction giving rise to the case. 308 F.3d at 347 n.3. Similarly, the Board recently held that PRM § 2533.1 is a new policy that could not be applied to a provider that applied for an exemption prior to the issuance of § 2533.1. *St. Joseph's Health Serv. of Rhode Island (Providence, RI) v. BlueCross BlueShield Ass'n/*

---

[19] This interpretation of the statutory definitions was found to be incorrect in the St. Elizabeth's case. 396 F.3d at 1234-35.

*BlueCross BlueShield of RI,* PRRB Dec. No. 2005-D40, Medicare and Medicaid Guide (CCH) ¶ 81,345 (2005)..

PRM § 2604.1, the provision in effect when the Provider entered into its transaction with Greenlawn and when it filed its new provider exemption request, did not state that a transfer of DON rights constitutes a change of ownership, nor that SNFs and NFs are, by definition, equivalent providers. Thus, CMS is impermissibly engaging in retroactive rulemaking by applying PRM § 2533.1 to the Provider. *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 215 (1988); *Health Ins. Ass'n of Am., Inc. v. Shalala,* 23 F.3d 412, 425 (D.C. Cir. 1994) (holding that CMS could not "exploit and claim deference for interpretive rules that did not exist when the transactions [at issue] were conducted"); *see also Paragon,* 251 F.3d at 1147-48 n.4; *St. Joseph's Health Serv.,* ¶ 81,354.

CMS may not announce a new, and far more restrictive, guideline, and then retroactively apply that guideline in evaluating the Provider's new provider exemption request. Basic principles of administrative law preclude CMS from applying PRM § 2533.1 to the Provider's new provider exemption application. CMS should have applied PRM § 2604.1, not § 2533.1, in evaluating the Provider's exemption request.

**D.    CMS's Determination that Greenlawn Operated as a SNF Is Erroneous**

As argued above, the operations of Greenlawn cannot be attributed to the PCTCU for purposes of the three year look back period. If that position is accepted by the Board, it is not necessary to reach the issue of whether Greenlawn operated as a SNF. However, even if the Board finds that the operations of Greenlawn can be attributed to the PCTCU, the Board must nevertheless reverse CMS's denial because Greenlawn did not operate as a SNF or its equivalent. *St. Elizabeth's,* 396 F.3d at 1235; *Milton Hosp.,* 377 F. Supp. 2d 17 at 27-28.

1.    SNFs and NFs Are Defined Differently Under Federal Law

CMS's denial letter states that the Provider:

> operated in a manner equivalent to a SNF, under past and present
> ownership, as evidenced by the fact that it provided skilled nursing
> and rehabilitative services as a nursing facility (NF) for three or
> more years under past ownership . . . .

Exhibit P-23. This statement ignores federal law that defines SNFs and NFs. As stated above,

the PCTCU was certified by Medicare as a SNF and Greenlawn was a Medicaid-certified NF.

The Medicare statute defines a Medicare-certified SNF as an institution that is *primarily* engaged

in providing skilled nursing or rehabilitation services. 42 U.S.C. § 1395i-3(a). In contrast, the

Medicaid statute defines an NF as an institution that may be primarily engaged in either: 1)

skilled nursing, 2) rehabilitative care, *or* 3) what is commonly called "custodial care."[20] *See* 42

U.S.C. § 1396r(a). Although an NF may be operating as the equivalent of a SNF, it does not

necessarily have to be. For an NF to be equivalent to a SNF, the NF must provide *primarily*

skilled or rehabilitation services. 42 U.S.C. § 1395i-3(a)(1). At least two courts and the PRRB

have recently confirmed this important distinction in the statutory definitions of SNF and NF. *St.*

*Elizabeth's*, 396 F.3d at 1234; *Milton Hosp.*, 377 F. Supp. at 26; *St. Joseph's Health Serv.*, ¶

81,354. Merely providing some skilled nursing facilities does not transform an NF into a SNF.

*St. Elizabeth's*, 396 F.3d at 1234; *Milton Hosp.*, 377 F. Supp. 2d at 27-28; *St. Joseph's Health*

*Serv.*, ¶ 81,354.

---

[20] The Medicaid statute states that NFs may primarily provide "on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities." 42 U.S.C. 1396r(a)(1)(c). These services are generally referred to as "custodial care." *See Milton Hospital*, 377 F. Supp. 2d at 26.

One court has interpreted the term "primarily" in these statutory definitions to mean 50% or more. *Milton Hosp.*, 377 F. Supp. 2d at 27-28. Unless 50% or more of a facility's services are skilled nursing or rehabilitative services, therefore, the facility is not operating as a SNF.

CMS's assertion that Greenlawn operated as a SNF ignores the plain language of the Medicare statute, which precludes *per se* equivalency of SNFs and NFs.[21] Greenlawn must have been "primarily" engaged in furnishing skilled nursing care or rehabilitative services in order for it to be operating as a SNF. *St. Elizabeth's*, 396 F.3d at 1234; *Milton Hosp.*, 377 F. Supp. 2d at 26.

 2.    Massachusetts Licensure Law Prohibited Greenlawn From Operating as a SNF

Greenlawn could not have operated as a SNF because Massachusetts licensure law prohibited it from doing so. As stated above, Greenlawn was licensed as a Level III facility. Exhibit P-11. Level III facilities generally may not admit patients that require skilled nursing services. Exhibit P-24, p. 248; Exhibit P-45. Although residents in Level III facilities may sometimes need skilled care, Level III facilities are not licensed to furnished skilled care on a regular basis. Exhibit P-45. Specifically, Massachusetts law requires that Level III facilities, such as Greenlawn, "provide routine nursing services and *periodic* availability of skilled nursing, restorative and other therapeutic services." 105 MASS. CODE REGS. 151.020 (emphasis added), Exhibit P-7. Greenlawn could not have operated beyond the level authorized by its license without receiving written approval from the MDPH and issuance of a new DON. *Id.* at 153.027(C), Exhibit P-6. Violation of this regulation twice in a twelve month period would have

---

[21] Also, this assertion ignores substantial distinctions between CMS's conditions of participation for NFs and SNFs. For example, the conditions of participation for both SNFs and NFs require certain minimum nurse staffing, which may be waived. 42 C.F.R. § 483.30 (1997). However, the requirements that may be waived for a NF are different than the requirements that may be waived for a SNF and the criteria for waiver differ for SNFs and NFs. *Compare* 42 C.F.R. § 483.30(c) (1997) *with* § 483.30(d). Thus, the conditions of participation for NFs and SNFs recognize that there are important differences between Medicaid NFs and Medicare SNFs.

been grounds for revocation Greenlawn's license to operate. *Id.* at 153.014(A)(5), Exhibit P-6. Greenlawn could have requested a waiver in order to furnish skilled nursing care on a regular basis and to operate as a SNF. Exhibit P-24, p. 248; Exhibit P-45. However, the available evidence shows that Greenlawn never requested, much less obtained, such a waiver. Exhibit P-45.

Massachusetts licensure law prohibited Greenlawn from providing skilled nursing and therapeutic care on a regular basis. Greenlawn's license, therefore, precluded it from operating as a SNF, and CMS's conclusion otherwise is clearly incorrect. *See also St. Joseph's Health Serv.,* ¶81,354 (holding that state licensing requirement prevented two facilities from providing equivalent services under the new provider exemption).

      3.    <u>CMS's Evidence on Greenlawn's Services Is Sparse and Unreliable</u>

In determining that Greenlawn provided SNF services, CMS relied primarily on Greenlawn's self-reported resident census report information retrieved from the On-Line Survey and Certification System ("OSCAR"). Exhibit P-23. The dates of the reports that CMS reviewed were June 19, 1991, June 30, 1992, September 10, 1992 and November 14, 1994. Exhibit P-23, p. 231.

CMS cannot rely on the three OSCAR reports from 1991 and 1992. The three year look back period is measured from the first day that the new provider is certified for Medicare. 42 C.F.R § 413.30(e) (1997); *see also* Exhibit P-23, p. 230. The PCTCU was first certified for the Medicare program on December 15, 2005. Exhibit P-23. Accordingly, the three year look back period extends only to December 15, 1992 and CMS's reliance on the OSCAR reports dated June 19, 1991, June 30, 1992 and September 10, 1992 is improper. *See Milton Hospital*, 377 F.

Supp. 2d at 27 n.13.  The only OSCAR report that is within the three year look back period is the

November 14, 1994 OSCAR.  Exhibit P-36.

The paucity of CMS's evidence is exacerbated by the fact that the OSCAR system lacks

sufficient reliability to serve as the basis for determining the type of services furnished by a

nursing facility. *Milton Hosp.*, 377 F. Supp. 2d at 28-29.  OSCAR data is reported at "discrete,

annual points in time," not "on an ongoing or regular basis." *Id.* at 27.  Although OSCAR

reports provide some information about the types of services performed at a facility, the reports

are not definitive support for the conclusion that an NF was "primarily engaged in skilled

nursing or rehabilitative services." *Id.* at 27-28.

In addition, although Greenlawn's OSCAR states that Greenlawn provided "hlth rehb" to

28 patients and "spec rehb" to 31 patients, there is no evidence whether these services constituted

skilled or unskilled rehabilitation services. Exhibit P-36.  In *Milton Hospital*, the court

determined that services listed in the OSCAR are generally not delineated as skilled nursing or

unskilled services. *Milton Hosp.*, 377 F. Supp 2d at 28.  While certain rehabilitation services are

categorized as skilled services in the Medicare regulations, other rehabilitative services are

categorized as unskilled or custodial services.[22]  CMS may not presume that a general category,

such as "rehabilitation," constitutes skilled services when CMS's own definitions could just as

easily lead to the conclusion that the services did not rise to the level of skilled care. *See Milton*

*Hosp.*, 377 F. Supp. 2d at 28.

The Medicare State Operations Manual ("SOM") in effect at the time that Greenlawn's

OSCAR was completed defines the terms "specialized rehabilitative services," "specialized

---

[22] *Compare* 42 C.F.R. §409.33(c)(8) (services of a speech pathologist or audiologist are skilled services) *with* 42
C.F.R. § 409.33(d)(13)(general supervision of exercises, including carrying out of a maintenance program, do not
constitute skilled services).

services for MI [mental illness] or MR [mental retardation]" and "mental health rehabilitative services for MI and MR."  SOM, Appendix P, Exhibit P-37.[23]  Although the definitions are lengthy and include several examples, they are also contradictory, and the examples do not support the definitions provided.  As an example, the SOM defines "specialized rehabilitative services" as services that are differentiated from "health restorative services provided by the nursing staff."  Exhibit P-37.  The SOM then states that there are two subcategories of "specialized rehabilitative services" that are furnished to persons with MI or MR:  1) specialized services; and 2) health rehabilitative services for MI and MR.  The definition of "health rehabilitative services for MI and MR is "services of lesser frequency or intensity to be implemented by all levels of nursing facility staff who come into contact with the resident who is mentally ill or who has mental retardation."  Exhibit P-37.  This definition of "health rehabilitative services for MI and MR" is at odds with the definition of "specialized rehabilitation services" (of which it is supposed to be a subset) because the former states that it is care furnished by all levels of nursing staff and the latter states that it is differentiated from care furnished by nurses.  Adding to the confusion, the SOM includes a definition for "specialized services," which is "services to be provided by the State which can only be delivered by personnel or programs other than those of the NF (e.g., outside the NF setting) because the overall level of NF services is not as intense as necessary to meet the individual's needs."  Exhibit P-37.

Moreover, the examples in the SOM of "health rehabilitative services for MI and MR" include both "consistent implementation during the resident's daily routine and across settings, of systematic plans which are designed to change inappropriate behaviors" as well as "crisis

---

[23] This SOM provision was replaced by CMS Transmittal No. 274, which was issued June 1, 1995, several months after Greenlawn submitted the November 14, 1994 OCSAR.  Exhibit P-37, p. 390.

intervention services." The first example is care that presumably could be provided by any level of caregiver, including an unskilled caregiver, but the latter example would obviously require skilled care. In summary, based on the CMS definitions in effect at the time that Greenlawn completed its November 1994 OCSAR, it is not clear whether "hlth rehb" and "spec rehb" encompassed skilled or unskilled care.

      4.    The Available Evidence Does Not Support CMS's Conclusion About Greenlawn's Services

Even if OSCAR reports were reliable for purposes of a new provider exemption, the November 14, 1994 OSCAR, along with other available evidence, demonstrates that Greenlawn was primarily engaged in providing custodial care rather than skilled nursing care or rehabilitative services. Accordingly, the available evidence does not support CMS's conclusion.

During its last year of operation, Greenlawn prepared a list of its discharged patients that included critical information about their age, diagnosis and length of stay.[24] Greenlawn's discharge summary ledger states that, of the 47 patients who were discharged in the two months before Greenlawn closed, 11 were 85 years of age or older. Exhibit P-41. The average age of those patients was 74. Exhibit P-41.[25]

At least 67% (40 of 60) of the residents at Greenlawn during its last year of operation had a primary diagnosis of a mental or emotional disorder, such as Alzheimer's disease, mental retardation, schizophrenia, or dementia. Exhibit P-41. The fact that Greenlawn's patients had primarily psychiatric problems is also supported by the November 14, 1994 OSCAR, which

---

[24] A copy of Greenlawn's discharge summary ledger was included with the Provider's exemption request. Exhibit P-22, p. 219-228. Because the discharge summary ledger is difficult to read, we have reproduced pertinent information from it at Exhibit P-41. Exhibit P-40 also includes two columns of information that are derived from the discharge summary ledger, but not in the original, "Age at Discharge" and "Length of Stay."
[25] The birthdate of two of these patients is cut off, so they are not included in the average.

shows that 11 of Greenlawn's patients suffered from mental retardation, 18 had a psychiatric diagnosis (excluding dementia and depression) and 12 suffered from dementia. Exhibit P-36.

The length of stay for most of Greenlawn's residents can be measured in years rather than days: most residents lived at Greenlawn for more than one year, and at least 11 residents listed in the discharge summary ledger lived at Greenlawn for ten years or more. Exhibit P-41.[26]  At least 31 of Greenlawn's patients resided at Greenlawn for two or more years. Exhibit P-41.[27]  In the month of October 1994, Greenlawn discharged only one patient and it discharged no patients in November 1994. Exhibit P-41. Greenlawn discharged 47 patients (its entire licensed capacity) during the months of December 1994 and January 1995 and the reason given for 45 of these discharges was that the facility closed, indicating that the patients would have remained had Greenlawn stayed in operation.[28]  In total, Greenlawn had only 60 discharges in its last year of operation. Exhibit P-41. The typical length of stay of Greenlawn's patients indicates that the patients suffered from chronic conditions.

The discharge summary ledger also shows that not one patient was discharged to his or her home. Other than two patients who died, every patient was released to another health care facility, generally another nursing home. Exhibit P-41. The fact that none of Greenlawn's patients were well enough to be transferred home indicates that the patients had chronic health conditions.

---

[26] The admission date on Greenlawn's discharge summary ledger is cut off in some instances and so we can only affirmatively verify that 11 Greenlawn patients were there for 10 years or more. It is reasonable to presume, however, that at least some of the patients whose admission date is cut off also lived at Greenlawn for ten or more years.

[27] As stated in the previous footnote, the admission date for some patients is cut off, so we can only affirmatively verify that 31 Greenlawn patients were there for 2 or more years. It is likely, however, that some of the patients whose admission date is cut off also lived at Greenlawn for 2 or more years.

[28] One of the discharge dates is listed as 1/10/94, but probably should have been 1/10/95 and we have counted it as such. The reason given for this person's discharge is "facility closed," which occurred in January 1995, not January 1994.

38

Other evidence also indicates that the majority of the rehabilitative care that Greenlawn furnished was unskilled care. Greenlawn submitted a Medicaid cost report for its fiscal year ended December 31, 1993.[29] Exhibit P-38. In that cost report, Greenlawn was required to report salaries for various personnel, including therapists. Greenlawn reported no salaries for "restorative" therapy and only $12,866 in recreational therapy salaries.[30] Exhibit P-38, p. 413-14. Total therapy salary costs of $12,866 for a 47-bed facility such as Greenlawn suggests that there was minimal therapy being provided. This salary cost was undoubtedly related to a Massachusetts regulation that requires nursing facilities to furnish "activities and recreation" through an Activity Director. 105 MASS. CODE REGS. 150.012. Exhibit P-39. The minimum credentials for an Activity Director are a high-school diploma and one year of related experience. *Id.* at 150.012(B)(1). Exhibit P-39. In other words, the therapy that was being provided at Greenlawn was not being furnished by a trained therapist and was therefore was not skilled care.

That cost report also states that Greenlawn incurred only $7,071 in costs for medical supplies and drugs, which is obviously a minimal amount for a 47-bed facility. Exhibit P-38, p. 413. In contrast, its annual expenditure for office supplies was $9,104. Exhibit P-38, p. 409. Greenlawn's entire annual expenditure for medical services (other than nurses' salaries) was only $13,389. *Id.* at 413.

The Provider also notes that, although Greenlawn reported furnishing "hlth rehb" and "spec rehb" on its November 14, 1994 OSCAR, it also reported that very few of its patients required other types of care that might arguably be categorized as skilled services. More specifically, in its November 14, 1994 OSCAR, Greenlawn reported nothing under the categories

---

[29] Greenlawn did not submit any Medicaid cost reports subsequent to its December 31, 1993 cost report. Exhibit P-40.

[30] By comparison, Greenlawn incurred $18,747 in salaries related to laundry, and $15,594 in salaries related to housekeeping, each more than it spent for therapists' salaries. Exhibit P-38, p. 412.

of "dialysis", "radiation", "IV therapy", "chemotherapy", "respiratory", "trac care", or "tube feed." Exhibit P-36. Under other categories that, again, might arguably be skilled care, Greenlawn reported very little activity. It reported only three patients with pressure sores, four requiring skin care, four requiring injections, and one patient with an ostomy. Exhibit P-36.

The length of stay and discharge destination for Greenlawn's patients demonstrates that the patients, unfortunately, had chronic illnesses. These facts, as well as the advanced age of Greenlawn's patients, lead to the conclusion that Greenlawn was primarily a residential facility rather than a skilled nursing facility. The long length of stay also indicates that the patients were not in any acute health condition that would have been alleviated by skilled nursing or rehabilitative care. In addition, the fact that the primary diagnosis of many of Greenlawn's patients related to mental disorders suggests that the patients were not receiving skilled nursing or rehabilitative care. As stated above, many of the patients suffered from mental diseases, such as Alzheimer's and dementia, which are illnesses for which improvement is unlikely, if not impossible. At least one court has held that addressing behavioral problems does not implicate skilled nursing services. *Milton Hosp.*, 377 F. Supp. 2d at 30. Also, Greenlawn's Medicaid cost report for the year ended December 31, 2003 indicates that Greenlawn's costs for therapy services, medical supplies and drugs was minimal. Evidence related to the age of Greenlawn's patients, their chronic conditions, long length of stay and the nature of their illnesses, and Greenlawn's expenditures on therapists, medical services and supplies, demonstrates that Greenlawn was undoubtedly a residential facility furnishing custodial care rather than skilled nursing or rehabilitative services.

### E.    The Provider Is Entitled to a New Provider Exemption Based on Relocation

As argued above, the operations of Greenlawn cannot be attributed to the PCTCU for purposes of the three year look back period and even if they could be, Greenlawn did not operate as a SNF during that period.  If either of these positions is accepted by the Board, it is not necessary to reach the question of whether the Provider qualifies for a new provider exemption because it relocated.  If the Board decides against the Provider on the first two issues above, however, the Provider is nonetheless eligible for a new provider exemption based on the fact that it relocated.

### 1.    The Provider Met the Requirements for an Exemption Based on Relocation Under PRM § 2604.1

A provider may qualify for a new provider exemption based on relocation.  PRM § 2604.1.  PRM § 2604.1 states:

> a provider which relocates may be granted new provider status where the normal inpatient population can no longer be expected to be served at the new location . . . . A provider seeking such new provider status must apply to the intermediary and demonstrate that in the new location a substantially different inpatient population is being served.  In addition, the provider must demonstrate that the total inpatient days at the new location were substantially less than at the old location for a comparable period during the year prior to the relocation.

Exhibit P-3.

In this case, the PCTCU served a "substantially different inpatient population" than Greenlawn did because Greenlawn's entire inpatient population had been discharged approximately eleven months before the PCTCU opened.  Moreover, the PCTCU was serving a substantially different inpatient population than was served by Greenlawn because the types of patients served at the facilities were entirely different.  As a preliminary matter, Massachusetts licensure law prevented the two facilities from serving the same types of patients.  A Level II facility furnishes care to "patients who show potential for improvement or restoration to a

41

stabilized condition or who have a deteriorating condition requiring skilled care." 105 MASS. CODE REGS. 151.020.  Exhibit P-7.  In contrast, a Level III facility furnishes care to "patients whose condition is stabilized to the point that they need only supportive nursing care, supervision and observation."  *Id.*  Stated differently, Level II facilities serve patients whose condition may stabilize with the proper skilled care or whose severe condition requires skilled care and level III facilities serve patients whose condition is stabilized to the point that they need only "supportive nursing care."  Massachusetts licensure law, therefore, did not permit Level II and Level III facilities to furnish services to patients needing the same acuity of care. Accordingly, Massachusetts law required the PCTCU and Greenlawn to serve a substantially different inpatient population.

Moreover, all of the factual evidence demonstrates that Greenlawn and the PCTCU served a different patient population.  As described at length above, Greenlawn served patients with chronic conditions, generally related to mental diseases.  In contrast, the PCTCU's patients were in need of short term, high intensity skilled nursing and rehabilitation services and the PCTCU's purpose was to rehabilitate those patients so they could be discharged to their homes.

The average length of stay at the PCTCU was short—only 10.7 days.  Exhibit P-33, p. 316.  The PCTCU provided "restorative, subacute and skilled nursing services for residents of all ages" who were "medically stable but still require[d] complex medical care and supervision." Exhibit P-33, p. 309.  Patients received, on average, 7.18 hours of skilled nursing and rehabilitation services a day.  Exhibit P-33, p. 313.  Services included treatment of advanced decubitus ulcers, wound care, and post-operative and unstable vital sign monitoring.  *Id.* at p. 314.  Patients at the PCTCU received radiation therapy, dialysis, intravenous therapy, respiratory therapy, tracheostomy care, ostomy care, suctioning, and injections.  Exhibit P-42, p. 444.

During FY 1996, 61% of patients at PCTCU received either intravenous therapy, special skin and wound care, injections, hemodialysis, and tube feeding care. Exhibit P-33, p. 314. CMS categorizes all of these services as skilled care. 42 C.F.R. § 409.33(b).

Intravenous therapy was administered to 22% of patients and required professional nursing staff: "For each procedure, nurses perform venipuncture to introduce the catheter into the resident's vein. IV fluids must then be administered at the rate and volume prescribed by the physician." Exhibit P-33, p. 314. The insertion site was inspected every shift and changed by professional nurses every 72 hours. *Id.* Twenty-two percent of patients also received special skin and wound care that involved "an RN or LPN assessing, treating and dressing the problem area two or three times per day." *Id.* Some of these patients had Stage I or II decubitus ulcers. *Id.*

The PCTCU also differed from Greenlawn because very few of its patients suffered from a mental illness. The OSCAR dated June 25, 1997 for the PCTCU shows that it had only one patient with a mental illness, while Greenlawn's November 14, 1994 OSCAR shows 11 patients with mental retardation, 18 with a psychiatric diagnosis and 12 with dementia. Exhibits P-42 and P-36.

The intensity of the PCTCU's services, and the purpose of the services furnished there, is also demonstrated by the fact that the vast majority of its patients are discharged to their homes. In its FY 1996, 76% of the PCTCU's patients were discharged to their homes and in FY 1998, 78% were discharged to their homes. Exhibit P-33, p. 317 and P-34, p. 370. These percentages are a stark contrast to the situation at Greenlawn, where no patients were discharged home in the last year of operation. Exhibit P-41.

Moreover, the difference in the physical structures of Greenlawn and the PCTCU indicate that they could not have furnished equivalent services. *See St. Joseph's Health Serv.*, ¶ 81,354. The PCTCU was a unit in an acute care hospital and had hospital grade patient rooms. Patient services were coordinated through a central nursing station, and 24-hour nursing services, as well as skilled physical and occupational therapy, were available. Greenlawn, in contrast, was located in a converted residential home. Facilities as dissimilar as PCTCU and Greenlawn cannot be considered "equivalent" for purposes of the new provider exemption. *St. Joseph's Health Serv.*, ¶ 81,354.

None of the employees of Greenlawn subsequently worked at the PCTCU. In addition, none of the admitting physicians at Greenlawn admitted patients at the PCTCU.

Thus, the nature of the services furnished by the PCTCU and Greenlawn was entirely different. Greenlawn offered long-term custodial care to patients who suffered primarily from mental disease. PCTCU provided intense skilled nursing and rehabilitation services to patients for a shorter period with the goal of sending them home. These facilities could not be considered to be serving the same inpatient population in any practical sense.

The second criterion for an exemption based on relocation is that the provider demonstrate that total inpatient days at the new location are less than at the old location. As discussed above, Greenlawn, a 47 bed facility, had an occupancy rate of 100% during the last three months of operation.[31] The PCTCU, a 25-bed facility, had an occupancy rate of 68%

---

[31] Greenlawn's discharge summary ledger shows that it discharged no patients in November 1994 and 47 patients in December 1994 and January 1995, its entire licensed capacity. Accordingly, Greenlawn was operating at 100% occupancy in its last three months of operation. Because the admission dates are cut off for many patients in the discharge summary ledger, it is difficult to determine Greenlawn's occupancy rate for its entire last year of operation. Exhibit P-22, p. 219; P-41, p. 439. Greenlawn's Medicaid cost report for the period ending December 31, 1993 shows inpatient days of 16,444 (as well as 15 discharges and 15 admissions). Exhibit P-38, p. 418. Greenlawn's inpatient day count of 16,444 for 1993 translates to an occupancy rate of 95.8% for this 47-bed facility. (47 x 365 = 17,155 = 100% occupancy; 16,444 ÷ 17,155 = 95.8% occupancy.)

during its first year of operation. Exhibit P-33, p. 331. The difference in bed size alone would dictate a much lower number of inpatient days at the PCTCU than Greenlawn. This factor, coupled with the lower occupancy rate at the PCTCU than at Greenlawn, demonstrates that there were substantially fewer inpatient days at the PCTCU than at Greenlawn for a comparable period.

2. <u>CMS May Not Base Its Relocation Decision on PRM § 2533.1</u>

CMS's denial letter states that the Provider did not qualify for an exemption based on relocation because the PCTCU and Greenlawn are both located in HSA V and that the majority of patients at both facilities came from HSA V. Exhibit P-23. CMS based its decision to deny the Provider's request under the relocation provisions on PRM § 2533.1, which was adopted in September 1997. PRM § 2533.1 announced a new standard for obtaining a new provider exemption based on relocation. Unlike PRM § 2604.1, it states that a nursing facility that relocates within the same HSA will not qualify for an exemption unless it can show that 50% or more of its admissions are from a different HSA. PRM § 2533.1, Exhibit P-5, p. 010.

CMS's reliance on PRM § 2533.1 is entirely improper. PRM § 2533.1 incorporates an entirely new set of standards for an exemption based on relocation that were not included in the prior PRM provision. There is nothing in PRM § 2604.1 that suggests that different standards would apply to a facility that moves within an HSA; in fact, HSAs are not mentioned at all in PRM 2604.1. More importantly, PRM § 2604.1 states that the "geography" of a move is unimportant, provided a different patient population is being served at the new location. Specifically, PRM § 2604.1 states:

> The distance moved from the old location will be considered but will not be the determining factor in granting new provider status. . . [T]he relocation of a general hospital a relatively short distance within a metropolitan area may greatly affect the inpatient population served.

45

Exhibit P-3.  It is highly unlikely that a hospital that moves a short distance, particularly within a

metropolitan area, would be moving to a new HSA.  Therefore, PRM § 2604.1 gives no warning

of CMS's new geographical requirements related to relocated providers, but simply states that a

"subsequently different patient population" must be served.  The Provider has articulated the

reasons why PRM § 2533.1 cannot be retroactively applied to it in a previous section of this

position paper and those arguments have equal force here.

F.    **The Board Has Jurisdiction Over All years Covered By The Provider's New Provider Exemption Application**

1.    Statutory Background – Jurisdiction

The Medicare statute specifies the following requirements for a Board appeal:

> Any provider of services which has filed a required cost report within the time
> specified in regulations may obtain a hearing with respect to such cost report by a
> Provider Reimbursement Review Board . . . if –

>> (1) such provider . . .is dissatisfied with a final determination of . . . its
>> fiscal intermediary . . . as to the amount of total program reimbursement
>> due the provider for the items and services furnished to individuals for
>> which payment may be made under this subchapter for the period covered
>> by such report . . . .

>> (2) the amount in controversy is $10,000 or more, and . . .

>> (3) such provider files a request for a hearing within 180 days after notice
>> of the intermediary's final determination under paragraph (1)(A)(i) . . . .

42 U.S.C. § 139500(a).  Once a provider has complied with the prerequisites of subsection (a),

subsection (d) of the statute grants the Board broad authority to decide issues raised at a hearing

that are related to the provider's cost reports:

> A decision by the Board shall be based upon the record made at such hearing . . .
> and shall be supported by substantial evidence when the record is viewed as a
> whole.  The Board shall have the power to affirm, modify, or reverse a final
> determination of the fiscal intermediary with respect to a cost report and to make
> any other revisions on matters covered by such cost report (including revisions
> adverse to the provider of services) even though such matters were not considered
> by the intermediary in making such final determination.

46

42 U.S.C. § 1395oo(d).   Similarly, the Medicare regulations define the scope of the Board's

authority to encompass matters "not considered in the intermediary's determination."  42 C.F.R.

405.1869.

> 2.    <u>The Medicare Statute Grants The Board Jurisdiction That Is Broader Than
> The Provider's Prerequisites For An Appeal</u>

To obtain an appeal under 42 C.F.R. § 1395oo, the provider must file a timely hearing

request that impacts its Medicare payment by at least $10,000.  Once these requirements have

been met, the Board is empowered to make whatever revisions it deems necessary, even if those

revisions are unrelated to the intermediary's final determination. *See Bethesda Hosp. Ass'n v.*

*Bowen,* 485 U.S. 399, 405-06 (1988); *MaineGeneral Med. Ctr. v. Shalala*, 205 F.3d 493, 499-

500 (1st Cir. 2000); *St. Luke's Hosp. v. Sec'y of Health and Human Serv.*, 810 F.2d 325, 330 (1st

Cir. 1987).  The Board is limited only by an evidentiary standard: its decisions must be based on

"substantial evidence." 42 U.S.C. § 1395oo(d).

The Board's jurisdiction under subsection (d) is broader than the prerequisites for a

hearing specified in subsection (a). *See Bethesda.*, 485 U.S. at 405-06 (analyzing section 1395oo

as a whole); *MaineGeneral*, 205 F.3d at 499-500; *St. Luke's Hosp*, 810 F.2d at 330.  Subsection

(a) sets the initial requirements for a provider to obtain a hearing before the board, but subsection

(a) is not "an unwaivable and unyielding exhaustion requirement." *MaineGeneral*, 205 F.3d at

500.  This is because the "interrelationship between the subsections of § 1395oo" confers on the

Board authority to decide matters beyond those enumerated in subsection (a).[32] *Id.* at 499-500.

---

[32] The Medicare statute also grants the Board certain "inherent" powers that are "'necessary' to accommodate other
Board revisions." *St. Luke's*, 810 F.2d at 330.

3.    Board Review of the Provider's 1996 and 1997 Cost Years Will Be
Supported by Substantial Evidence as Required by The Statute

The substantial evidence standard acts as check on the Board's authority to ensure that

the Board does not decide matters wholly unrelated to the evidence presented at a hearing.

Although the typical situation might involve only the cost report from which the Provider

appealed, the plain language of the statute does not mandate that the Board limit its review only

to the single cost report for which the Provider initially requested review. Subsection (d) of the

statute does not say, for instance, "The Board shall have the power to affirm, modify, or reverse

a final determination of the fiscal intermediary with respect to the cost report appealed in

subsection (a)" or even "such cost report," which would implicitly refer to the cost report

appealed under subsection (a). Instead, subsection (d) refers generally to "*a* cost report": "The

Board shall have the power to affirm, modify, or reverse a final determination of the fiscal

intermediary with respect to a cost report" and permits the Board "to make any other revisions on

matters covered by such cost report." 42 U.S.C. § 1395oo(d).

The central issue in this case is whether the Provider is entitled to an exemption from

routine cost limits as a new provider. If the Board agrees that the Provider has established, by

substantial evidence, that it is entitled to a new provider exemption, then it is entitled to that

exemption for *all* three years that are covered by its exemption application. A decision by the

Board with respect to any of these years would, therefore, comply with the substantial evidence

limitation that Congress placed on the Board's authority.

4.    The Board Has Extended Its Jurisdiction Over Cost Years Not Directly
Appealed by a Provider

The Board has in the past accepted jurisdiction over multiple years of a new provider

exemption application, even though the provider only appealed a single cost year. In *St.*

48

*Elizabeth's Med. Ctr. of Boston v. BlueCross BlueShield Ass'n/Associated Hosp. Svc. of Maine,*

the Provider appealed CMS's denial of a new provider exemption request and captioned its

appeal as an appeal for its fiscal year 1997 only.  PRRB Case. No. 98-0489, Exhibit P-43, p. 448.

The Intermediary contested the Board's jurisdiction over fiscal year 1998, arguing that the

Provider had instituted an appeal only for its 1997 cost year.  *Id.*  The Board rejected the

intermediary's argument:

> The Board reserves the right to determine the cost reporting periods to which the
> decision is applicable, should it find for the Provider with regard to the substance
> of the issue under dispute.  The Board finds that the regulation regarding new
> provider exemptions is clear on it faced and applies to multiple fiscal periods.

Exhibit P-43, p. 450.[33]  This decision was upheld by the D.C. Circuit: "Now that the substantive

decision as to the TCU's entitlement to the new provider exemption has been reinstated, the

PRRB should proceed, as it reserved the right to do, to determine the exact years for which St.

Elizabeth's is entitled to reimbursement."  396 F.3d at 1235.  The court emphasized that this

determination is "a simple task under the statute."  *Id.*

     5.    <u>Board Review is Warranted in This Case Because One Exemption Applies
to Multiple Years</u>

The new provider exemption regulation unambiguously applies to multiple years:  a new

provider exemption "expires at the end of the provider's first cost reporting period beginning at

least two years after the provider accepts its first patient."  42 C.F.R. § 413.30(e); *see also St.*

*Joseph's Health Serv.,*  ¶ 81,354 (holding that one exemption applies to multiple years); *Rogue*

*Valley Med. Ctr. (Medford, Or.) v. BlueCross BlueShield Ass'n/Medicare Northwest,* PRRB Dec.

---

[33] CMS has, in another case, agreed to issue a new provider exemption for multiple years, despite the provider
having only appealed a single cost year.  In *Mercy Medical Skilled Nursing Facility v. Mutual of Omaha Ins. Co.,*
the provider instituted an appeal for its 1994 cost year.  PRRB Dec. 2002-D31, [2002-2 Transfer Binder] Medicare
& Medicaid Guide [CCH] § 80,890 (2002).  At a later stage in the Provider's appeal of this cost year, CMS
voluntarily agreed to issue the provider an exemption for three full years. *See* Settlement Agreement, *Mercy Medical
Skilled Nursing Facility v. Thompson,* No. 1:02 CV 02384 (D.D.C. Feb. 12, 2004).  Exhibit P-44.

No. 2005-D26, Medicare & Medicaid Guide (CCH) ¶ 81,297 (2005) (same). Because a new

provider exemption has a defined multi-year duration, it does not have to be renewed from year

to year.[34] Neither the regulation nor the PRM instructs providers to reapply for exemptions each

fiscal year. *See Citrus Health and Rehab. Ctr. v. Mutual of Omaha Ins. Co.*, PRRB Hearing Dec.

No. 2003-D40, [2003-2 Transfer Binder] Medicare & Medicaid (CCH) ¶ 81,026 (July 29, 2003).

In *Citrus Health*, the Board held, "The regulation contains no language which expressly or

implicitly requires a provider to submit separate requests for each cost reporting period within

the limits of expiration of the exemption." Instead, the regulation plainly states that new

provider exemptions will apply to multiple fiscal years.

In this case, the PCTCU's annual cost reporting period runs from October 1 through

September 30 and the PCTCU accepted its first patient on December 11, 1995. Accordingly, the

exemption period would run from December 11, 1995 through the end of fiscal year 1999—that

is, through the "first cost reporting period beginning at least two years" after December 11,

1995.[35] This is precisely what the Provider requested in its new provider exemption application.

The Provider requested an exemption "for the applicable cost reporting periods as provided

under 42 CFR 413.30." Exhibit P-17. As it turned out, the Balanced Budget Act of 1997

("BBA") changed the reimbursement system for SNFs effective for the Provider's FY 1999 and

the new provider exemption would not have affected the Provider's reimbursement for that year.

Pub. L. 105-33.[36]

---

[34] A cost limit exception, by contrast, lacks a pre-defined duration, and thus PRM § 2534.1 calls for separate exception requests to be filed "for each cost reporting period in which a provider believes an exception is warranted."

[35] The provider's first cost reporting period beginning two years after December 15, 1995 would have been the provider's cost reporting period beginning on October 1, 1998 and ending on September 30, 1999.

[36] Section 4432(a) of the BBA amended § 1888 of the Social Security Act to mandate a prospective payment system for SNFs effective for cost reporting periods beginning on or after July 1, 1998, at which time the routine cost limits,
*footnote continued*

No rational purpose would be served by requiring the Provider to appeal each NPR affected by the Provider's exemption application.  Only one exemption application is at issue for all cost years: 1996, 1997, and 1998.  The legal issues are identical.  No factual issues distinguish one year from the other.  A hearing for 1996 and 1997 would be duplicative, unnecessary, and a waste of the Board's resources.  For these same reasons, the Intermediary will not be prejudiced by the lack of separate hearings for 1996 and 1997.  *See St. Luke's*, 810 F.2d at 332 (noting strong equitable argument for Board jurisdiction over issue not presented to the intermediary because this failure "prejudiced no one").  The Board, should, therefore, follow its precedent in the *St. Elizabeth's* case and exercise jurisdiction over all cost years covered by the Provider's new provider exemption application.

Courts have recognized that, under the Medicare reimbursement scheme, intermediary determinations in one year may affect reimbursement in other years.  *See Georgetown Univ. Hosp. v. Bowen*, 862 F.2d 323, 326-27 (D.C. Cir. 1988).  With regard to new provider exemptions, CMS has conceded that one exemption request applies to all years.  *Rogue Valley Med. Ctr. v. BlueCross BlueShield Ass'n/Medicare Northwest*, CMS Admin. Dec. No. 2005-D26, Medicare & Medicaid Guide (CCH) ¶ 81,369 (2005) (rejecting assertion by CMS's Center for Medicare Management that exemptions are not automatically applied to later cost years).[37]  Thus, a Board determination that the Provider's exemption request was wrongly denied should extend to all cost years covered by the Provider's exemption application.

---

and any exemptions or exceptions from them, no longer affected Medicare reimbursement for many SNFs, including the PCTCU.

[37] The Provider notes that the CMS administrator reversed the Board and held that a provider must appeal the NPR for each cost year at issue.  This part of the Administrator's decision, however, is contrary to the D.C. Circuit's holding in *St. Elizabeth's*.  396 F.3d at 1235.

## V.   CONCLUSION

For the foregoing reasons, the Intermediary's determination that the Provider did not qualify for a new provider exemption must be reversed and the Provider should be granted a new provider exemption for its PCTCU for FY 1996, FY 1997 and FY 1998.

Respectfully Submitted,

*Barbara Straub Williams*
Barbara Straub Williams
Ronald S. Connelly
Powers, Pyles, Sutter & Verville, PC
1875 Eye Street, NW
12th Floor
Washington, DC 20006-5409
(202) 466-6550

November 1, 2005                Counsel for Provider

TABLE OF CONTENTS

I.   INTRODUCTION

II.  ISSUES AND ADJUSTMENTS IN DISPUTE

        Whether the Health Care Financing Administration's ("HCFA") denial
        of Jordan Hospital Transitional Care Unit's request to be exempt from the SNF RCL for
        the cost reporting period ended September 30, 1998, as a new provider under 42 C.F.R.
        413.30(e), was proper.

III. INTERMEDIARY'S POSITION

        A.    Background
        B.    Massachusetts Determination of Need Program
        C.    Development of Chapman TCU
              1.    The Operation of Greenlawn Nursing Home
        D.    Statutory and Regulatory Background of The SNF RCL's and Adjustments Thereto
              1.    Regulatory Relief from the SNF RCL
              2.    The Exemption Provision is Narrowly Defined
        E.    Argument
              1.    The Language of 42 C.F.R. § 413.30(e) is Ambiguous Therefore The
                    Secretary's Interpretation is Entitled to Deference
              2.    The Secretary has Permissibly Construed the Ambiguity in His Regulation
              3.    The Record does Not Support A Determination of "Primarily Engaged"
                    Under Past *or* Present Ownership
              4.    Why is Jordan Hospital's TCU Exceeding the SNF RCL?
        F.    Conclusion

IV.  CITATION OF PROGRAM LAWS
     REGULATIONS AND INSTRUCTIONS
V.   EXHIBITS

PLAINTIFF'S EXHIBIT 5

I.    INTRODUCTION

Jordan Hospital is an acute care hospital located at 275 Sandwich Street, Plymouth, Massachusetts.  Plymouth, Massachusetts is located in Health Service Area VI ("HSA VI"), as designated by the Commonwealth of Massachusetts, Department of Public Health, Determination of Need Program.  Jordan Hospital entered into an agreement under section 1866 of the Social Security Act ("the Act") with the Secretary of Health and Human Services to participate in the Medicare program as a hospital on July 1, 1966.

Jordan Hospital acquired ownership of an existing nursing home known as Greenlawn Nursing Home on May 18, 1995.  The nursing home was subsequently relocated to the hospital campus.  Greenlawn Nursing Home ("Greenlawn") had operated since as early as 1974 at which time it entered into an agreement under section 1904(a)(27) of the Social Security Act ("the Act") to participate in the Medicaid program with the Commonwealth of Massachusetts as a nursing facility effective March 31, 1974. Greenlawn Nursing Home's provider agreement with the Commonwealth of Massachusetts Medicaid program, was voluntarily ended effective November 11, 1995 due to the suspension of operations in the old location.

Greenlawn Nursing Home was relocated to the Hospital's campus and renamed the Peter A. Chapman Transitional Care Unit ("Chapman TCU").  The beds were reactivated on December 8, 1995.  Chapman TCU subsequently sought to participate in both the Medicare and Medicaid programs by entering into an agreement under section 1904(a)(27) with the Commonwealth of Massachusetts to participate in the Medicaid program as a nursing facility and by entering into an agreement under section 1866 of the Act with the Secretary of Health and Human Services to participate in the Medicare program as a skilled nursing facility

effective December 15, 1995.

Relevant statistics in the finalized cost reports regarding the SNF are as follows:

|  | FYE 9/30/98 |
|---|---|
| Total Number of Beds | 25 |
| Medicare Inpatient Days | 5208 |
| Total Inpatient Days | 7332 |
| Medicare Inpatient Days to Total Inpatient Days Ratio | 71% |
| Occupancy Rate | 80% |
| Date of CMS Denial of Exemption Request | 6/22/98 |
| Date Notification of Decision Was Mailed | 7/15/98 |
| Original NPR | 9/25/00 |
| Date of Appeal | 4/7/05 |

II.    ISSUES AND ADJUSTMENT IN DISPUTE

Peter Chapman Transitional Care Unit (Chapman TCU) is appealing CMS's determinations regarding requests that it be treated as a new provider, and therefore be exempt from the skilled nursing facility (SNF) routine service cost limits for the cost reporting periods ended September 30, 1998.

The estimated reimbursement effect for 9/30/98 is calculated as follows:

|  | Per Diem | Total |
|---|---|---|
| Non-Capital Routine Service Costs | $ 422.61 | $2,200,953 |
| Routine Service Cost Limit (base) | $ 178.99 | 932,180 |
| Exception | $  62.33 | 324,615 |
| Adjusted RSC Limit | $ 241.32 | $1,256,795 |

Reasonable Costs

| | |
|---|---|
| Adjusted Routine Service Cost Limit | $ 241.32 |
| Capital-Related Routine Service Costs | $  65.74 |
| Ancillary Service Costs | $ 145.14 |
| Total Reasonable Cost Reimbursement | $ 452.20 |

Lower of Cost or Charge

| | |
|---|---|
| Total Reasonable Cost Reimbursement | $ 2,355,057.60 |
| Estimated Exemption Amt | $   944,158.32 |
| Total Cost | $ 3,299,215.92 |
| Total Charges | $ 4,048,857.00 |
| **Amount In Controversy** | $   944,158.92 |

III.    INTERMEDIARY'S POSITION

A.    BACKGROUND

Peter A. Chapman Transitional Care Unit at Jordan Hospital ("Chapman TCU") entered into
an agreement under section 1866 of the Act with the Secretary of Health and Human Services
to participate in the Medicare program as a skilled nursing facility effective December 15,
1995 (Exhibit I-1).  Chapman TCU submitted multiple requests to be exempt from the
Medicare skilled nursing facility routine service cost limits ("SNF RCL") through the cost
reporting period ending September 30, 1998 in a letter dated December 31, 1997, received by
the Fiscal Intermediary ("FI") on January 6, 1998 (Exhibit I-2).

On January 19, 1998, Associated Hospital Service, the fiscal intermediary ("FI") prepared a
cover letter requesting additional documentation (Exhibit I-3).  A response was provided by
Chapman TCU on or about February 3, 1998 with a subsequent filing on March 3, 1998
(Exhibit I-4).  The FI forwarded the requests along with supporting documentation submitted
by Chapman TCU to CMS for final determinations by letter dated March 23, 1998 (Exhibit I-
5).  CMS received a package from C&S Administrative Services on March 26, 1998.

CMS denied the requests in a letter dated June 22, 1998 (Exhibit I-6).  Associated Hospital
Service of Maine notified Chapman TCU that its requests were denied by CMS in a letter
dated July 15, 1998 (Exhibit I-7).

Chapman TCU timely appealed its Notice of Program Reimbursement for the cost reporting
period ended 9/30/98 on September 25, 2000 and added the issue of the exemption by letter
dated April 7, 2005 (Exhibit I-8 and I-9).  The NPR reflected CMS' determination regarding

the exemption request, demonstrating an amount in controversy exceeding the $10,000 required for Board jurisdiction. Jordan Hospital never appealed its NPR for the cost reporting period ended 9/30/96. It did file an appeal of its NPR for the 9/30/97 which was closed on 6/11/01, with all issues resolved.

## B.    MASSACHUSETTS' DETERMINATION OF NEED PROGRAM

Like most states, Massachusetts (the Commonwealth) issues certificates of need, known in Massachusetts as "Determinations of Need," to regulate health care facilities within its jurisdiction. The Commonwealth's Determination of Need ("DON") program functions to ensure that "adequate health care services are made reasonably available to every person in the [state] at the lowest reasonable aggregate cost," and does so by regulating the construction, relocation, and expansion of health care facilities. See Mass. Regs. Code tit. 105 § 100.532 (hereinafter "C.M.R.").

Before an owner of a heath care facility may make a substantial capital expenditure for construction or substantially change the service provided by the facility, it first must obtain a DON from the Massachusetts Department of Public Health, that is, a determination that there is need for such an expenditure or change. See Mass. Gen. Laws ch. 111, § 25C (hereinafter "M.G.L.") 1/ Once the Commonwealth issues a DON and the proposed project has been implemented, ownership of the DON cannot be transferred to another party. See 105 C.M.R. §§ 100.551(B), 100.710.

---

1 An increase in a health care facility's bed capacity of more than 12 beds is defined to be a "substantial change in services," which requires a DON. See Mass. Gen. Laws ch. 111, §§ 25B; cf. Mass. Regs. Code tit. 105, §§ 153.028(B).

Since 1992, Massachusetts has imposed a moratorium on DON applications for new nursing facility beds, cf. id. § 100.302(D), which has prevented entities wanting to establish new nursing facilities from doing so directly. Cf. M.G.L. ch. 111, § 25G (DON law violation is grounds to deny licensure)2/. Instead, such an entity could acquire an existing nursing facility by giving the Department of Public Heath notice of its intent to acquire the facility. See M.G.L. ch. 111, §§ 25C ¶ 5, 71 ¶ 3; 105 C.M.R. § 100.250. The transfer of ownership is allowed to proceed if the state determines the purchaser suitable for licensure and that the transaction will not change the facility's services or increase its bed capacity. See M.G.L. ch. 111, §§ 25C ¶ 5, 71 ¶ 8. Cf.also id. § 71 ¶ 23 (defining "changes in ownership"). Once the new owner acquires a nursing home, it can then request the DON Program Director to transfer the facility's site to a new location. See 105 C.M.R. § 100.720. If the transfer is granted, the new owner may begin nursing home operations at the new site once it obtains a state license for the facility.3/

In short, Massachusetts regulations require entities desiring to open a nursing facility to comply with Massachusetts Department of Public Health "transfer of ownership" and "transfer of site" procedures in order to transfer the DON rights required to establish a

---

2 Health care facilities in under bedded areas are exempt from this moratorium (see 105 C.M.R §100.604 (for hospital bed conversions to non-acute services) and §100.608 (for long-term care facilities)) in accordance with Chapter 111, Sec. 25C1/2 of the Massachusetts General Laws.

3 The operating license of the selling entity is only valid for the building for which the license was originally issued and must be returned to the state if the nursing facility undergoes a change in ownership or a change in location. See 105 C.M.R. § 153.021(C), (D)(3)-(4). But under Massachusetts regulations, the purchasing entity that files "[a] license application [] as a result of a transfer of ownership, if timely filed, shall have the effect of a license from the date of transfer.

nursing facility.  In 1996, the Massachusetts legislature codified the existing regulatory mechanism by which a facility could acquire DON rights by enacting Section 31 of the Acts of 1996 which went into effect in July 1996.

Under section 31 the legislature directed the Massachusetts Department of Public Health ("DPH") to:  issue a determination of need to any hospital licensed pursuant to section fifty-one of chapter one hundred and eleven of the General Laws, that can demonstrate the following:-

(1)     a binding contractual commitment with a nursing home . . . that results in the nursing home's surrender of its license;

(2)     that such license holder has ceased operation of its facility;

(3)     that the hospital has developed a hospital based skilled nursing facility and meets the qualifications of licensure and Medicare certification; and

(4)     that the hospital agrees to be responsible for all overpayments owed to the Division of Medical Assistance by the nursing facility which surrenders its license..

Copies of the relevant State statute and regulations appear in Exhibit I-10.

## C.     DEVELOPMENT OF CHAPMAN TCU

Greenlawn Nursing Home operated as a nursing home licensed by the Commonwealth of Massachusetts, Department of Public Health in accordance with M.G.L, Chapter 111,

{D0092431.DOC / 1}9

Section 71, as amended.

A Request to Temporarily Discontinue Operation of the Facility known as Greenlawn Nursing Home was submitted by Greenlawn Nursing Home, on behalf of itself and the Hospital on December 27, 1994 (Exhibit I-11). The request was not a request for a discontinuance of operation and was not to be deemed an abandonment of the license. On December 29, 1994, Greenlawn Nursing Home and Jordan Hospital executed a letter of intent to confirm an agreement for Jordan to purchase the operations of the nursing home known as Greenlawn nursing home (Exhibit I-11). As part of the Agreement, Jordan Hospital executed Check No. 076709 in the amount of $25,000 paid to the order of Greenlawn Nursing Home as a nonrefundable deposit on the execution of the letter (Exhibit I-11).

On January 9, 1995, the Board of Directors of Jordan Hospital, Inc. voted to:

- Authorize the hospital to acquire the right to own and operate the beds of Greenlawn Nursing Home as subacute skilled nursing beds (a/k/a Hospital Based Skilled Nursing Facility) on the hospital's campus for a purchase price of no more than $300,000.
- Authorize the hospital to spend from the unrestricted endowment fund, and at a future date to refinance any such amounts as necessary, no more than the allowable amount pursuant to the rules of the Determination of Need Program for the acquisition and renovation costs associated with this transaction and, as such, up to but not exceeding, $885,952 (1994 dollars).
- Authorize the president or treasurer or chief financial officer, each singly to execute all documents necessary to acquire rights contemplated hereunder.
- Ratify the vote taken by the Executive Committee by conference call on December

19, 1994, regarding the transaction (Exhibit I-11).

By letter dated January 13, 1995, Greenlawn Nursing Home subsequently amended its request to temporarily suspend operation of the Greenlawn Nursing Home to indicate that the suspension was requested in order to facilitate a planned sale of the facility to Jordan Hospital (Exhibit I-11).

On January 11, 1995, pursuant to 105 CMR 100.250, the Hospital filed with the DON program a Notice of Intent to Acquire an Existing Health Care facility (Exhibit I-11). A report dated January 12, 1995 prepared by Mullen & Company, CPAs sets forth the forecasted operating budget, schedules of income and expense and cash flow for the three years ended December 31, 1998 for a 30 bed SNF. In the "Summary of Significant Assumptions and Account Policies," Mullens & Company utilized Medicare rates based on the assumption that an exemption from the routine cost limits would be obtained for the first three years of operation and an average of 250 minutes per Medicaid patient served (Exhibit I-11).

By letter dated January 30, 1995, Jordan Hospital, Inc., submitted an original "Notice of Intent to Acquire Ownership Application" of Greenlawn Nursing Home (Exhibit I-11). The Department of Public Health received the Notice of Intent to Acquire Application on behalf of Jordan Hospital, Inc., regarding the acquisition of the Greenlawn nursing home business on January 31, 1995 (Exhibit I-11). Under the proposed transaction, Jordan Hospital, Inc. would relocate the forty-seven (47) beds from the 14 East Grove Street, Middleboro location to Jordan Hospital for the purpose of establishing a hospital based SNF pursuant to the DON approval effective April 18, 1995.

By letter dated February 17, 1995, Jordan Hospital, Inc. requested that the Department of Public Health approve a change in location of licensed nursing home beds from 14 East Grove Street, Middleboro, MA to 275 Sandwich Street, Plymouth, MA (Exhibit I-11). The letter states that the beds will continue to be located in Long-Term Planning Area HAS V and the majority of the patients serviced by the beds have come from Plymouth and the surrounding communities.4

Greenlawn Nursing Home is notified by letter dated March 2, 1995 that its request that the Department of Public Health give it permission to temporarily suspend operations of the Greenlawn Nursing Home in order to facilitate a planned sale to Jordan Hospital has been approved.

On March 23, 1995, Jordan Hospital, Inc. and Shirley Dionne entered into an Agreement (Exhibit I-4). The terms of the Agreement state that the Operator wished to surrender her license to operate the Nursing Home and Hospital wished to obtain the right to operate skilled nursing beds in its facility as may be granted by the Department and Operator was willing to assist Hospital in obtaining such rights, to be facilitated by Operator's surrender of its license. The purchase price is set forth in Article 2, Section 2.01 at Three Hundred Thousand Dollars ($300,000). The Operator represented and warranted that she had all licenses and permits to conduct her business and own the Contracted Services.

Concerned about the existing approval for temporary suspension of the Greenlawn Nursing

---

4 These statements were verified by CMS when it reviewed the application under the relocation provision which found that the 87 percent of the patient population served at Chapman TCU and 66 percent of the patient population served at the Greenlawn Nursing Home came from HSA V. In fact, Chapman TCU continued to serve 55 % of the same cities and towns served by Greenlawn Nursing Home Exhibit I-12).

Home, by letter dated April 11, 1995, Attorney's for Greenlawn Nursing Home requested a minimum forty-five day extension of the existing approval due to expire April 15,1995 (Exhibit I-11). An extension to May 30, 1999 was approved by the Department of Public Health by letter dated April 13, 1995 (Exhibit I-11).

By letter dated May 4, 1995, the Department of Public Health, Division of Health Care Quality found Jordan Hospital, Inc. suitable and responsible for the licensure of the Greenlawn Nursing Home in accordance with the standards and requirements set forth in 105 CMR 153.012 (Exhibit I-11). Moreover, the Department granted permission to discontinue operation of the entire facility (47 beds) at 14 East Grove Street, Middleboro, MA until the construction incident to the relocation and reactivation of the forty-seven (47) beds at the HB/SNF was complete and the HB/SNF operational.

On May 19, 1995, Jordan Hospital completed a License Application for what was formerly the Greenlawn Nursing Home, now to be known as the Jordan Hospital Transitional Care Unit, as a consequence of the change of ownership that occurred on May 18, 1995 (Exhibit I-2).

On December 8, 1995, Jordan Hospital reactivated the license to operate the 47-bed Greenlawn Nursing Home under a new name, the Chapman TCU with 25 beds (Exhibit I-11). The TCU was certified to participate in the Medicare program as a skilled nursing facility on December 15, 1995.

1.    Operation of Greenlawn Nursing Home

Greenlawn Nursing Home operated as a nursing home licensed by the Commonwealth of

Massachusetts, Department of Public Health in accordance with M.G.L, Chapter 111, Section 71, as amended. Effective October 31, 1974, Greenlawn Nursing Home received certification in the Massachusetts Medicaid program as a nursing facility (Exhibit I-13).

According to HCFA Form 671, The Resident Census and Conditions of Residents relating to surveys performed of the Greenlawn Nursing Home on June 19, 1999, June 30, 1992, September 10, 1993 and November 14, 1994, Greenlawn Nursing Home provided residents with the following skilled nursing and related service and rehabilitation services: use of indwelling catheters, rehabilitation nursing procedures (e.g., bowel and bladder training), care of pressure ulcers; respiratory treatments; subcutaneous and/or intramuscular injections, and rehabilitative services (e.g., occupational therapy, physical therapy and speech therapy) (Exhibit I-13).

**D.    STATUTORY AND REGUATORY BACKGROUND OF THE SNF RCL's AND ADJUSTMENTS THERETO**

Confronted with rising Medicare costs, Congress in 1972 recognized that the original Medicare payment structure provided little incentive for providers to operate efficiently. Accordingly, Congress amended the Act to provide that "reasonable costs" reimbursable under Medicare should exclude "any part of incurred cost(s) found to be unnecessary in the efficient delivery of needed health services. 42 U.S.C. § 1395x(V)(1)(A). Congress then authorized the Secretary of Health and Human Services to establish upper limits on the costs "to be recognized as reasonable" and to establish such limits "based on the estimates of the costs necessary in the efficient delivery of needed health services."

The prescription that Medicare reimburse only reasonable costs applies to three general categories of costs that SNFs incur in providing services: (1) routine service costs (including all nursing, room and board, administration and other overhead costs) See 42 C.F.R. § 413.53(b); HCFA Pub. 15-1, Provider Reimbursement Manual Pt. 1 §§ 2202.6, 2203.1; (2) ancillary services (such as laboratory services and non-routine drugs) See 42 C.F.R. § 413.53(b); PRM-1 §§ 2202.8, 2203.2 and (3) capital related costs (such as depreciation expense and taxes) See 42 C.F.R. § 413.130(a); PRM-1 §§§ 104.10, 108.1-2, 2154.1-3.

While each of these three categories of costs is subject to the general requirement that reimbursed costs be reasonable, only (non-capital) routine service costs are subject to an upper limit capping the total amount of such costs deemed to be reasonable. Accordingly,

the Secretary's per diem "routine service cost limits" (RCLs) place a ceiling on the amount of routine service costs that Medicare will reimburse per day of patient care.   42 C.F.R. § 413.30(a)-(b) (2001).   Ancillary service and capital costs are both paid on the basis of reasonable costs and neither is subject to limits.   CMS first issued routine service cost limits for SNFs effective October 1, 1979.   See FR 44 Fed. Reg. 51542 (August 31, 1979)(Final rule) (Exhibit I-14).

The per diem routine service cost limit (RCL) that is applicable to a specific SNF is determined by taking the weighted average amount of per diem routine service costs incurred by SNFs (total routine cost/total Medicare days) of its type nationwide, adjusting this average to reflect the prevailing wage rates near the SNF, and setting the limit for free-standing SNFs at 112% of the adjusted average.   See id. § 1395yy(a); see also St. Francis Health Care Ctr. v. Shalala, 205 F.3d 937, 940 & n.3 (6th Cir. 2000) (explaining RCLs); 57 Fed. Reg. 46,177, 46,179-80 (1992) (explaining methodology) (Exhibit I-15).   Roughly speaking, this limit allows a SNF to be reimbursed for per diem routine service costs up to 12% higher than average, thereby "encourag[ing] providers with high[er] costs to bring their expenditures into line with their more efficient peers." See 44 Fed. Reg. at 51,544.

To apply these "per diem" limits, a SNF's total routine service cost limit is calculated by multiplying the per diem limit by the number of days of inpatient care that the SNF has provided to Medicare patients.   Because a single inpatient day for a single Medicare patient counts as one day of care, a 25-bed SNF that has 19 inpatients each day during a 10-day

period will provide 190 days of inpatient care during that period. Such a SNF could then be reimbursed for (non-capital) routine service costs equal to 190 times the applicable per diem RCL. The costs at issue in this case are all non-capital routine service costs subject to a limit.

1.    Regulatory Relief from the SNF RCL

Recognizing that this scheme of routine service cost limits may sometimes warrant adjustment when applied to a particular SNF, the Secretary has exercised his broad authority to adjust the cost limitations "to the extent [he] deems appropriate" by enacting a regulation establishing "exemptions" and "exceptions" from the limits. See 42 U.S.C. § 1395yy(c); 42 C.F.R. § 413.30(e)-(f) (1998). While the "exceptions" created by this regulation can increase a SNF's cost limit to account for the specific circumstances warranting the exception, the "exemption" found in section § 413.30(e)(2) will cause the application of the routine service cost limits to be suspended. See 44 Fed. Reg. 31,802, 31,802 (1979) (Add. 1a) (Exhibit I-16).

However, an institution that has been granted relief from the effect of the cost limits through the exemption provision under 42 C.F.R. § 413.30(e) is not necessarily eligible for the full disparity between the claimed cost and the established cost limit (Exhibit I-17). As stated earlier, amounts that exceed the established cost limits also include costs that are potentially unreasonable. Therefore, the Congress has required that the entire cost to provide services to

Medicare beneficiaries by an institution be subject to a determination of reasonableness in accordance with the principles of reasonable cost found in 42 C.F.R. § 413.9 of the regulations. Relief through the exemption provision is thus limited to those costs that are determined to be reasonable, thereby excluding those items or services substantially in excess of or more expensive than those generally considered necessary for the provision of needed health services.

2.    The Exemption Provision is Narrowly Defined

The Secretary has narrowly construed the construction of the exemption provision to address the difficulty in meeting the applicable cost limits due to the effects of assumed under-utilization. Because the regulation presumes "new providers" are underutilized, factors affecting utilization guide the Secretary's interpretation of his regulatory definition of "new provider." Under-utilization inflates the cost per day causing the institution to exceed the cost limit due to higher fixed costs being spread over a smaller number of patients than an established institution that would have established contacts and clientele.5 The Court in Larkin Chase Nursing and Restorative Center v. Donna E. Shalala, Secretary, Department of

---

5 While the CMS Administrator has previously articulated that the exemption provides for relief associated with start up costs (See San Diego Physicians and Surgeons Hospital v. Aetna Life Insurance Company, CMS Administrator Decision, January 12, 1991), the preamble in the 44 FR 31802 does not indicate that the purpose of the exemption is to assist with start up costs. Start up costs is defined at § 2132 of the Provider Reimbursement Manual, Part 1. Start up costs are incurred from the time preparation begins on a newly constructed or purchased building, wing, floor, unit, or expansion thereof to the time the first patient, whether Medicare or non-Medicare, is admitted for treatment. Generally, start-up costs are fixed costs that must be incurred by all providers to do business, and are thus affected by underutilization when computing a per diem cost to compare to the routine service cost limits.

Health and Human Services, United States District Court for the District of Columbia, Civil Action 99-00214 (HHK), February 16, 2001, noted "HCFA's narrow interpretation of the regulations" (Exhibit I-18).

While the effects of under-utilization may be the policy rationale behind the exemption provision, utilization **is not** a criterion used in determining whether a provider is "new" under the regulations, **except** in the case of a relocation as described in § 2533.1B.3 of the PRM, Part 1.  To determine if an institution is a "new provider", CMS looks to the types of services the institution provides(d) under *present and previous ownership*.**6** Therefore, not every newly certified provider experiencing a low census is eligible for exemption(s) pursuant to regulation at 42 C.F.R. § 413.30(e).

Accordingly, CMS' narrow interpretation of 42 C.F.R. § 413.30(e) does not supplant Congress' intent to exclude "any part of incurred cost(s) found to be unnecessary in the efficient delivery of needed health services" 42 U.S.C. § 1395x(V)(1)(A).  Likewise, exemption(s) from the SNF RCL cannot be granted under the relocation provision even if, in

---

6 Moreover, to say that an SNF is new because it does not meet the requirements for Medicare certification defeats the purpose of the exemption.  The regulation refers to the operation as the "type of provider," not to the operation as a provider that meets all of the requirements for certification.  In fact, the Seventh Circuit agreed with this policy objective in Home Makers North Shore v Bowen, 832 F.2d 408 (7th Cir. 1987), wherein the court found that, "The desire to allow new firms a higher price per service during the slack period of start-up does not imply that established firms also should receive higher prices just because they have elected to join the Medicare program and add to their menu of service....That it chooses the occasion of its access to federal funding to greatly...upgrade the quality of the service supplied does not compel a conclusion that it is supplying a new "type" of medical care.  The Secretary is entitled to say, as he did, that home nursing care is a distinct type of care, and that migration within this type does not activate new periods of entitlement or extra reimbursement."

the new location the institution or a portion of an institution that has undergone a change in location suffers from low utilization. Granting exemption(s) from the SNF RCL under these circumstances undercuts the proper and efficient operation of the program by causing Medicare to inappropriately subsidize relocations. Thus, Medicare is not liable for bad business decisions or inefficiencies in the market caused by "idle capacity - particularly relatively high personnel costs in relation to patient loads where occupancy rates are low."

E.    **ARGUMENT**

1.    <u>THE LANGUAGE OF 42 C.F.R. § 413.30(e) IS AMBIGUOUS THEREFORE THE SECRETARY' INTERPRETATION IS ENTITLED TO DEFERENCE</u>

42 C.F.R. § 413.30(e) defines "new provider" as a "provider of inpatient services" that has "operated * * * , under present and previous ownership, for less than three full years." As the First, Seventh and Ninth Circuits have held, this regulatory language is ambiguous with respect to one of the questions raised in this appeal and thus is without a plain meaning that governs the present dispute.

A regulation is unambiguous only when its text directly addresses the "precise question at issue" in a case in such a way that the regulatory intent on that issue is clear. See <u>Pacheco-Camacho v. Hood</u>, 272 F.3d 1266, 1268 (9th Cir. 2001). Thus, a regulation normally will speak clearly to such a question only if its text "explicitly" addresses the specific issue. See <u>Walton</u>, 122 S. Ct. at 1269-70. When the text is silent and fails to address the precise

{D0092431.DOC / 1}20

question presented, that silence yields ambiguity. See id. Likewise, if there is more than one plausible construction of the text, regardless of whether one construction is arguably better than the next, the existence of multiple plausible interpretations renders the text ambiguous. See Regions Hosp. v. Shalala, 522 U.S. 448, 460 (1998) (statute is ambiguous if proffered interpretation, though "plausible," is "not the 'only possible interpretation'"); see also United States v. Nordic Village, Inc., 503 U.S. 30, 37 (1992) (discussing ambiguity of waiver of immunity); Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991) (it is axiomatic that agency's interpretation of regulation "need not be the best or most natural one by grammatical or other standards").

The text of 42 C.F.R. § 413.30(e) fails to disclose a single, unambiguous intent regarding the precise question in this case: how the Secretary should determine whether a "provider" has operated under "previous ownership." Indeed, nothing in the regulation addresses the manner in which the Secretary should determine whether a provider has operated under previous ownership. This silence reflects the regulation's ambiguity on this point.

Recourse to the Medicare statute does nothing to diminish this ambiguity. While it is true that 42 U.S.C. § 1395x(u) defines a "provider of services" to be, among other things, a skilled nursing facility and a SNF is further defined by statute to be an institution or "distinct part" of an institution, 42 U.S.C. §§ 1395i-3(a), 1395x(j), these definitions succeed only in demonstrating that "provider" is a term of art in Medicare that can mean only a "portion" of a health care institution that is artificially segregated for Medicare purposes from the institution

as a whole.  See PRM § 2337.1.7.7.

Once one recognizes that a "provider" may be only a portion of a health care institution, § 413.30(e)'s mandate to consider the "previous ownership" of a "provider" becomes strikingly ambiguous.  As a "provider" may have no distinct legal identity of its own and may constitute only a few beds located on one side of one hallway in a health care institution, cf. PRM § 2337.1(1) (Add. 5a), the "previous ownership" of the "provider" need not be the same as the previous ownership of the entire entity of which the provider is but a part.  Indeed, a provider may simply be a collection of segregable physical and intangible assets (equipment and other property, employment contracts, and regulatory rights) that are held by an institution and utilized to provide Medicare services.  What it means for such a "provider" to have operated under "previous ownership" is far from clear; and it certainly is not unambiguously resolved by § 413.30(e).

The Seventh Circuit correctly recognized this ambiguity in Paragon (Exhibit I-19).  Paragon explains that, to give content to 42 C.F.R. § 413.30(e)'s focus on the "previous ownership" of a "provider of inpatient services," it is necessary to understand the meaning of "provider" before proceeding to evaluate ownership of the provider.  See 251 F.3d at 1148.  However,

---

7 PRM § 2337.1 explains that a "distinct part" SNF is a "portion" of a health care institution, which must be physically distinguishable from the rest of the institution of which it is a part (i.e., its beds must be physically separate from and not commingled with the institution's other beds), but which can be located in multiple areas in the physical plant of the institution.  While this description of a provider may be sufficient for purposes of identifying the provider for Medicare certification and for segregating those Medicare costs associated with the provider's services, it does not materially assist in unambiguously defining "previous ownership" of the "provider."

identifying the particular attributes that define a "provider," is an elusive task for, as we have

discussed, a "provider" may be only a "distinct part" of an institution and attributes adhering

to institutions as a whole are not necessarily essential to the identity of a "provider" that may

be only a portion of the whole.  While such a provider will, at a minimum, be "composed of

many different attributes," including its staff and assets such as equipment and its physical

plant, Paragon, 251 F.3d at 1148, there simply is no commonly understood set of such

attributes that define a provider.  As the Seventh Circuit explained,

> "If a facility fires all its staff and hires a new one, but makes no other changes, an
>
> ordinary user of the English language probably would consider the SNF with the new
>
> staff to be the same "provider" as it was before.  Similarly, a SNF that replaced all of
>
> its old equipment with new models would still be the same "provider" as it was
>
> before the modernization.  Even if a SNF both fired its staff and replaced all of its
>
> equipment, one might still call it the same "provider" if the administration and
>
> physical plant remained the same." Paragon, 251 F.3d at 1148.

This lack of a plain meaning for the term "provider" and the regulation's failure to define

what constitutes a "provider" renders ambiguous § 413.30(e)'s command to consider the

"previous ownership" of a "provider."

Following Paragon, the First Circuit held that § 413.30(e) is "manifestly ambiguous." South

Shore Hosp. v. Thompson, 308 F.3d 91, 98 & n.4 (1st Cir. 2002) (Exhibit I-20).  The court

explained that the precise issue in that case, like the present case, turned on the meanings of "previous ownership," "provider," and "institution," none of which are unambiguous. See id. at 98.  Consequently, the court correctly found § 413.30(e) to be ambiguous since it "is not drawn in blacks and whites but leaves significant grey areas unresolved." Id. at 98; cf. Walton, 122 S. Ct. at 1269-70 ("provision [that] says nothing explicitly about" the "'precise question at issue'" in case is ambiguous).  More recently, the Ninth Circuit in the case of Providence Health System v. Thompson, 353 F.3rd 661, (9th Cir. 2003) (Exhibit I-21) held that "the plain language of 42 C.F.R. § 413.30(e) does not clearly address whether Summitview's ownership of the bed rights it transferred to Providence constitute previous ownership."  The Ninth Circuit was persuaded by *Paragon Health Network v. Thompson, and South Shore Hospital v. Thompson* holding that the interplay of "provider" and "previous ownership" renders the regulation inherently ambiguous as to the critical issue in this case."

Because a "provider" may be only a portion of an institution that may not have any independent legal identity, traits associated with an institution as a unified whole do not necessarily apply to a "provider."  Indeed, the fact that a provider may only be a collection of segregable tangible and intangible assets within a health care institution that are used to render a particular type of patient care suggests that "provider" should be defined by its attributes.  Because changing some attributes (such as staff or equipment) would not transform the provider into a different provider, such a definition necessarily requires that a line be drawn to separate those attributes that are essential to the meaning "provider" and those that are not.  As Paragon, South Shore, and Providence recognize, the necessity of

drawing this line without explicit textual guidance from § 413.30(e) renders the regulation ambiguous.

Although a divided panel of the Fourth Circuit in <u>Maryland General Hospital v. Thompson</u>, 308 F.3d 340, 346 (4th Cir. 2002)(Exhibit I-22), has held that § 413.30(e) unambiguously uses "provider" to refer to the "business institution that is providing the skilled nursing services," the court's erroneous ruling should not be followed here. <u>Ashtabula County Medical Center v. Thompson</u> 352 F.3d 1090 (6th Cir. 2003)(Exhibit I-23) is similar. There the Court found the question of the regulations ambiguity to be "a very close call."

<u>Maryland General</u> rests its holding largely on an interpretive provision (PRM § 2604.1) that describes a provider in loose terms as an "institution," <u>see</u> 308 F.3d at 344, but the court fails to recognize that this provision does not purport to explain the meaning of "provider" or "institution" and only refers to these terms indirectly. <u>Ashtabula</u> on the other hand recognized the absence of a definition of the term "provider" yet could not conclude that section 413.30(e) was ambiguous given the ordinary meaning of the word "provider" and the manner in which it is used in the regulation.

In <u>Maryland General</u>, the court's reliance on the statutory definition of a provider of services, 42 U.S.C. § 1395x(u), to support its view that a provider is a "business entity or institution," 308 F.3d at 344-45, also fails to recognize that terms (like SNF) used in that definition are subject to further definition -- definitions which make clear that a provider may only be a <u>part</u>

of such an entity or institution.  The Court in <u>Ashtabula</u> never reaches this question. Moreover, while <u>Maryland General</u> does correctly note that the ambiguities in "provider" that were identified by <u>Paragon</u> do not exist if one construes "provider" to mean an entire institution or facility, <u>id.</u> at 345, the court reaches this result by defining the term to resolve ambiguity, not because the term on its own is unambiguous.  In short, as the First Circuit has held, <u>Maryland General</u>'s analysis of § 413.30(e)'s ambiguity is "unpersuasive."  <u>See</u> <u>South Shore</u>, 308 F.3d at 98 n.4.8

Absent clear guidance from the regulatory text, there are multiple ways to interpret the "previous ownership" of a "provider."  One method focuses on the legal personhood of an institutional entity and ownership of the facility as a whole.  This approach, however, does not account for the fact that traits adhering to an institution as a whole are not essential to the definition of a "provider" because a "provider" may be only a "distinct part" of the institution. Moreover, this approach, which is used by the <u>Ashtabula</u> district court and upheld by the circuit court leads to absurd results. Under <u>Ashtabula</u>'s reading of section 413.30(e), "[t]he relevant inquiry is simply whether a second, new institution has come into existence as a result of [a] transaction," and because Ashtabula County Medical Center's "SNF did not exist until [Ashtabula] purchased the CON rights from [a nursing facility], it qualified as a new

---

8 The Fourth Circuit's errors may have been the result of the panel majority's decision to base its ruling on a question that was not adequately briefed to it.  Because the hospital in <u>Maryland General</u> had conceded that the Secretary's general interpretation of § 413.30(e) was permissible, the government did not brief the question of textual ambiguity to the court and instead addressed the hospital's argument that the Secretary's lawful interpretation applied only to "operational" bed rights and could not extended to the transfer of "waiver" bed rights at issue in the case.  <u>Cf.</u> <u>Maryland Gen.</u>, 308 F.3d at 346 n.2; <u>id.</u> at 349 & n.1 (dissenting opinion).

provider." 191 F. Supp. 2d at 892-93. This reasoning applies equally to situations where a SNF keeps only its name and corporate identity and sells off its physical plant, all of its assets, and its staff to a buyer that proceeds to use these items to operate a facility that provides nursing care under a new name and corporate identity. The "institution" that emerges from this sale came into existence as a result of the transaction and thus would be "new" under Ashtabula's reasoning. However, such a result undermines the very function of section 413.30(e)'s "previous ownership" inquiry, which is intended to exclude from the definition of "new provider" those providers that have operated under "previous ownership" for more than three years. The Secretary thus has properly rejected this "constricted interpretation" of the regulation, see Ashtabula County Med. Ctr. v. Blue Cross & Blue Shield, No. 2000-D70, 2000 WL 875714, at *7 (PRRB June 29, 2000), which finds no support in logic and is not compelled by the plain language of section 413.30(e).

A second, better approach recognizes that an institution (or a distinct part of an institution) is merely a fictional legal entity that in truth is composed of many constituent elements. Under this view, one could consider the ownership of the parts making up the facility when one examines the "previous ownership" of the provider. The fact that the text of section 413.30(e) does not unambiguously reflect a choice between these two views illustrates that the regulation does not directly address, and is ambiguous with respect to, the issue in this case.

2.    THE SECRETARY HAS PERMISSIBLY CONSTRUED THE AMBIGUITY IN
      HIS REGULATION.

Confronted with this ambiguity in 42 C.F.R. § 413.30(e), the Secretary has adopted a
reasonable construction that interprets the "previous ownership" of a "provider" in light of
the attributes that are essential to the meaning of "provider" as found in §2604.1 of the
Provider Reimbursement Manual, Part 1. The Board is obliged to give these instructions and
the Secretary's interpretation of his regulation controlling weight because the Secretary's
construction of his own regulation is not inconsistent with the purpose of the new provider
exemption and is supported by both considerations of policy and equity.

Section 1500 of the PRM, Part 1, asserts that the disposition of all or some of an institution
or institutional complex or its assets used to render patient care is a change of ownership for
purposes of Medicare reimbursement.  More specifically, the Secretary has defined such a
disposition as all or some portion of an institution or an institutional complex or its assets
(used to render patient care) through sale, scrapping, involuntary conversion, demolition or
abandonment if the disposition affects licensure or certification.

A certificate of need (e.g., the right to operate) is an asset used to render patient care that
directly effects licensure and certification of a provider entity.9  If an owner is granted the
right to operate "new beds," or its equivalent, directly from the State, the requirement to look

---

9 The CMS Administrator has ruled in the case of Mercy Medical Skilled Nursing Facility,
PRRB No. 2002-D-31 decided October 8, 2002, that a CON is an asset used to render patient
care and that a CON transfer constitutes a change of ownership transaction for purposes of
determining whether the Provider qualifies for an exemption as a new provider.

{D0092431.DOC / 1}28

at the "previous owners operations" is not triggered by the regulation, except where the State is reallocating or selling a CON or its equivalent itself that was used to operate a pre-existing institution. However, where the right to operate, or its equivalent, is for example, purchased, leased or abandoned by an existing institution, the regulation requires CMS to consider the "operation" of the institution under "previous ownership." Neither of these interpretations is inconsistent with the underlying purpose of the regulation.

The Social Security Amendments of 1972 (P.L. 92-603) added §1122 to the Social Security Act ("the Act") to ensure that neither the Medicare nor Medicaid program would support the construction of unneeded health facilities. Then, in an effort to improve health, access, costs, and prevent unnecessary duplication of health care facilities, Congress passed the National Health Planning and Resources Development Act of 1974 (P.L. 93-641) which established federal oversight and the continued development of certificate of need programs (CON) requiring approval for new beds and services. Thus, Congress established a link between health financing and health planning in an effort to ensure the rational allocation of health care resources while controlling total health care spending. By 1980, all states had adopted a CON program. The States added moratoria to their CON programs beginning in the early 1980's. Federal involvement in certificate of need programs continued through 1986, at which time P.L. 93-641 expired. Thereafter, the States became responsible unto themselves for such activities.

CON programs are in effect cost-control strategies that introduce supply constraints to the

marketplace.  In this case the supply constraint is the number of beds that are allowed to

operate in a given health service area.  Thus, the number of years that a state has had a CON

program or moratorium in place has been found to be associated with higher occupancy rates

and less bed growth.  See, <u>State Data Book on Long Term Care Program and Market</u>

<u>Characteristics</u>, Health Care Financing Administration, Extramural Report, August 1994.

Moreover, "the availability of open-ended, third-party reimbursement gives providers

substantial control over demand, resulting in a high correlation between bed supply and

occupancy.  CON programs also allow existing nursing homes to maintain their market share

and, at the same time, can help obtain higher occupancy rates, which lowers per resident

costs."**10**  In 1998, 13 states had both a CON and moratorium, 6 states had only a nursing

facility moratorium (with no CON) and 25 states had a CON only.  This left only seven states

with neither a CON nor a moratorium in 1998, located primarily in the western region of the

United States.**11**


Where an institution is acquired in a CON or non-CON state, the CON or its equivalent is

typically conferred through the licensure process, thus there will always be an affect on

licensure and certification, even where the institution has ceased operating and/or suspended

operations.  Where a CON or its equivalent is purchased from an existing institution, the new

owner acquires either an entire institution or a portion thereof.  None of the pre-existing

---

10 "Controlling the Supply of Long-Term Care Providers at the State Level," Joshua M. Wiener, David G, Stevenson and Susan M. Goldenson, The Urban Institute.
11 <u>1998 State Data Book on Long Term Care Program and Market Statistics</u>, Harrington, Swan, Wellin, Clemena and Carrillo, Department of Social & Behavioral Science, University of California & Department of Health Services Organization and Policy, Wichita State University, November 1999.

institutions, or parts thereof, is a new institution; they simply have a new owner. Thus, CMS' interpretation of its regulation protects the program from "gaming" of the system through the redistribution of the right to operate nursing home beds, or its equivalent, where the prior owner has operated in the manner of a SNF or its equivalent. Of course, where the institution under prior ownership has not operated in the manner of a SNF or its equivalent, the exemption provision may apply. Thus the Secretary's interpretation of the regulation demonstrates that he has carefully weighed the purpose of the new provider exemption, under 42 C.F.R. § 413.30(e), against a policy that strongly discourages unwarranted Medicare payments.

A "change of ownership" is a "term of art in the Medicare context" which has different meanings in different situations. See South Shore, 308 F.3d at 99 & n.5, 100. The types of CHOWs identified in § 1500 of the PRM "are not intended to define changes of ownership for purposes of determining * * * the continuation of the provider agreement," or in other contexts. See 42 C.F.R. § 489.18(a), (c) (defining CHOWs that trigger automatic assignment of provider agreement).

3.    **THE RECORD DOES NOT SUPPORT A DETERMINATION OF "PRIMARILY ENGAGED" UNDER PAST OR PRESENT OWNERSHIP**

The D.C. Circuit, in the case of St. Elizabeth v Thompson, 396 F.3d 1228 (D.C. Circuit 2005) (Exhibit I-24) held that an institution must be "primarily engaged" in the provision of skilled nursing and related services or rehabilitative services to meet the definition of a SNF set forth in Section 1819(a)(1) of the Act. CMS never determines whether or not a facility is "primarily engaged" for purposes of survey and certification or for that matter for purposes of

reimbursement in the manner prescribed by the Court.  Indeed, a SNF can file a no utilization cost report and still remain certified as a SNF.

However, the term "primarily engaged" has since been defined by the Courts, in the case of Milton v Thompson, 377 F. Supp. 2d 17 (DDC 2005) (Exhibit I-25) and S.C. Management, Inc. v Leavitt, Case No. 1:05CV12 CDP, United States District Court, Eastern District of Missouri, Southeastern Division, November 9, 2005 (Exhibit I-26) as requiring that over one-half of a facility's entire operation be occupied on a regular basis by residents receiving skilled nursing and related services or rehabilitative services.  As the D.C. Circuit held, the only way to determine if a facility has operated as a SNF or its equivalent is to look beyond the facility's defined capabilities and examine the quantity of SNF services actually provided. So while Chapman TCU may have been licensed to provide SNF services on December 7, 1995, no such determination as to whether or not Chapman TCU or its predecessor Greenlawn Nursing Home has been undertaken applying the "primarily engaged" standard set forth in St. Elizabeth's.  Thus the record does not support a determination that in fact there was a change in the operation of the nursing home under past _or_ present ownership to that of a SNF, irregardless of its certification in the Medicare program.

Unfortunately, given the Board's decision not to postpone this case, the response received by the Intermediary from Chapman TCU regarding its discovery request on December 8, 2005 did not afford the Intermediary sufficient time to review approximately 430,000 pages of medical records pertaining to 2,155 patients at the Provider, as stated Chapman TCU in response to the Intermediary's response (Exhibit I-27 and I-28).  Moreover, while the Intermediary understands that the medical records for Greenlawn Nursing Home may not be in Chapman TCU's possession, Article 7, Section 7.01 of the Agreement dated March 31, 1995 between Jordan Hospital, Inc. and Shirely Dion, indicates that at all times, the

{D0092431.DOC / 1}32

Hospital's duly authorized representative shall be entitled to have access to and to make copies of such books and record relating to the Contracted Services with respect to periods prior to the date hereof.

4.    WHY IS CHAPMAN TCU EXCEEDING THE SKILLED NURSING FACILITUY ROUTINE SERVICE COST LIMITS?

CMS informed Chapman TCU in its determinations that Chapman TCU should seek relief from the effect of the imposition of the skilled nursing facility routine service cost limits through the exception process. Relief from the cost limits for the provision of atypical services is provided for under the exception provision found at 42 C.F.R. 413.30(f).  As stated at 42 C.F.R. 413.30(f), limits under this section may be adjusted upward for a provider under the circumstances specified only to the extent the costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary.  An exception may be granted if an institution can demonstrate that it has a lower than average length of stay, higher than average ancillary cost per day and higher than average Medicare utilization than that of its peers.  CMS utilizes a uniform peer group that is based on data from SNFs whose costs are used to compute the cost limits when assessing atypical status.

Chapman TCU requested and received relief from the effects of the skilled nursing facility routine service cost limits through the exception provision due to the provision of atypical services in the amount of $62.33 per day for the cost reporting year ended September 30, 1998, a total of $324,615 in addition to the SNF RCL (Exhibit I-29). Chapman TCU demonstrated that it provides atypical services since it has a lower than average length of stay compared to its peers (that is hospital-based SNFs in urban areas), a higher than average

{D0092431.DOC / 1}33

ancillary cost per day and higher than average Medicare utilization. All factors it attempts to portray as relevant to an exemption request. Yet, none of these factors are relevant to a determination of an exemption request.

F.     CONCLUSION

In view of the foregoing, Chapman TCU failed to demonstrate that it met the requirements to be exempt from the application of the skilled nursing facility routine service cost limits for the cost reporting period ended September 30, 1998. The record lacks any evidence that the standard established in St. Elizabeth's has been met under past *or* present ownership. Therefore, in consideration of the facts in this case, the Board must find that HCFA properly adhered to Medicare law, regulation and program instructions by affirming the denial by HCFA of the provider's request for an exemption.

IV.    CITATION OF PROGRAM LAWS, REGULATIONS AND INSTRUCTIONS

    A.    LAW:

        42 U.S.C. § 1395x(v)(1)(A)--Reasonable Cost.
        § 1819(a)(1) of the Social Security Act
        § 1888(d) of the Social Security Act

    B.    REGULATIONS--42 C.F.R.:

        § 400.202--Definitions specific to Medicare.
        § 409.33 (a), (b) and (c)--Examples of Skilled Nursing and Rehabilitation Services.
        § 413.9--Costs related to patient care.
        § 413.30--Limitations of Reimbursable Costs.
        § 413.35--Limitation on coverage of costs: Charges to beneficiaries if cost limits applied to services.
        § 440.40—Nursing facility services for individuals age 21 or older (other than services in an institution for mental disease), EPSDT, and family planning services and supplies.

    C.    PROGRAM INSTRUCTIONS:

        Provider Reimbursement Manual, Part I:

        § 1500--Change of Ownership--General
        § 2202.6--Routine Services
        § 2203.1--Routine Services in SNFs
        § 2531--Provider Requests Regarding Applicability of Cost Limits
        § 2533--Requests Regarding New Provider Exemption
        § 2604.1--Definitions.  New Provider

        Skilled Nursing Facility Manual

        §134--Admission of Medicare Patients for Care and Treatment

        Intermediary Manual:

        § 3159--Custodial Care

D.    CASE LAW:

*Larkin Chase Nursing and Restorative Center v Donna E. Shalala, Secretary, Department of Health and Human Services*, Civil Action 99-00214 (HHK), U.S. District Court for the District of Columbia, February 16, 2001

*Paragon Health Network, Inc., d/b/a Milwaukee Subacute Center a/k/a Milwaukee Suabacute and Rehabilitation Center v. Tommy G. Thompson, Secretary, Department of Health and Human Services*, 251 F.3rd 1141 (7th Cir. 2001)

*South Shore Hospital, Inc. v Thompson*, 308 F.3d 91 (1st Cir. 2002)

*Providence Health System v. Thompson*, 353 F.3rd 661 (9th Cir. 2003)

*Maryland General Hospital, Inc. v Thompson*, 308 F.3d 340, 346 (4th Cir. 2002)

*Ashtabula County Medical Center v. Thompson*, 352 F.3d 1090 (6th Cir. 2003)

*St. Elizabeth's v. Thompson*, 396 F.3d 1228 (D.C. Circuit 2005)

*Milton v Thompson, 377 F. Supp.* 2d 17 (DDC 2005)

*S.C. Management, Inc. v Leavitt*, Case No. 1:05CV12 CDP, United States District Court,  Eastern District of Missouri, Southeastern Division, November 9, 2005

*Homemakers North Shore, Inc. v Bowen*, 832 F2d. 408 (7th Cir. 1987)

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**

VIA FACSIMILE

Arthur E. Peabody, Jr., Esq.
Blue Cross Blue Shield Association          MAR 2 8 2007
1310 G. Street, NW
Washington, DC 20005

Re: Jordan Hospital, PRRB Dec. No. 2007-D23

Dear Mr. Peabody:

This is to notify you that comments have been received from the Center for Medicare Management requesting review of the above captioned PRRB decision involving whether the Intermediary's denial of the Provider's new provider exemption request from the routine cost limits for its provider-based skilled nursing facility was proper. Accordingly, this case will before the Administrator, CMS, for review within the next few weeks.

Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments. The Board's decision will be review in light of prior decisions of the Administrator and relevant court decisions.  The governing regulation published at 42. CFR 405.1875 explains the procedures in conducting final agency review of decisions made by the Board. You have a right to submit comments within 15 days of your receipt of this letter. **If you do submit comments, we would appreciate your faxing them to this office at (410) 786-0043 so as to expedite review.**

An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision.  I will promptly send you a copy of the decision after it has been rendered.

Sincerely,

Jacqueline R. Vaughn
Attorney Advisor

cc: Barbara Straub Williams, Provider's Representative
    Center for Medicare Management, CMS

PLAINTIFF'S EXHIBIT 6